# Exhibit A (Declaration of Effie Anastassiou)

```
                        Cinelli.ROUGHD~1.TXT
Rough Draft - 1                 NONCERTIFIED ROUGH DRAFT

                1          UNEDITED TRANSCRIPTION DISCLAIMER

                2

                3        THE FOLLOWING TRANSCRIPT OF PROCEEDINGS, OR ANY

                4    PORTION THEREOF, IS BEING DELIVERED UNEDITED AND

                5    UNCERTIFIED BY THE COURT REPORTER.

                6        THE PURCHASER AGREES NOT TO DISCLOSE THIS UNEDITED

                7    TRANSCRIPTION IN ANY FORM (WRITTEN OR ELECTRONIC) TO

                8    ANYONE WHO HAS NO CONNECTION TO THIS CASE.  THIS IS AN

                9    UNOFFICIAL TRANSCRIPTION WHICH SHOULD NOT BE RELIED UPON

               10    FOR PURPOSES OF VERBATIM CITATION OF TESTIMONY.

               11        THIS TRANSCRIPTION HAS NOT BEEN PROOFREAD.  IT IS A

               12    DRAFT TRANSCRIPT, NOT A CERTIFIED TRANSCRIPT.  AS SUCH,

               13    IT MAY CONTAIN COMPUTER-GENERATED MISTRANSLATIONS OF

               14    STENOTYPE CODE OR ELECTRONIC TRANSMISSION ERRORS,

               15    RESULTING IN INACCURATE OR NONSENSICAL SYMBOLS WHICH

               16    CANNOT BE DECIPHERED BY NONSTENOTYPISTS.

               17        CORRECTIONS WILL BE MADE IN THE PREPARATION OF THE

               18    CERTIFIED TRANSCRIPTION, RESULTING IN DIFFERENCES IN

               19    CONTENT, PAGE AND LINE NUMBERS, PUNCTUATION, AND

               20    FORMATTING.

               21

               22

               23

               24

               25


Rough Draft - 2                      NONCERTIFIED ROUGH DRAFT

                1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

                2               COUNTY OF SAN BENITO

                3
                                  Page 1
```

Cinelli.ROUGHD~1.TXT

4

5    SNOW SEED CO., A CALIFORNIA CORPORATION,

6            PLAINTIFF(S),

7        VS.                                    CASE NO.

8    CU0700149

9    FRESH 'N HEALTHY, INC., ET AL.,

10           DEFENDANT(S).

11   _____/

12

13

14

15

16              DEPOSITION OF STEVEN A. CINELLI

17

18

19

20       THE FOLLOWING DEPOSITION WAS GIVEN ON THE 11TH OF

21   MARCH, 2008, COMMENCING AT THE HOUR OF 9:15 A.M., BEFORE

22   ELIZABETH ALDRICH, CERTIFIED SHORTHAND REPORTER, LICENSE

23   NUMBER 6100.

24       THE WITNESS PERSONALLY APPEARED AT 242 CAPITOL

25   STREET, SALINAS, CALIFORNIA.

Rough Draft - 3                    NONCERTIFIED ROUGH DRAFT

1                          INDEX

2    EXAMINATION BY:                              PAGE

3       ATTYNAME                                  PG#

4       ATTYNAME                                  PG#

5

6

7    DEPOSITION EXHIBITS:                         PAGE

8    EX#ORLETTER        EXDESC                    PG#

                         Page 2

```
                     Cinelli.ROUGHD~1.TXT
     9   EX#ORLETTER        EXDESC                      PG#

    10   EX#ORLETTER        EXDESC                      PG#

    11   EX#ORLETTER        EXDESC                      PG#

    12   EX#ORLETTER        EXDESC                      PG#

    13   EX#ORLETTER        EXDESC                      PG#

    14

    15

    16

    17

    18   APPEARANCE PAGE                                PG#

    19   DEPONENT'S SIGNATURE PAGE                      PG#

    20   REPORTER'S CERTIFICATE PAGE                    PG#

    21

    22

    23

    24

    25
Rough Draft - 4                    NONCERTIFIED ROUGH DRAFT

     1                        APPEARANCES

     2

     3   FOR PLAINTIFF, SNOW SEED:

     4            EFFIE F. ANASTASSIOU, ESQ.

     5            ANASTASSIOU & ASSOCIATES

     6            242 CAPITOL STREET

     7            SALINAS, CA 93901

     8            TELEPHONE:  831-754-2501

     9            FAX:  831-754-0621

    10            EMAIL  EFFIEESQ@SALINASAGLAW.COM

    11

    12   FOR PARTY NAME     :

    13            ATTORNEYNAME

    14            FIRM (OPTIONAL)
                         Page 3
```

Cinelli.ROUGHD~1.TXT

15      ADDRESS1

16      CITY STATE ZIP

17      TELEPHONE:  PHONE

18      FAX:  FAX

19      EMAIL  EMAIL (OPTIONAL)

20

21

22

23

24

25

Rough Draft - 5                    NONCERTIFIED ROUGH DRAFT

1                    SALINAS, CALIFORNIA

2             TUESDAY, MARCH 11, 2008, 9:15 P.M.

3                        --oOo--

4                    STEVEN A. CINELLI,

5      FIRST DULY SWORN BY THE CERTIFIED SHORTHAND REPORTER,

6      ELIZABETH ALDRICH, TO TELL THE TRUTH, THE WHOLE TRUTH,

7      AND NOTHING BUT THE TRUTH, TESTIFIED AS FOLLOWS:

8                        EXAMINATION

9      BY MS. ANASTASSIOU:

10         Q.  PLEASE STATE YOUR NAME FOR THE RECORD?

11         A.  STEVEN A CINELLI, C-I-N-E-L-L-I.

12         Q.  AND WHAT IS YOUR CURRENT RESIDENCE ADDRESS?

13         A.  24605 HEATHER HEIGHTS ROAD.

14         Q.  SPELL THAT, HEATHER HEIGHTS?

15         A.  HEATHER, H-E-A-T-H-E-R.  HEIGHTS,

16      H-E-I-G-H-T-S, ROAD, R-O-A-D.  SARATOGA.  95070.

17         Q.  AND YOU HAVE A RESIDENCE PHONE NUMBER?

18         A.  408, 741, 8004.

19         Q.  WHAT IS YOUR CURRENT BUSINESS ADDRESS?

Page 4

Cinelli.ROUGHD~1.TXT

20    A.   I USE THE HOME PRIMARILY.

21    Q.   SO YOU HAVE NO OTHER PLACE OF BUSINESS OTHER

22  THAN YOUR HOME ADDRESS?

23    A.   CORRECT.

24    Q.   OKAY.  DO YOU HAVE A BUSINESS PHONE NUMBER?

25    A.   I USE 415, 710, 2700.

Rough Draft - 6                    NONCERTIFIED ROUGH DRAFT

1    Q.   IS THAT DIFFERENT FROM YOUR CELL PHONE?

2    A.   NO THAT IT IS.

3    Q.   SO THAT IS YOUR CELL AND BUSINESS PHONE NUMBER?

4    A.   I USE THAT AS MY PRIMARY BUSINESS CONTACT.

5    Q.   AND THEN DO YOU HAVE A FAX NUMBER?

6    A.   845, 839, 8456.

7    Q.   OKAY.

8    A.   YOU WANT MY EMAIL ADDRESS?

9    Q.   YEAH.  LET'S CONFIRM?

10    A.   SACINELLI AT PRESTWICKPARTNERS, WHICH

11  P-R-E-S-T-W-I-C-K, PARTNERS DOT-COM.

12        MS. ANASTASSIOU:  OKAY.  LET'S MARK THIS AS THE

13  FIRST EXHIBIT HERE.

14        (EXHIBIT SC-1 MARKED.)

15        MS. ANASTASSIOU:  SO I AM HANDING THE WITNESS A

16  DOCUMENT THAT WE HAVE MARKED AS SC-1.  SC-1.  AND IT'S

17  CALLED DID NOTICE OF TAKING DEPOSITION OF DEFENDANT

18  STEVE CINELLI AND REQUEST FOR PRODUCTION OF DOCUMENTS.

19  AND IT IS A DOCUMENT THAT'S APPROXIMATELY 11 PAGES.  IF

20  YOU CAN TAKE A LOOK AT THAT DOCUMENT, SIR, AND LET ME

21  KNOW WHEN YOU ARE READY FOR QUESTIONS.

22        THE WITNESS:  OKAY.

23  BY MS. ANASTASSIOU:

24    Q.   OKAY.  THIS DOCUMENT THAT'S MARKED SC NO. 1

25  INDICATES IT WAS SERVED ON YOU BY BOTH MAIL AND EMAIL TO

Page 5

Cinelli.ROUGHD~1.TXT

NONCERTIFIED ROUGH DRAFT

1    THE ADDRESSES YOU HAVE IDENTIFIED ON FEBRUARY 20TH, 2008

2    BY MY SECRETARY.  YOU DID RECEIVE THIS DEPO NOTICE PRIOR

3    TO TODAY; IS THAT CORRECT?

4         A.  CORRECT.

5         Q.  AND THERE ARE A NUMBER OF DOCUMENTS HERE THAT

6    ARE REFERENCED THAT YOU ARE TO BRING TO YOUR DEPOSITION.

7    DID YOU GO THROUGH THE DOCUMENT REQUESTS WHICH LISTED --

8         A.  TWO THINGS, THE PREPONDERANCE OF THE DOCUMENTS

9    LIE ON THE COMPANY SERVER, COMPUTER SERVER, AND AS PART

10   OF THE ENTIRE WIND DOWN OF THE BUSINESS, AN OUTSIDE

11   CONSULTANT HAS DOWNLOADED THE PREPONDERANCE, WELL, THE

12   CONTENT OF THE SERVER ONTO A DISK.  I HAVE NOT RECEIVED

13   THAT IS OF YET.

14        Q.  WHEN ARE YOU ANTICIPATING THAT YOU ARE GOING TO

15   GET THAT DISK?

16        A.  I'M -- ANY TIME.  THE CHALLENGE IS THAT IT'S ON

17   A PARTICULAR SOFTWARE PROGRAM WHICH WE DON'T HAVE, SO

18   THEY'VE GOT TO OBTAIN A NEW COPY OF THE SOFT WARE

19   PACKAGE TO BASICALLY RETRIEVE THE PREPONDERANCE,

20   PARTICULARLY THE FINANCIAL RECORDS.

21        Q.  WHO IS THE CONSULTANT THAT IS WORKING ON --

22        A.  RUSSELL BURBANK.  I BELIEVE YOU SPOKE TO HIM

23   YESTERDAY.

24        Q.  SO HE'S THE ONE THAT IS DOWNLOADING THE

25   DOCUMENTS?

NONCERTIFIED ROUGH DRAFT

1         A.  THAT'S CORRECT.

2         Q.  AND --

3         A.  SOME OF THE CORPORATION DOCUMENTS I HAVE

4    REQUESTED COPIES FROM THE ATTORNEYS WE USED IN THE

                        Cinelli.ROUGHD~1.TXT
     5  ORIGINAL TRANSACTION.

     6      Q.  OKAY.  SO LET'S JUST GO -- SO SOME OF THEM ARE

     7  BEING DOWNLOADED FROM THE SERVER BY RUSSELL BURBANK,

     8  WHEN DO YOU ANTICIPATE YOU ARE GOING TO GET --

     9      A.  I BELIEVE HE HAS IT ON DISK I HAVE NOT RECEIVED

    10  THE DISK FROM HIM.  BUT THE DISK, UNLESS WE HAVE THE

    11  APPROPRIATE SOFTWARE IS BASICALLY UNREADABLE.  SO

    12  RUSSELL IS ATTEMPTING TO OBTAIN A COPY OF THE SOFTWARE

    13  WHEREBY THE CONTENT OF WHAT WAS ON THE SERVER IS

    14  READABLE.

    15      Q.  WHAT'S THIS SOFTWARE THAT YOU NEED?

    16      A.  FAMOUS.  I BELIEVE IT'S A STANDARD IN THIS

    17  INDUSTRY.

    18      Q.  OKAY.  AND THEN YOU SAID SECOND THERE WERE

    19  DOCUMENTS THAT WITH WITH ATTORNEYS?

    20      A.  THAT'S CORRECT.

    21      Q.  WHO ARE THE ATTORNEYS?

    22      A.  BAKER AND MCKENZIE.

    23      Q.  AND WHAT PARTICULAR ATTORNEY AND FROM WHAT

    24  LOCATION OF BAKER & MCKENZIE?

    25      A.  THE PARTNER IN CHARGE WAS MARIA SENDRA.
Rough Draft - 9                   NONCERTIFIED ROUGH DRAFT

     1      Q.  SPELL?

     2      A.  S-E-N-D-R-A.  SHE RUNS THE CORPORATE SECURITY

     3  PRACTICE FOR SOUTHERN CALIFORNIA.

     4      Q.  WHERE IS HER OFFICE?

     5      A.  IN SAN DIEGO.

     6      Q.  DO YOU KNOW THE ADDRESS?

     7      A.  NO, NOT OFF THE TOP.  IN FACT,, I MAY.  I LEFT

     8  MY BLACKBERRY IN THE CAR.  THAT I CAN RETRIEVE THAT FOR

     9  YOU.

    10      Q.  MAYBE ON A BREAK IF YOU WOULD GO GET BLACK
                        Page 7

Cinelli.ROUGHD~1.TXT

11    BERRY.  WHEN IS SHE GOING TO GET YOU A COPY OF THOSE

12    CORPORATE?

13         A.  HOPEFULLY MOMENTARILY.

14         Q.  LIKE WITHIN THE NEXT DAY OR SO?

15         A.  UH-HUH.

16         Q.  AND?

17         A.  AND I'VE GOT SOME COPIES, BUT WHAT I WANTED TO

18    DO IS PUT EVERYTHING TOGETHER IN ONE PACKAGE.

19         Q.  SO YOU HAVE SOME PERSONAL COPIES AT HOME?

20         A.  YES, OF SOME OF THE DOCUMENTS REQUESTED HERE.

21         Q.  BUT YOU HAVEN'T PUT THEM ALL TOGETHER?

22         A.  NO, I WAS HOPING TO PULL EVERYTHING, PRIMARILY

23    THE FINANCIAL RECORDS WHICH BURBANK HAS, BUT YOU SOME OF

24    THE OTHER DOCUMENTS SUCH AS THE TRANSACTION DOCUMENTS,

25    GOURMET VEG-PAQ I'VE GOT CERTAIN COPIES OF THOSE.

Rough Draft - 10                    NONCERTIFIED ROUGH DRAFT

1    CERTAINLY THE BAKER & MCKENZIE HAS THE BYLAWS, THEY HAVE

2    THE ALL THE CHARTER DOCUMENTS.  I DO HAVE THAT I JUST

3    RECEIVED COPIES OF THE CHECKING ACCOUNT STATEMENTS.  BUT

4    ALL THE FINANCIAL RECORDS LIE ON THAT SOFTWARE PROGRAM.

5         Q.  OKAY WELL AT THE END OF THE DEPOSITION WE WILL

6    TALK ABOUT WHEN YOU MIGHT GET THOSE RECORDS, BECAUSE WE

7    WILL NEED TO RESCHEDULE ANOTHER DEPO TO GO THROUGH ALL

8    THOSE WITH YOU.

9              AND OTHER THAN RECORDS THAT YOU HAVE AT HOME,

10   RECORDS AT BAKER & MCKENZIE, AND RECORDS THAT BURBANK IS

11   GOING TO GATHER, WHERE ARE THE OTHER CORPORATE RECORDS

12   RELATING TO FRESH 'N HEALTHY?

13        A.  SUCH AS?

14        Q.  SUCH AS THE ORDINARY TRANSACTIONS THAT THEY

15   HAD, I MEAN THAT KEPT AT THE BUSINESS OFFICE WHERE DID

Cinelli.ROUGHD~1.TXT

16    THOSE RECORDS GO?

17        A.   I WOULD ANTICIPATE THEY WOULD ALL BE ON THE

18    SERVER.

19        Q.   BUT COULDN'T THERE BE PAPER FILES THAT THEY

20    WOULD ALSO HAVE AT THE CORPORATE OFFICE?

21        A.   BURBANK HAS ALL THOSE.  HE'S GOT BOXES OF

22    DOCUMENTS.

23        Q.   SO RUSSELL BURBANK HAS ALL THE CORPORATE --

24        A.   YES.

25        Q.   -- DOCUMENTS?

Rough Draft - 11                    NONCERTIFIED ROUGH DRAFT

1        A.   HE PULLED THE CORPORATE DOCUMENTS SUCH AS

2    INVOICES, SUCH AS PAYABLE LISTINGS, SUCH AS GENERAL

3    LEDGERS, OUT OF THE CORPORATE OFFICE I GUESS A COUPLE OF

4    WEEKS AGO AND THEY ARE IN BOXES AND I BELIEVE THEY ARE

5    IN BURBANK'S POSSESSION.

6        Q.   OKAY.  ANY OTHER PLACE THAT YOU KNOW OF WHERE

7    THERE IS CORPORATE RECORDS?

8        A.   THE ONLY OTHER PLACE MIGHT BE AT THE LAW OFFICE

9    OF MURRAY AND MURRAY WHO IS HANDLING THE WIND DOWN OF

10    THE COMPANY.

11        Q.   WAS MURRAY & MURRAY RETAINED BY FRESH 'N

12    HEALTHY?

13        A.   IT WAS SUGGESTED BY THE BANK TO RETAIN MURRAY &

14    MURRAY.  BUT THE COMPANY IS ACTUALLY PAYING MURRAY &

15    MURRAY, THE SAME THING WITH BURBANK, THE BANK ASKED TO

16    GET BURBANK OR AN ALTERNATIVE INTO THE SITUATION OF

17    WHICH THE COMPANY PAYS BURBANK BUT IT'S REALLY UNDER THE

18    ORCHESTRATION OF THE BANK.

19        Q.   WHERE IS THE COMPANY GETTING THE FUNDS TO PAY

20    THE LAW FIRM AND RUSSELL BURBANK?

21        A.   LARGELY FROM THE COLLECTION OF RECEIVABLES

Cinelli.ROUGHD~1.TXT

22    WHICH HAVE BEEN ESSENTIALLY ASSIGNED TO THE BANK.

23        Q.    SO ARE YOU AWARE THAT THERE WAS AN INJUNCTION

24    IN PLACE PURSUANT TO A NORTHERN DISTRICT COURT ORDER

25    REQUIRING ALL THE RECEIVABLES TO GO INTO AN ACCOUNT?
Rough Draft - 12                NONCERTIFIED ROUGH DRAFT

1        A.    STEVE O'NEILL WHO REPRESENTS, WHO IS

2    REPRESENTING THE COMPANY AT MURRAY & MURRAY, HE'S BEEN

3    IN -- I WOULD IMAGINE HE AND THE BANK ARE AWARE OF THAT.

4    THAT'S AN ASSUMPTION ON MY PART.

5        Q.    ARE YOU PERSONALLY AWARE OF THE INJUNCTION?

6        A.    I CAN'T SAY THAT I AM.

7        Q.    OKAY.  WE WILL TALK ABOUT THAT LATER.

8        A.    AS YOU KNOW THERE HAS JUST BEEN A FLOOD OF

9    LEGAL DOCUMENTS.

10        Q.    OKAY.  SO THEN I THINK WE HAVE GONE THROUGH, SO

11    THERE IS DOCUMENTS WITH RUSSELL BURBANK, DOCUMENTS WITH

12    BAKER & MCKENZIE SOME PERSONAL DOCUMENTS THAT YOU HAVE

13    AT HOME, AND DOCUMENTS AT THE LAW OFFICES OF MURRAY &

14    MURRAY.  AND WHO IS THE PERSON --

15        A.    STEVEN O'NEILL.

16        Q.    STEVEN O'NEILL THAT WOULD HAVE THE DOCUMENTS.

17    ANY OTHER PLACE WHERE CORPORATE DOCUMENTS --

18        A.    I DON'T BELIEVE SO.

19        Q.    I'D LIKE TO GO BACK INTO SOME BACKGROUND

20    INFORMATION ABOUT YOURSELF.

21        A.    SURE.

22        Q.    WHEN DID YOU GRADUATE FROM HIGH SCHOOL?

23        A.    1974.

24        Q.    AND WHAT HIGH SCHOOL DID YOU ATTEND?

25        A.    SAINT IGNATIUS IN SAN FRANCISCO.
Rough Draft - 13                NONCERTIFIED ROUGH DRAFT

                              Cinelli.ROUGHD~1.TXT
1        Q.   COULD YOU SPELL THAT?

2        A.   SAINT I-G-N-A-T-I-U-S.

3        Q.   AND AFTER YOU GRADUATED FROM SAINT IGNATIUS,

4    DID YOU ATTEND COLLEGE?

5        A.   YES, SANTA CLARA UNIVERSITY.

6        Q.   AND DID YOU GET A DEGREE FROM SANTA CLARA?

7        A.   THAT'S CORRECT.

8        Q.   WHEN DID YOU GET THAT?

9        A.   1978.

10       Q.   WHAT WAS THE DEGREE IN?

11       A.   ECONOMICS AND MARKETING.

12       Q.   AND AFTER YOU GOT WAS THAT A BA OR BS?

13       A.   IT'S CALLED A BS.  BACHELOR OF SCIENCE IN

14   COMMERCE.

15       Q.   AND AFTER YOU GOT YOUR BS DID YOU GO ON GET A

16   GRADUATE DEGREE?

17       A.   I ENDED UP GETTING A MASTER'S IN INTERNATIONAL

18   FINANCE WITH GOLDEN GATE UNIVERSITY IN SAN FRANCISCO.

19       Q.   AND WHEN DID YOU GET THAT?

20       A.   1980.

21       Q.   ANY OTHER COLLEGE DEGREES THAT YOU GOT?

22       A.   NOT DEGREES, I DID SOME EDUCATION OVER AT

23   BERKELEY, UC-BERKELEY.

24       Q.   IN WHAT AREA?

25       A.   ECONOMICS.
Rough Draft - 14                    NONCERTIFIED ROUGH DRAFT


1        Q.   WHEN DID YOU ATTEND UC-BERKELEY?

2        A.   '82, '83 IT WAS SOME EXTENSION COURSES.

3        Q.   ANY OTHER COLLEGE EDUCATION THAT YOU HAVE HAD?

4        A.   NO.

5        Q.   AND SINCE YOU GOT YOUR MASTER'S IN FINANCE AT

6    GOLDEN GATE UNIVERSITY, COULD YOU DESCRIBE YOUR
                         Page 11

Cinelli.ROUGHD~1.TXT

7      POSITIONS OF EMPLOYMENT?

8          A.   I BEGAN MY CAREER WITH BANK OF AMERICA IN THEIR

9      MANAGEMENT TRAINING PROGRAM.

10         Q.   WAS THAT IN SAN FRANCISCO?

11         A.   CORRECT.

12         Q.   AND HOW LONG DID YOU WORK FOR THEM?

13         A.   FROM 1978 THROUGH 1984.

14         Q.   AND WHAT WAS YOUR POSITION WHEN YOU LEFT BANK

15     OF AMERICA?

16         A.   I WAS A VICE PRESIDENT IN THEIR TECHNOLOGY BANK

17     GROUP.

18         Q.   AND AFTER THAT POSITION WHAT WAS YOUR NEXT

19     POSITION?

20         A.   I WAS RECRUITED AWAY BY SECURITY PACIFIC BANK.

21     AND BECAME A VICE PRESIDENT IN THEIR MERCHANT BANKING

22     GROUP.

23         Q.   WAS THAT ALSO IN SAN FRANCISCO?

24         A.   THAT'S CORRECT.

25         Q.   HOW LONG DID YOU WORK THERE?

Rough Draft - 15              NONCERTIFIED ROUGH DRAFT

1          A.   UNTIL I BELIEVE 1990.

2          Q.   SO THAT WAS 1984 TO 1990?

3          A.   CORRECT.

4          Q.   AND THEN WHAT WAS YOUR NEXT POSITION OF

5      EMPLOYMENT?

6          A.   THEN I JOINED A PRIVATE EQUITY FIRM BY THE NAME

7      OF THE KNIGHTSBRIDGE PARTNERS.

8          Q.   SPELL THAT?

9          A.   K-N-I-G-H-T-S-B-R-I-D-G-E PARTNERS.

10         Q.   WHERE WAS THAT LOCATED?

11         A.   HOME BASE WAS CHICAGO, BUT THE OFFICE OUT WEST

Cinelli.ROUGHD~1.TXT
12    COAST WAS IN SAN RAFAEL, CALIFORNIA.

13        Q.  WHAT WAS YOUR POSITION WITH THEM?

14        A.  PRINCIPAL.

15        Q.  WHAT WAS YOUR DUTIES AND RESPONSIBILITIES WITH

16    KNIGHTSBRIDGE PARTNERS?

17        A.  IT WAS A LEVERAGE BUYOUT FIRM TO LOOK FOR NEW

18    OPPORTUNITIES AND I SAT ON A SERIES OF BOARDS OF

19    COMPANIES THAT HAD BEEN ACQUIRED BY KNIGHTSBRIDGE.

20        Q.  AND HOW LONG DID YOU WORK FOR KNIGHTSBRIDGE

21    PARTNERS?

22        A.  I THINK ABOUT THREE YEARS.

23        Q.  SO 1990 TO 1993?

24        A.  CORRECT.

25        Q.  THEN WHAT DID DO YOU AFTER THAT?

Rough Draft - 16                    NONCERTIFIED ROUGH DRAFT

1        A.  BEGAN DOING INDEPENDENT ADVISORY ASSIGNMENTS.

2        Q.  DID YOU HAVE A CONSULTING FIRM?

3        A.  PRESTWICK PARTNERS I SET UP IN 1992.  AND

4    THAT'S PRESTWICK PARTNERS, INC..

5        Q.  AND IS IT PRESTWICK PARTNERS NOW THAT YOU AN

6    LLC OR INC.?

7        A.  LLC WHILE IT WAS CREATED IT WAS NEVER AN

8    OPERATING ENTITY.  WE WERE AT ONE TIME LOOKING AT THAT

9    TO HOLD INVESTMENT SECURITIES BUT WE NEVER DID.

10        Q.  THE LLC?

11        A.  THAT'S CORRECT.  SO LLC DOES NOT EXIST.

12        Q.  THE LLC DOES NOT EXIST?

13        A.  CORRECT.

14        Q.  AND SO PRESTWICK PARTNERS INC. YOU SAY WAS

15    FORMED IN 1992?

16        A.  THAT'S CORRECT.

17        Q.  AND WHO IS THE OWNERS PRESTWICK PARTNERS, INC.?

Page 13

Cinelli.ROUGHD~1.TXT

```
18    A.  MYSELF PERSONALLY.
19    Q.  SO IT'S JUST --
20    A.  CORRECT.
21    Q.  -- A SOLE --
22    A.  CORRECT.
23    Q.  -- PROPRIETORSHIP SO THE SPEAK?
24    A.  CORRECT.
25    Q.  OKAY.  AND THAT IS STILL OPERATING TODAY?
```

Rough Draft - 17                    NONCERTIFIED ROUGH DRAFT

```
 1    A.  THAT'S CORRECT.
 2    Q.  AND WHERE IS THE OFFICES FOR PRESTWICK PARTNERS
 3  INC.?
 4    A.  CURRENTLY JUST AT MY HOME.  ANY ADVISORY WORK
 5  OR INVESTMENTS I MAKE I MAKE THROUGH PRESTWICK PARTNERS.
 6    Q.  SO YOU STARTED PRESTWICK PARTNERS IN 1992 AND
 7  THAT CONTINUES TO 2008, TO TODAY RIGHT?
 8    A.  YES.  IN THE MEANTIME I'VE STARTED A COUPLE OF
 9  COMPANIES INDEPENDENTLY.
10    Q.  OKAY.  AND SO OTHER THAN PRESTWICK PARTNERS,
11  WHAT OTHER --
12    A.  I WAS A FOUNDER TKOER OF A COMPANY BY THE NAME
13  OFFROAD CAPITAL.
14    Q.  SPELL THAT?
15    A.  O-F-F-R-O-A-D.  CAPITAL.  AND THAT WAS FORMED
16  IN 1999.  THROUGH I BELIEVE 2002.
17    Q.  AND WHAT WAS THE BUSINESS OF OFFROAD CAPITAL?
18    A.  WE HAD DESIGNED AN INTERNET BASED CAPITAL
19  MARKET SYSTEM FOR PRIVATE SECURITIES.  OF WHICH I'M A
20  HOLDER OF THE PATENT.
21    Q.  SO THERE WAS A PATENT, AND THEN WAS --
22    A.  I DON'T KNOW IF THE PATENT WAS EVER FINALIZED.
```

Page 14

Cinelli.ROUGHD~1.TXT

23    YOU CAN STILL PULL UP THE PATENT AND FIND IT ON THE WEB.

24         Q.   THERE IS A PATENT, AND DID OFFROAD CAPITAL DO

25    ANY BUSINESS OTHER THAN CREATING THE PATENT?

Rough Draft - 18                    NONCERTIFIED ROUGH DRAFT

1         A.   YEAH, OFFROAD, WE RAN THE COMPANY FROM TWO OF

2    US TO ABOUT 250 PEOPLE.  I WAS THE FOUNDER THAT WAS

3    OUSTED BECAUSE OF DIFFERENT STRATEGY.  THE COMPANY HAD

4    RAISED ABOUT $80 MILLION IN CAPITAL.  AND THEY TOOK IT

5    IN THE DIRECTION WHICH WAS ILL-ADVISED ENDED UP SELLING

6    IT FOR A SMALL AMOUNT OF MONEY.

7         Q.   WHEN WERE YOU OUSTED IN 2002?

8         A.   EARLY PART OF THE YEAR.

9         Q.   OF 2002?

10        A.   YES.

11        Q.   AND DOES THAT COMPANY STILL EXIT?

12        A.   VESTIGES OF IT BACK IN NEW YORK BY THE COMPANY

13    IT WAS ACQUIRED BY.

14        Q.   DOES IT STILL EXIST UNDER THE NAME OF OFFROAD

15    CAPITAL?

16        A.   I BELIEVE SO.

17        Q.   AND THAT WAS A NEW YORK BASED COMPANY?

18        A.   NEW YORK BASED COMPANY BY THE NAME OF NEW YORK

19    PRIVATE PLACEMENT EXCHANGE ACQUIRED THE ASSETS.

20        Q.   AND YOU SAID IT RAMPED UP TO $80 MILLION?

21        A.   NO.  $80 MILLION OF CAPITAL WAS RAISED INTO

22    OFFROAD CAPITAL BY SOME OF THE LEADING VENTURE CAPITAL

23    FIRMS.

24        Q.   WHAT DID THEY DO WITH THAT 80 MILLION OF

25    CAPITAL.

Rough Draft - 19                    NONCERTIFIED ROUGH DRAFT

1         A.   THEY BUILT THE BUSINESS.

2         Q.   DOING WHAT?

Cinelli.ROUGHD~1.TXT

        3       A.  BUILDING A TECHNOLOGY PLATFORM, CREATING A
        4   SALES FORCE, CREATING AN INVESTMENT GROUP.
        5       Q.  WHAT DID THEY SELL?
        6       A.  IT WAS A MARKETPLACE SUCH AS A STOCK EXCHANGE
        7   FOR THE BUYING AND SELLING OF UNREGISTERED SECURITIES.
        8       Q.  DOES THAT MARKETPLACE STILL EXIST?
        9       A.  NO.
       10       Q.  AND YOU SAID THAT VESTIGES OF OFFROAD CAPITAL
       11   STILL EXIST AND WHAT IS THAT ENTITY DOING NOW?
       12       A.  IT IS I BELIEVE SELLING SECURITIES UNDER THE
       13   OFFROAD CAPITAL NAME.
       14       Q.  AS A BROKER?
       15       A.  YES.
       16       Q.  AS A REGISTERED BROKER?
       17       A.  YES.
       18       Q.  AND WAS THIS OFFROAD CAPITAL, WAS IT EVER
       19   LISTED THE --
       20       A.  NO.
       21       Q.  -- ON EXCHANGE OR ANYTHING?
       22       A.  NO.
       23       Q.  AND THEN AFTER YOU LEFT OFFROAD CAPITAL WHAT
       24   WAS YOUR NEXT VENTURE?
       25       A.  I WENT BACK INTO PRIVATE ADVISORY WORK WITH A
Rough Draft - 20              NONCERTIFIED ROUGH DRAFT

        1   SERIES OF SMALL PRIVATE COMPANIES.
        2       Q.  WHEN YOU SAY PRIVATE ADVISORY WORK, WHAT DO YOU
        3   MEAN BY THAT?
        4       A.  DOING A COMBINATION OF STRATEGIC PLANNING,
        5   CORPORATE DEVELOPMENT AND INVESTMENT BANKING.
        6       Q.  WHO WERE YOUR CLIENTS?
        7       A.  TYPICALLY EARLY STAGE TECHNOLOGY COMPANIES.
                        Page 16

Cinelli.ROUGHD~1.TXT

8          Q.   AND THAT'S WHAT PRESTWICK PARTNERS HAS BEEN

9     INVOLVED WITH FROM ITS --

10         A.   CORRECT.

11         Q.   -- INCEPTION?

12         A.   INCEPTION, THAT'S CORRECT.

13         Q.   HAVE THEY BEEN MOSTLY SILICON VALLEY COMPANIES?

14         A.   PREPONDERANTLY, YES.

15         Q.   AND CAN YOU NAME ANY OF THE COMPANIES THAT YOU

16    DID WORK FOR?

17         A.   LET'S SEE.   SOME WERE SILICON VALLEY COMPANIES,

18    TECHNOLOGY BASE, THERE WAS COMPANY ORCO WHICH WAS A

19    BUILDING SUPPLIER, MOKA PAY, WHICH IS A MOBILE PAYMENT

20    SERVICE.   CHINA BLUE, WHICH WAS A FOOD COMPANY.   LA

21    PETITE BOULANGERIE, WHICH IS A RESTAURANT CHAIN.   CARR

22    GOTTSTEIN FOOD WHICH WAS A GROCERY CHAIN BY WHICH I MET

23    MARK WILLIAMS.   SAVE MART MARKET WHICH WAS A GROCERY

24    CHAIN.   THERE IS PROBABLY HALF A DOZEN OTHERS.   I CAN'T

25    RECALL.

Rough Draft - 21                    NONCERTIFIED ROUGH DRAFT

1          Q.   WHAT WERE TECHNOLOGY COMPANIES YOU SAID YOU

2     WERE WORKING FOR?

3          A.   MOKA PAY IS A TECHNOLOGY COMPANY.   SO MOBILE

4     PAYMENTS.   CURRENTLY THERE IS A COMPANY Z DEGREE

5     INTERACTIVE WHICH IS ASOCIAL NETWORKING COMPANY.   LET'S

6     SEE, WHAT ELSE IS -- ACTIVA WHICH IS AN ONLINE

7     REGISTRATION AND PAYMENT BUSINESS.

8          Q.   HAVE YOU EVER HAD OFFICES FOR PRESTWICK

9     PARTNERS?

10         A.   YES.

11         Q.   WHERE WERE THE OFFICES BEEN LOCATED?

12         A.   BOTH IN SAN FRANCISCO AND PALO ALTO.

13         Q.   DID YOU EVER HAVE ANY EMPLOYEES WORKING FOR

                          Page 17

Cinelli.ROUGHD~1.TXT

14    YOU?

15         A.   TEMPORARIES.   AND THE TEMPORARIES WOULD BE

16    SECRETARIAL SERVICES.

17         Q.   SO YOU NEVER HAD ANY OTHER BUSINESS EXECUTIVES

18    OR ANYTHING LIKE THAT --

19         A.   NO.

20         Q.   -- WORKING FOR YOU?

21         A.   NO.   UNDER OFFROAD I DID.

22         Q.   UNDER OFFROAD BUT NOT AT --

23         A.   NOT AT PRESTWICK.

24         Q.   WHERE WERE YOUR OFFICES LOCATED IN SAN

25    FRANCISCO FOR PRESTWICK?

Rough Draft - 22                    NONCERTIFIED ROUGH DRAFT

1          A.   DOWN ON -- THERE WERE A COUPLE OF OFFICES, ONE

2     OF WHICH WAS 50 CALIFORNIA STREET, AND IN PALO ALTO, IT

3     WAS, I CAN'T REMEMBER THE NUMBER, HILLVIEW AVENUE.

4          Q.   WAS THAT A SOLE OFFICE OR DID YOU SHARE?

5          A.   I SHARED OFFICE SPACE.

6          Q.   OKAY.   AND AT 50 CALIFORNIA?

7          A.   I SHARED OFFICE SPACE.

8          Q.   WITH WHO?

9          A.   I SUBLET FROM, WHO WAS THE FIRM, IT WAS ANOTHER

10    BANKING FIRM, I'LL REMEMBER IT.

11         Q.   IN PALO ALTO?

12         A.   SHARED OFFICES WITH GARAGE DOT-COM OR GARAGE

13    TECHNOLOGY VENTURES.

14         Q.   WHEN DID YOU HAVE THE OFFICE IN SAN FRANCISCO

15    APPROXIMATELY?

16         A.   PROBABLY, OH, '94 THROUGH '96, '97.

17         Q.   WHAT ABOUT THE OFFICE IN PALO ALTO?

18         A.   2005, 2006.

Page 18

                         Cinelli.ROUGHD~1.TXT
19        Q.   OKAY.   AND THEN OTHER THAN THESE OPERATIONS

20    WITH PRESTWICK PARTNERS, HAVE YOU HAD ANY OTHER

21    INVOLVEMENT IN BUSINESSES PRIOR TO FRESH 'N HEALTHY?

22        A.   I BELIEVE I JUST ILLUSTRATED THE BUSINESSES

23    I'VE HAD.

24        Q.   RIGHT.   HAVE YOU HAD ANYTHING ELSE?   I MEAN YOU

25    HAD INDICATED THAT I GUESS YOU HAD WORKED FOR OFFROAD

Rough Draft - 23                  NONCERTIFIED ROUGH DRAFT

1     CAPITAL?

2         A.   YES.

3         Q.   AND THEN THAT WAS TERMINATED IN WHAT DID YOU

4     SAY, '92?

5         A.   2002.

6         Q.   SO YOU WERE OFFROAD CAPITAL FROM 1999 TO 2002?

7         A.   CORRECT.

8         Q.   AND THEN AFTER THAT YOU SAID YOU WENT BACK TO

9     JUST DOING MAINLY PRESTWICK PARTNERS.   AND I'M JUST

10    ASKING IS THERE ANYTHING ELSE --

11        A.   NO.

12        Q.   -- OTHER THAN PRESTWICK PARTNERS --

13        A.   NO.

14        Q.   -- THAT YOU'VE DONE SINCE THAT TIME?

15        A.   NO.

16        Q.   AND SO HOW DID YOU COME TO GET INVOLVED IN THE

17    COMPANY KNOWN AS FRESH 'N HEALTHY?

18        A.   A FELLOW BANKER FROM NEW YORK HAD CALLED ME

19    REGARDING SOME FOOD SAFETY OR ACTUALLY FOOD TECHNOLOGY.

20        Q.   WHAT'S THE NAME OF THE BANKER?

21        A.   LARRY KNUTSON.

22        Q.   CAN YOU SPELL HIS NAME?

23        A.   K-N-U-T-S-O-N.

24        Q.   AND HE IS AN INVESTMENT BANKER?
                         Page 19

Cinelli.ROUGHD~1.TXT

25        A.  YES.
Rough Draft - 24                    NONCERTIFIED ROUGH DRAFT

1        Q.  AND HE CALLED YOU ABOUT SOME FOOD SAFETY

2   TECHNOLOGY?

3        A.  UH-HUH.  WHICH WAS PARTIALLY DEVELOPED ON THE

4   WEST COAST AND THROUGH LARRY I WAS INTRODUCED TO JACK

5   PARSON.

6        Q.  WHEN DID YOU FIRST MEET JACK PARSON?

7        A.  IT HAD TO BE PROBABLY JANUARY 2006.

8        Q.  HOW DID THAT INTRODUCTION TO JACK PARSON LEAD

9   TO YOUR INVOLVEMENT IN FRESH 'N HEALTHY?

10        A.  JACK PARSONS WAS A PARTNER IN A FIRM BY THE

11   NAME OF PREMIUM FRESH FARMS.

12        Q.  YES?

13        A.  AS PART OF THE CONVERSATION WITH PARSONS, HE

14   AND HIS PARTNER, EMMETT POST, WERE HAVING DIFFICULTIES

15   WITH THE OTHER SHAREHOLDERS OF PREMIUM FRESH FARMS, AND

16   ASKED IF I WOULD INTERCEDE AND ASSIST PARSONS AND POST

17   DO ACQUIRE THE OTHER 50 PERCENT OF PREMIUM FRESH FARMS.

18        Q.  AND DID YOU DO THAT?

19        A.  I DID NOT.  I DID INSTIGATE A CONVERSATION, DID

20   PUT TOGETHER A SERIES OF PROPOSALS, TRYING TO

21   FINANCIALLY ENGINEER A TRANSACTION.

22        Q.  AND THEN WHAT HAPPENED?

23        A.  BOTH SIDES DECIDED TO CONTINUE TO PLAY

24   TOGETHER, IT WAS OBVIOUS THEY NEEDED SOME MANAGEMENT

25   ASSISTANCE, AND AT THAT TIME I HAD CALLED MARK WILLIAMS,
Rough Draft - 25                    NONCERTIFIED ROUGH DRAFT

1   WHO HAD SINCE RETIRED, TO SEE IF HE WAS INTERESTED IN

2   GETTING INVOLVED IN PREMIUM FRESH FARMS.  HE CAME IN AS

3   A CONSULTANT.  HIRED BY PREMIUM FRESH.  THAT LED TO A

Page 20

Cinelli.ROUGHD~1.TXT

4    REVIEW OF THE MARKET THAT PREMIUM FRESH CONDUCTED THEIR

5    BUSINESS NAMELY THE PACKAGED GREENS BUSINESS, LETTUCE,

6    SPINACH, SPRING MIX.  THROUGH 2006 TIME FRAME, WE LOOKED

7    AT A SERIES OF OTHER COMPANIES WITH THE OBJECTIVE OF

8    PUTTING TOGETHER A CONSOLIDATION STRATEGY.

9         Q.   AND YOU ARE SAYING WE, IS THAT --

10        A.   MARK WILLIAMS AND I.

11        Q.   AND PREMIUM FRESH FARMS OR NO?

12        A.   PREMIUM FRESH WAS GOING TO BE PART OF THE

13   CONSOLIDATION STRATEGY.  THE FIRST PIECE.

14        Q.   AND THEN --

15        A.   WHEN WE -- FRESH 'N HEALTHY WAS SET UP AS THE

16   DESIGNATED ACQUIRER OF PREMIUM.

17        Q.   WAS THAT FRESH 'N HEALTHY INC. OR FRESH 'N

18   HEALTHY LLC?

19        A.   INC..

20        Q.   WHAT ABOUT FRESH 'N HEALTHY LLC THAT'S

21   LISTED --

22        A.   I DON'T KNOW WHAT THAT IS.

23        Q.   JACK PARSON IS LISTED AS THE REGISTERED OWNER

24   OF THAT?

25        A.   HE MAY HAVE SET THAT UP INDEPENDENTLY.  I HAVE

Rough Draft - 26                    NONCERTIFIED ROUGH DRAFT

1    NO IDEA WHAT THAT IS.

2         Q.   SO YOU'VE NEVER BEEN INVOLVED WITH FRESH 'N

3    HEALTHY LLC?

4         A.   THAT'S CORRECT.

5         Q.   AND SO WHO SET UP FRESH 'N HEALTHY INC. THEN TO

6    BE AN ACQUIRING COMPANY?

7         A.   BAKER & MCKENZIE.

8         Q.   AND WHO WERE THE INITIAL SHAREHOLDERS OF FRESH

9    'N HEALTHY INC.?

Page 21

Cinelli.ROUGHD~1.TXT

10        A.   THERE WERE MYSELF, MARK WILLIAMS, JACK PARSON,

11   MARK MCCORMICK.   TOM PAVICH.   THERE WAS A LIST OF

12   PROBABLY ABOUT SIX OR SEVEN FOUNDERS.

13        Q.   HOW WAS THAT CAPITALIZED?

14        A.   DE MINIMUSLY.   LARGELY IT WAS SWEAT EQUITY.

15        Q.   WAS THERE ANY MONEY PUT INTO THE COMPANY WHEN

16   IT WAS FORMED BY THOSE --

17        A.   LIMITED.   PROBABLY TEN TO $15,000 TO ADDRESS

18   LEGAL BILLS.   BUT IT WAS ESSENTIALLY A SHELL COMPANY AT

19   THE TIME.

20        Q.   SO IT WAS TEN TO $15,000 PUT IN INITIALLY INTO

21   THE COMPANY.   AND DID EACH PERSON CONTRIBUTE PRO RATA

22   OR --

23        A.   NO, I BELIEVE I FUNDED IT.   AND THEN AGAIN IT

24   WAS BASICALLY EXPENSES.

25        Q.   WHAT WAS THE INITIAL GOAL OF FRESH 'N HEALTHY,

Rough Draft - 27                    NONCERTIFIED ROUGH DRAFT

1    INC?

2         A.   TO SERVE AS THE ACQUIRER OF NOT ONLY PREMIUM

3    FRESH FARMS BUT WE HAD IDENTIFIED THROUGH JACK PARSON

4    GOURMET VEG-PAQ.   AND THE ORIGINAL INTENTION WAS TO

5    ACQUIRE BOTH PREMIUM FRESH FARMS AND GOURMET VEG-PAQ

6    UNDER FRESH 'N HEALTHY, INC.   WE LOOKED AT A SERIES OF

7    OTHER COMPANIES TO DO THE SAME THING.   THE CHALLENGE WAS

8    IN THE CONSOLIDATION OF THE TWO AND TRYING TO FINANCE

9    THE TWO ACQUISITIONS SIMULTANEOUSLY WAS THAT PREMIUM

10   FRESH FARMS' FINANCIAL PROGRESSION WAS DESPERATELY WEAK.

11   GOURMET VEG-PAQ WAS A HEALTHY BUSINESS.   AND THE

12   DIFFICULTY WITH PREMIUM FRESH MADE THE FINANCING

13   DIFFICULT TO COME BY.   SO IN THE FALL OF 2006, I MADE A

14   DECISION JUST TO ACQUIRE GOURMET VEG-PAQ, LEAVING

Page 22

Cinelli.ROUGHD~1.TXT

15  PREMIUM FRESH FARMS OUT OF THE PICTURE.

16      Q.  AND YOU SAID THAT JACK PARSON WAS INVOLVED IN

17  PREMIUM FRESH?

18      A.  THAT'S CORRECT.

19      Q.  DID HE STAY INVOLVED IN PREMIUM FRESH?

20      A.  I BELIEVE SO.  I THINK HE WAS WEARING TWO HATS.

21      Q.  SO HE STAYED INVOLVED IN PREMIUM FRESH AND YOU

22  SAID WILLIAMS WAS WORKING AS A CONSULTANT FOR THEM?

23      A.  THAT'S CORRECT.

24      Q.  AND THEN DID HE TERMINATE THAT CONSULTING

25  ARRANGEMENT?

Rough Draft - 28                    NONCERTIFIED ROUGH DRAFT

1       A.  HE DID, HE DID.

2       Q.  WERE YOU WORKING AS A CONSULTANT FOR THEM ALSO?

3       A.  NO.

4       Q.  ONLY WILLIAMS?

5       A.  YEAH.  I RECEIVED AS PART OF MY ATTEMPTS TO

6   FACILITATE THE ACQUISITION OF THE OTHER 50 PERCENT THAT

7   PARSON AND POST DID NOT OWN HE HAD GIVEN ME A MINORITY

8   POSITION IN THE LEGAL ENTITY THAT OWNED THEIR

9   50 PERCENT.  SO INDIRECTLY, I BECAME A SHAREHOLDER OF

10  PREMIUM FRESH FARMS.

11      Q.  DO YOU STILL HAVE THAT POSITION?

12      A.  YES.

13      Q.  AND THAT WAS GIVEN TO YOU BY JACK AND EMMETT?

14      A.  THAT'S CORRECT.

15      Q.  AND YOU SAID THAT YOU DECIDED TO ACQUIRE

16  GOURMET VEG-PAQ BECAUSE YOU FELT IT WAS IN GOOD

17  FINANCIAL CONDITION?

18      A.  THAT'S CORRECT.

19      Q.  AND WHAT WAS THE DILIGENCE THAT WAS DONE TO

20  DETERMINE THAT?

Page 23

Cinelli.ROUGHD~1.TXT

21      A.   REVIEW OF FINANCIAL DATA, REVIEW OF CUSTOMER

22   LISTS, WE HAD PARSON AND OTHER PARTIES WALK THROUGH THE

23   FARMS, LOOKING AT, YOU KNOW, CORPORATE RECORDS.  LOOKING

24   AT TAX RETURNS.  SPENDING A GOOD DEAL OF TIME WITH

25   GOURMET VEG-PAQ'S ACCOUNTANT TO UNDERSTAND THE FINANCIAL

Rough Draft - 29                  NONCERTIFIED ROUGH DRAFT

1    POSITION AND THE OPERATIONS.

2        Q.   WHO IS THEIR AACCOUNTANT?

3        A.   CHUCK DOGLIONE.

4        Q.   SPELL?

5        A.   D-O-G-L-I-O-N-E.

6        Q.   WAS HE AN OUTSIDE CPA OR --

7        A.   YES, HE WAS.  HIS FIRM IS KASAVAN AND POPE.

8        Q.   HERE IN SALINAS?

9        A.   THAT'S CORRECT.

10       Q.   AND THEN DID YOU HAVE AN APPRAISAL DONE OF THE

11   GOURMET VEG-PAQ EQUIPMENT?

12       A.   YES.

13       Q.   WHO DID THE APPRAISAL?

14       A.   I CAN'T RECALL, BUT IT WAS FACILITATED BY A

15   THIRD-PARTY AGENT THAT WAS ASSISTING IN THE

16   FUND-RAISING, AND THAT COMPANY WAS BLUE DIAMOND CAPITAL.

17       Q.   WHERE ARE THEY LOCATED?

18       A.   UP IN THE PACIFIC NORTHWEST.

19       Q.   AND HOW DID IT COME TO BE THAT --

20       A.   MAY I GET A LITTLE BIT MORE COFFEE?

21            MS. ANASTASSIOU:  SURE.  I SHOULD JUST TELL YOU

22   THE RULES OF A DEPOSITION.  I FORGOT TO EXPLAIN THOSE TO

23   YOU, THAT YOU CAN ASK FOR A BREAK AT ANY TIME, AS CAN I

24   OR THE COURT REPORTER, AND SO WE CAN TAKE A BREAK RIGHT

25   NOW.

Rough Draft - 30              NONCERTIFIED ROUGH DRAFT
                                  Page 24

Cinelli.ROUGHD~1.TXT

```
1           (BREAK.)
2   BY MS. ANASTASSIOU:
3       Q.   SO YOU SAID BLUE DIAMOND CAPITAL ARRANGED FOR
4   THE APPRAISAL OF THE GOURMET VEG-PAQ EQUIPMENT?
5       A.   THAT'S CORRECT.
6       Q.   AND WHEN WAS THAT APPRAISAL DONE?
7       A.   I WOULD IMAGINE THE FALL OF '06.
8       Q.   AND YOU SAID YOU WERE ALSO LOOKING AT PREMIUM
9   FRESH, DID THEY ALSO DO AN APPRAISAL OF --
10      A.   YEAH, IT WAS DONE SIMULTANEOUSLY.
11      Q.   THERE WERE TWO APPRAISALS DONE OR --
12      A.   ONE APPRAISAL CONSOLIDATING BOTH EQUIPMENT
13  ASSETS.
14      Q.   OF BOTH PREMIUM FRESH AND GOURMET VEG-PAQ?
15      A.   THAT'S CORRECT.
16      Q.   AND WHAT WAS BLUE DIAMOND CAPITAL'S ROLE YOU
17  SAID THEY HAD SOME INVOLVEMENT IN FINANCING?
18      A.   YEAH, BUT THEY DIDN'T DO ANYTHING.  I HELD SOME
19  DISCUSSIONS WITH THEM, THEY FACILITATED THE APPRAISAL,
20  BUT THEY WERE -- THEY DIDN'T ACCOMPLISH ANYTHING, SO WE
21  DIDN'T DO ANY BUSINESS TOGETHER.
22      Q.   OTHER THAN THEY FACILITATED THE APPRAISAL?
23      A.   THAT'S CORRECT.
24      Q.   AND YOU DON'T REMEMBER WHO THE APPRAISER WAS?
25      A.   I DO NOT.
```

Rough Draft - 31                    NONCERTIFIED ROUGH DRAFT

```
1       Q.   AND THE ASSETS OF GOURMET VEG-PAQ THAT WERE
2   APPRAISED, WHERE WERE THEY LOCATED?
3       A.   IN GILROY, HOLLISTER AND EL CENTRO.
4       Q.   AND WAS THERE ALSO ANY REAL ESTATE THAT WAS
5   APPRAISED OR JUST EQUIPMENT?
```

Cinelli.ROUGHD~1.TXT

6      A.  REAL ESTATE, THE EL CENTRO PLANT AS WELL AS THE

7  HOLLISTER PLANT.

8      Q.  SO THOSE TWO FACILITIES WERE OWNED BY GOURMET

9  VEG-PAQ?

10     A.  THAT'S CORRECT.

11     Q.  AND WHY DON'T YOU JUST DESCRIBE, WHAT WAS IN

12  GILROY AT THE TIME YOU WERE LOOKING AT THIS ENTITY FOR

13  PURCHASE, GOURMET VEG-PAQ?

14     A.  THERE WAS A LEASED OFFICE BUILDING, AND THEN

15  MISCELLANEOUS FARM EQUIPMENT.

16     Q.  AND THAT OFFICE BUILDING WAS WHAT, A FARM

17  OFFICE OR A SALES OFFICE OR WHAT?

18     A.  MR. MARTINEZ, THE OWNER OF GOURMET VEG-PAQ,

19  MAINTAINED HIS OFFICE THERE, AS WELL AS THE ACCOUNTING

20  DEPARTMENT.

21     Q.  AND THEN YOU SAID THAT THERE WAS A FARM

22  EQUIPMENT YARD THERE?

23     A.  YES.

24     Q.  HOW BIG WAS THE OFFICE, FAIRLY SMALL?

25     A.  YES.              NONCERTIFIED ROUGH DRAFT

Rough Draft - 32

1      Q.  LIKE HOW MANY SQUARE FEET APPROXIMATELY?

2      A.  8,000, 10,000.

3      Q.  SQUARE FEET OF OFFICE SPACE?

4      A.  YEAH, PROBABLY.  MAYBE NOT THAT BIG, MAYBE

5  5,000.  I'M NOT A GOOD JUDGE OF THAT.

6      Q.  OKAY.  AND THAT WAS A LEASED OFFICE BUILDING

7  AND WAS THAT OWNED BY MR. MARTINEZ PERSONALLY?

8      A.  I BELIEVE IT WAS.  I BELIEVE IT WAS.

9      Q.  AND THEN IN HOLLISTER, WHAT WAS IN HOLLISTER AT

10  THE TIME YOU LOOKED?

Page 26

Cinelli.ROUGHD~1.TXT

11      A.   THAT WAS THEIR PROCESSING PLANT, THEIR NORTHERN

12   PROCESSING PLANT.

13      Q.   WERE THERE ALSO OFFICES THERE?

14      A.   NO.

15      Q.   SO THERE WAS A PROCESSING PLANT, WAS THERE A

16   PLACE FOR SHIPPING AND RECEIVING PRODUCE?

17      A.   YES.

18      Q.   A COOLER?

19      A.   HAD A COOLER, YOU KNOW, TWO PROCESSING LINES.

20   IT WAS A BIG FACILITY, PROBABLY 40,000 SQUARE FEET.

21   OWNED ALSO BY MR. MARTINEZ.

22      Q.   SO THAT WAS OWNED BY HIM PERSONALLY?

23      A.   YES.

24      Q.   AND WERE THERE OFFICES THERE FOR QUALITY

25   CONTROL PEOPLE AND PEOPLE RUNNING --

Rough Draft - 33                  NONCERTIFIED ROUGH DRAFT

1      A.   THEY HAD QA PEOPLE.  THEY HAD PRODUCTION

2   PEOPLE.  AND I GUESS SALES AND RECEIVING PEOPLE.

3      Q.   SALES AND RECEIVING?

4      A.   YEAH.

5      Q.   WAREHOUSE PEOPLE?

6      A.   CORRECT.

7      Q.   LOAD THE PRODUCE?

8      A.   THAT'S CORRECT.

9      Q.   BUT THEIR SALES OFFICE WAS LOCATED WHERE AT THE

10   TIME?

11      A.   I THINK, I BELIEVE, YOU KNOW, MARK WILLIAMS

12   WOULD HAVE A BETTER SENSE, HE WAS OPERATING THE

13   BUSINESS, I BELIEVE THERE WERE SALESPEOPLE BOTH AT THE

14   HOLLISTER FACILITY AS WELL AS THE DAVIDSON FACILITY.

15      Q.   THAT IS IN GILROY?

16      A.   YEAH.  I BELIEVE THAT'S THE CASE.

Page 27

Cinelli.ROUGHD~1.TXT

17        Q.   AND THAT WAS AT THE TIME IT WAS BEING OPERATED

18  BY GOURMET VEG-PAQ?

19        A.   THAT'S CORRECT.

20        Q.   AND THEN WHAT WAS THE EL CENTRO FACILITY?

21        A.   THAT WAS A SOUTHERN PROCESSING PLANT.  FOR THE

22  WINTER SEASON.

23        Q.   AND WAS IT SIMILAR TO THE HOLLISTER FACILITY OR

24  SMALLER OR LARGER?

25        A.   IT WAS SMALLER, IT WAS SMALLER.

Rough Draft - 34                    NONCERTIFIED ROUGH DRAFT

1         Q.   AND DID THEY ALSO HAVE THE SAME THING, A

2  COOLER, A --

3         A.   CORRECT.

4         Q.   -- PROCESSING LINES?  HOW MANY PROCESSING

5  LINES?

6         A.   I THINK THERE WERE TWO PROCESSING LINES DOWN

7  THERE.

8         Q.   AND WAS THERE ALSO SALES STAFF THAT --

9         A.   I BELIEVE THE SALES MAINTAINED UP IN NORTHERN,

10  STILL UP IN GILROY.  BUT DURING THE WINTER SEASON, ALL

11  THE GROWING OF CROPS AND PROCESSING TOOK PLACE DOWN IN

12  EL CENTRO.

13        Q.   AND THEN YOU SAID THAT YOU WERE ALSO AT THE

14  TIME YOU WERE LOOKING AT THIS ACQUISITION OF GOURMET

15  VEG-PAQ LOOKING AT PREMIUM FRESH FARMS, A POTENTIAL

16  ACQUISITION OF THAT IN TANDEM?

17        A.   CORRECT.

18        Q.   WHAT WERE YOU LOOKING TO ACQUIRE FROM PREMIUM

19  FRESH?

20        A.   THE OPERATING BUSINESS.

21        Q.   AND ALSO ANY FACILITIES?

Page 28

Cinelli.ROUGHD~1.TXT

22    A.   THEY LEASED EVERYTHING.  AND THE THOUGHT THERE

23  IS THAT THEIR BUSINESS COULD BE CONSOLIDATED WITH

24  GOURMET VEG-PAQ BECAUSE THEY HAD ADDITIONAL CAPACITY IN

25  THEIR PROCESSING PLANT AND THE OBJECTIVE WAS TO

Rough Draft - 35                     NONCERTIFIED ROUGH DRAFT

1  CONSOLIDATE AND REDUCE THE OVERHEAD.

2    Q.   SO IN THE APPRAISAL, THEN, WAS THERE ANY

3  APPRAISAL OF EQUIPMENT THAT WAS OWNED BY PREMIUM FRESH

4  OR ONLY --

5    A.   THAT WAS THE APPRAISAL THAT WAS DONE BY BLUE

6  DIAMOND.

7    Q.   AND SO THEY DID APPRAISAL OF THE LEASED

8  EQUIPMENT?

9    A.   THEY DID AN APPRAISAL OF ALL THE EQUIPMENT THAT

10  RESIDED AT THE PREMIUM FRESH FARM FACILITY.

11    Q.   BUT YOU ARE SAYING IT WAS MOSTLY NOT OWNED IT

12  WAS MOSTLY ALL LEASED?

13    A.   NO, I DIDN'T SAY THAT.

14    Q.   OH, OKAY.  I THOUGHT YOU SAID THEY WERE LEASING

15  ALL THEIR EQUIPMENT.  NO?

16    A.   NO.  SOME OF IT WAS OWNED, SOME OF IT WAS

17  LEASED I'M SURE, BUT I DON'T KNOW WHAT THE BREAKOUT IS.

18    Q.   AND YOU ARE SAYING THE APPRAISAL ALSO COVERED

19  AN EVALUATION OF THAT EQUIPMENT?

20    A.   THAT'S CORRECT.

21    Q.   AND HOW -- WAS THERE ONE PLANT, TWO PLANTS, HOW

22  MANY PLANTS DID PREMIUM FRESH HAVE?

23    A.   I BELIEVE IT WAS A SINGLE PLANT UP IN NORTHERN

24  CALIFORNIA.

25    Q.   WHERE?

Rough Draft - 36                     NONCERTIFIED ROUGH DRAFT

1    A.   SALINAS.

Page 29

Cinelli.ROUGHD~1.TXT

2        Q.   AND THEY DIDN'T HAVE A SOURTHERN OPERATION

3   OR --

4        A.   I DON'T BELIEVE SO.   THEY DID, BUT I CAN'T

5   RECALL WHERE IT WAS.   GIVEN THE NATURE OF THE BUSINESS,

6   I'M SURE THEY MAINTAINED A SOUTHERN PLANT AND I HAVE NO

7   IDEA WHERE THAT WAS LOCATED.

8        Q.   WAS THAT APPRAISED?

9        A.   NO.

10        Q.   SO ONLY THE SALINAS PLANT WAS APPRAISED?

11        A.   THAT'S CORRECT.   THE EQUIPMENT IN THE SALINAS

12   PLANT WAS APPRAISED.   THEY DID NOT OWN THE REAL ESTATE.

13        Q.   AND THEN YOU SAID THAT REAL ESTATE WAS

14   APPRAISED IN BOTH HOLLISTER AND EL CENTRO --

15        A.   THAT'S CORRECT.

16        Q.   -- THAT GOURMET VEG-PAQ OWNED?

17        A.   THAT'S CORRECT.

18        Q.   AND THEN AT SOME POINT IN TIME, YOU STARTED

19   TALKING -- YOUR GROUP DECIDED THAT THEY WERE GOING TO

20   MOVE FORWARD WITH AN ACQUISITION?

21        A.   THAT'S CORRECT.

22        Q.   AND AT THE TIME YOU DECIDED, WAS IT THOSE SAME

23   ORIGINAL I THINK IT WAS FIVE OR SIX PEOPLE WHO YOU HAD

24   PREVIOUSLY DESCRIBED, MR. MCCORMICK, JACK PARSON,

25   WILLIAMS, YOURSELF AND --

Rough Draft - 37                      NONCERTIFIED ROUGH DRAFT

1        A.   WE DID NOT SET UP FRESH 'N HEALTHY UNTIL SUCH

2   TIME AS WE WERE UNDER A LETTER OF INTENT TO ACQUIRE

3   GOURMET VEG-PAQ.

4        Q.   YOU SAID THAT INITIALLY THERE WERE SIX OR SEVEN

5   FOUNDERS AND YOU NAMED WHO YOU RECALLED --

6        A.   YES.

                          Page 30

Cinelli.ROUGHD~1.TXT

7      Q.   -- WERE THE INITIAL FOUNDERS.  AND THAT

8   CORPORATE ENTITY WAS SET UP AT THE TIME WHEN YOU WERE

9   DOING THE LETTER OF INTENT WITH GOURMET VEG-PAQ?

10      A.   THAT'S CORRECT.

11      Q.   AND THEN YOU SAID THERE WAS AN INITIAL

12   CAPITALIZATION OF MINIMAL AMOUNT OF TEN TO 15,000.  AND

13   THEN SUBSEQUENTLY WAS THERE MORE CAPITALIZATION PUT IN?

14      A.   YES, WE ARRANGED FINANCING FOR THE GOURMET

15   VEG-PAQ TRANSACTION, WHICH INCLUDED COMERICA BANK,

16   MR. MARTINEZ TOOK BACK SOME SELLER FINANCING, WE HAD --

17   A THIRD-PARTY INVESTOR PROVIDED CAPITAL TO ACQUIRE THE

18   EL CENTRO FACILITY.  AND THEN WE HAD ONE PRIVATE

19   INVESTOR WHO CONTRIBUTED EQUITY CAPITAL.  AND THEN

20   WITHIN ABOUT 60 DAYS, WE ENDED UP RAISING ANOTHER

21   MILLION AND A HALF OF EQUITY.

22      Q.   LET'S GO THROUGH THAT.  COMERICA BANK, HOW MUCH

23   FINANCING DID THEY PROVIDE?

24      A.   THEY PROVIDED A $3 1/2 MILLION TERM LOAN AND A

25   $1 1/2 MILLION LINE OF CREDIT WHICH WAS A FORMULA LINE

Rough Draft - 38                    NONCERTIFIED ROUGH DRAFT

1   BASED ON RECEIVABLES.

2      Q.   HOW MUCH OF THE LINE OF CREDIT ONE?

3      A.   I THINK IT WAS 1 1/2 MILLION.  IT WAS A

4   COMMITMENT BUT IT WAS SUBJECT TO THE AMOUNT OF ACCOUNTS

5   RECEIVABLE THAT WAS ON THE BALANCE SHEET.  SO AT THE

6   INCEPTION, THE FULL MILLION-AND-A-HALF WAS NOT

7   AVAILABLE.  I BELIEVE THERE WAS PROBABLY A MILLION ONE

8   OF RECEIVABLES AND AT 80 PERCENT WE PROBABLY --

9   80 PERCENT ADVANCE RATE WE PROBABLY HAD ABOUT 800,000

10   AVAILABLE TO US.

11      Q.   OKAY.  AND THEN YOU SAID MARTINEZ TOOK BACK

12   SOME PAPER?

Page 31

Cinelli.ROUGHD~1.TXT

13    A.   YES.

14    Q.   WHAT WAS THAT?

15    A.   APPROXIMATELY 5 MILLION.  MARTINEZ ALSO

16 REINVESTED A MILLION TWO-FIFTY INTO A SERIES A STOCK.

17    Q.   SO THE $5 MILLION OF PAPER WHATEVER THAT

18 MARTINEZ TOOK, WHAT WAS THAT FOR?

19    A.   TOTAL CONSIDERATION, THE TOTAL, WE HAD PRICED

20 THE TRANSACTION TO VALUE THE COMPANY BASED ON GOURMET

21 VEG-PAQ'S 2005 RESULTS.  AT THAT TIME, IT WAS

22 REPRESENTED TO US THAT GOURMET VEG-PAQ HAD GENERATED

23 ABOUT $2 MILLION OF CASH FLOW.  WE PRICED THE

24 TRANSACTION AT ABOUT 5, 5 1/2 TIMES CASH FLOW TO ATTAIN

25 A VALUE FOR GOURMET VEG-PAQ.

Rough Draft - 39                  NONCERTIFIED ROUGH DRAFT

1    Q.   WHAT WAS THE --

2    A.   THAT'S THAT --

3    Q.   WHAT WAS THE GOURMET VEG-PAQ VALUE THEN AT,

4 10 MILLION OR --

5    A.   WE PAID ROUGHLY ABOUT $12 MILLION FOR THE

6 BUSINESS.  WHICH INCLUDED $3 MILLION FOR THE PROCESSING

7 FACILITY.  SO WHAT YOU HAVE IS 3 1/2 IN CASH, LET'S SEE,

8 3 1/2 FROM THE TERM LOAN, $5 MILLION IN SELLER

9 FINANCING, 1.25 IN MARTINEZ EQUITY, AND THEN $3 MILLION

10 FOR THE EL CENTRO FACILITY.  SO 8 1/2, 9 3/4, ABOUT $12

11 3/4 MILLION.

12    Q.   WAS THE TOTAL PRICE.  AND THAT WAS BROKEN DOWN

13 AND $3 MILLION WAS PAID FOR EL CENTRO?

14    A.   CORRECT.

15    Q.   AND THAT WAS A PRIVATE THIRD-PARTY INVESTOR

16 THAT BOUGHT THAT EL CENTRO?

17    A.   YES.  WE SET UP -- FOR TEMPORARY PURPOSES, WE

Page 32

Cinelli.ROUGHD~1.TXT

18  SET UP AN ENTITY BY THE NAME OF CARNOUSTIE PROPERTIES.

19      Q.  AND IS THAT CARNOUSTIE PROPERTIES, WAS THAT

20  JUST A NEW ENTITY OR --

21      A.  YES, IT WAS A NEW ENTITY.

22      Q.  OKAY.

23      A.  OUR STRATEGY WAS TO HAVE ALL THE REAL ESTATE IN

24  A SEPARATE ENTITY AND IT WASN'T ONLY THE PROCESSPING

25  FACILITIES, BUT WE HAD STARTED CONVERSATIONS TO ACQUIRE

Rough Draft - 40                   NONCERTIFIED ROUGH DRAFT

1   FARMLAND.  AND THE INTENT WAS TO BUY BOTH THE EL CENTRO

2   FACILITY AS WELL AS THE HOLLISTER FACILITY AS PART OF

3   THE OVERALL GOURMET TRANSACTION.

4       Q.  BUT HOLLISTER WASN'T PURCHASED?

5       A.  IT WAS NOT PURCHASED AT THE TIME.

6       Q.  SO THE 12.3 MILLION DID NOT INCLUDE A PURCHASE

7   OF --

8       A.  HOLLISTER.

9       Q.  -- HOLLISTER?

10      A.  THAT'S CORRECT.

11      Q.  WHO IS THE THIRD-PARTY INVESTOR FOR EL CENTRO?

12      A.  HE WAS A PRIVATE INVESTOR, BILL POLAND.

13      Q.  P-O-L-A-N-D?

14      A.  THAT'S CORRECT.

15      A.  HE WAS A LENDER, HE PROVIDED A CONVERTIBLE NOTE

16  TO FINANCE EL CENTRO.

17      Q.  WAS HE THE OWNER OF CARNOUSTIE PROPERTIES?

18      A.  NO.  WE SET UP TEMPORARILY CARNOUSTIE WAS

19  MYSELF AND MARK WILLIAMS.  WE WERE IN THE PROCESS OF

20  RAISING MORE FUNDS INTO CARNOUSTIE WHEREBY WILLIAMS AND

21  I WOULD HAVE A DE MINIMUS EQUITY POSITION BUT BECAUSE OF

22  THE PERFORMANCE OF THE COMPANY, FOLLOW-UP FINANCING IN

23  THE FALL BECAME PROBLEMATIC FOR CAPITAL NOT ONLY IN

                    Page 33

Cinelli.ROUGHD~1.TXT

24   CARNOUSTIE BUT ALSO IN FRESH 'N HEALTHY.

25        Q.   WE'RE GETTING AHEAD OF OURSELVES.

Rough Draft - 41                NONCERTIFIED ROUGH DRAFT

1        A.   SURE.

2        Q.   SO THIS BILL POLAND GAVE A CONVERTIBLE NOTE AND

3    OTHER THAN THAT THERE WAS NO EQUITY PUT INTO THE

4    CARNOUSTIE PROPERTIES?

5        A.   THAT'S CORRECT.

6        Q.   AND SO CARNOUSTIE PROPERTIES STILL HOLDS THE

7    DEED TO --

8        A.   THAT'S CORRECT.

9        Q.   -- EL CENTRO?

10        A.   THAT'S CORRECT.

11        Q.   AND WHAT IS THE EL CENTRO FACILITY DOING NOW?

12        A.   IT'S IDLE.

13        Q.   IS IT UP FOR SALE?

14        A.   I'M HOLDING CONVERSATIONS WITH POLAND ABOUT

15    DOING A DEED IN LIEU AND THEN TRYING TO SELL IT.  AND IN

16    ALL LIKELIHOOD MARTINEZ WILL BE BUYING IT BACK.

17        Q.   FOR HOW MUCH?

18        A.   LESS THAN THE PURCHASE PRICE.

19        Q.   WHY IS THAT?

20        A.   THE ORIGINAL TRANSACTION, THE REAL ESTATE VALUE

21    WAS LESS THAN THE 3 MILLION BUT FOR A SELLER

22    ACCOMMODATIONS AND TAX PURPOSES, WE HAD ALLOCATED A

23    HIGHER AMOUNT OF THE TOTAL CONSIDERATION TO THE REAL

24    ESTATE JUST PURCHASE PRICE ACCOUNTING TO ALLOW MARTINEZ

25    TO DO A 1031 EXCHANGE ON A HIGHER DOLLAR AMOUNT OF THE

Rough Draft - 42                NONCERTIFIED ROUGH DRAFT

1    PROCEEDS HE RECEIVED IN THE ACQUISITION.

2        Q.   AND SO HAVE YOU HAD ANY -- WHEN THAT EL CENTRO

Cinelli.ROUGHD~1.TXT
3  PLANT WAS APPRAISED --

4      A.  PROBABLY ABOUT A MILLION 1/2.

5      Q.  IT WAS APPRAISED AT A MILLION 1/2?

6      A.  THAT'S CORRECT.  AND AGAIN IT WAS AN

7  ACCOMMODATION TO ASSIGN THE VALUE.  WE SUPPORTED THE

8  VALUE ON AN ONGOING BASIS IN AN ATTEMPT TO REFINANCE

9  THAT BY DRAWING UP A LEASE BETWEEN CARNOUSTIE AND FRESH

10  'N HEALTHY, AND I CAN'T REMEMBER THE DOLLAR AMOUNT OF

11  THE LEASE OR THE MONTHLY PAYMENT, BUT BASED ON CURRENT

12  MARKET CONDITIONS, BASED ON THE INCOME STREAM, WE COULD

13  VALUE THE EL CENTRO FACILITY PROBABLY ABOUT

14  3 1/2 MILLION BASED ON AN INCOME APPROACH.

15      Q.  AND DID FRESH 'N HEALTHY EVER MAKE ANY LEASE

16  PAYMENTS TO CARNOUSTIE?

17      A.  NOT DIRECTLY.  BUT IT DID PAY THE INTEREST AND

18  EXPENSES TO POLAND, WHICH IN EFFECT WAS A LEASE PAYMENT.

19      Q.  WHAT WAS THE INTEREST RATE ON THE NOTE?

20      A.  I THINK THE TOTAL INTEREST RATE WAS 12 PERCENT

21  OF WHICH 6 PERCENT WAS PAID CURRENTLY, THE REST WAS

22  ACCRUED.

23      Q.  AND BILL POLAND GAVE A $3 MILLION NOTE?

24      A.  CORRECT.

25      Q.  AND THAT INTEREST MONEY WAS PAID OUT OF MONEY
Rough Draft - 43                    NONCERTIFIED ROUGH DRAFT

1  FROM FRESH 'N HEALTHY FROM ITS OPERATIONS?

2      A.  THAT'S CORRECT.

3      Q.  AND THEN YOU SAID THAT THERE WAS ALSO A PRIVATE

4  INVESTOR THAT INITIALLY PUT UP SOME EQUITY CAPITAL --

5      A.  YES.

6      Q.  -- FOR THE TRANSACTION.  WHO IS THAT?

7      A.  JOHN GIBBONS.

8      Q.  HOW MUCH DID HE PUT UP?
Page 35

Cinelli.ROUGHD~1.TXT

```
 9        A.   HE PUT $250,000.
10        Q.   AND THEN DID MR. MARTINEZ GET ANY MONEY WHEN HE
11   INITIALLY MADE THE DEAL?
12        A.   SURE, HE PICKED UP 3 1/2 -- SEVEN PLUS MILLION
13   DOLLARS IN CASH.
14        Q.   HE WAS PAID 7 MILLION?
15        A.   CORRECT.  AND THEN HE --
16        Q.   PLUS A $5 MILLION NOTE?
17        A.   THAT'S CORRECT.  AND THEN HE HAD THE MILLION
18   TWO OF EQUITY.
19        Q.   SO HE DIDN'T PUT IN ANY MONEY, THAT WAS JUST --
20        A.   HE WAS THE SELLER.
21        Q.   SO THAT WAS JUST DEDUCTED OUT OF HIS 7 MILLION
22   HE WAS OWED HE TOOK ONE POINT --
23        A.   NO, THAT WAS IN ADDITION.
24        Q.   SO HE GOT $7 MILLION OUT OF IT AND THEN HE PUT
25   1.2 MILLION BACK INTO IT?
```

Rough Draft - 44                    NONCERTIFIED ROUGH DRAFT

```
 1        A.   YOU CAN SAY THAT HE GOT 8.25 MILLION OF WHICH
 2   1.25 WENT BACK INTO THE EQUITY.  SO NET HE RECEIVED
 3   7 MILLION IN CASH PLUS THE RESIDUAL SECURITIES.
 4        Q.   AND THE $5 MILLION SELLER FINANCING, WHAT WERE
 5   THE TERMS OF THAT?
 6        A.   I BELIEVE IT WAS A FIVE- OR SEVEN-YEAR NOTE AT
 7   EITHER 6 OR 8 PERCENT.
 8        Q.   WERE INTEREST PAYMENTS MADE ON THE NOTE?
 9        A.   NO.  THEY WERE -- THE BANK PROHIBITED INTEREST
10   PAYMENTS UNTIL SUCH TIME THAT THE COMPANY DEMONSTRATED A
11   CERTAIN CASH FLOW LEVEL.
12        Q.   SO THE 8.2 MILLION THAT WAS PAID TO MARTINEZ
13   INITIALLY, WELL, 7 MILLION NET, YOU GOT 3 1/2 MILLION OF
```

Page 36

Cinelli.ROUGHD~1.TXT

14    THAT FROM THE COMERICA LINE OF TERM LOAN?

15        A.   UH-HUH.

16        Q.   AND YOU GOT 3 MILLION OF THAT FROM THE

17    CARNOUSTIE INVESTMENT?

18        A.   UH-HUH.

19        Q.   AND THEN 250,000 OF EQUITY CAPITAL FROM

20    GIBBONS?

21        A.   YES.

22        Q.   AND SO THAT'S WHAT REALLY FINANCED THE

23    ACQUISITION?

24        A.   THAT'S CORRECT.

25        Q.   AND THEN YOU SAID YOU GOT A $1 1/2 MILLION LINE

Rough Draft - 45                    NONCERTIFIED ROUGH DRAFT

1    OF CREDIT FROM COMERICA FOR OPERATING CAPITAL?

2        A.   THAT'S CORRECT.

3        Q.   AND THEN THERE WAS 1 1/2 MILLION OF EQUITY THAT

4    WAS RAISED?

5        A.   YES, WITHIN ABOUT 60 TO 90 DAYS AFTER THE

6    INITIAL CLOSING.

7        Q.   WAS THAT SOME KIND OF PRIVATE PLACEMENT OR

8    WAS --

9        A.   YES, IT WAS A PRIVATE PLACEMENT TO INDIVIDUAL

10    INVESTORS.

11        Q.   AND WHO DID THE PRIVATE PLACEMENT?

12        A.   THE COMPANY.

13        Q.   FRESH 'N HEALTHY ITSELF?

14        A.   UH-HUH.

15        Q.   SO THERE WAS NO INVESTMENT BANKING FIRM

16    INVOLVED?

17        A.   I FACILITATED IT BUT AS AN INSIDER.  IT WAS

18    FRESH 'N HEALTHY THAT DID THE PLACEMENT.

19        Q.   AND OTHER THAN THAT $1 1/2 MILLION OF EQUITY

Cinelli.ROUGHD~1.TXT

20    THAT WAS IN THE PRIVATE PLACEMENT, WAS THERE ANY OTHER

21    FINANCING THAT WAS RAISED?

22        A.   NONE.

23            MS. ANASTASSIOU:  LET'S MARK THIS AS EXHIBIT 2.

24            (EXHIBIT SC-1 MARKED.)

25

Rough Draft - 46                  NONCERTIFIED ROUGH DRAFT

1    BY MS. ANASTASSIOU:

2        Q.   I HAVE JUST HANDED THE WITNESS A DOCUMENT

3    THAT'S MARKED SC NO. 2 AND IT'S A COPY OF A COMPLAINT,

4    ASA FARMS VERSUS FRESH 'N HEALTHY INC..  AND IT IS BATES

5    STAMP NUMBER SNO 418 THROUGH SNO 433.  AND IN THIS

6    PARTICULAR LAWSUIT, THERE IS A NUMBER OF INDIVIDUALS

7    LISTED AS BEING INVOLVED OR INDIVIDUALS AND ENTITIES AS

8    BEING INVOLVED IN FRESH 'N HEALTHY, AND I'D LIKE YOU TO

9    IDENTIFY TO ME AS WE GO THROUGH THEM ONE BY ONE WHETHER

10    OR NOT THOSE WERE THE PERSONS INVOLVED IN THAT PRIVATE

11    PLACEMENT THAT YOU JUST DISCUSSED.

12            FIRST NAME IS MARK WILLIAMS.

13        A.   NO.  HE SERVED AS CEO OF THE COMPANY.

14        Q.   DID HE --

15        A.   NO.

16        Q.   DID MARK WILLIAMS MAKE ANY INVESTMENT

17    PERSONALLY IN THE COMPANY?

18        A.   NO, HE DID NOT.

19        Q.   DID HE GET A SHAREHOLDER INTEREST IN THE

20    COMPANY?

21        A.   YES, HE WAS THE LARGEST SHAREHOLDER.

22        Q.   HOW MUCH DID HE GET IN THE COMPANY?

23        A.   HE PROBABLY OWNED 18 PERCENT OF THE COMPANY.

24        Q.   AND NO MONEY PUT IN?

                         Page 38

Cinelli.ROUGHD~1.TXT

25      A.   THAT'S CORRECT.

Rough Draft - 47                    NONCERTIFIED ROUGH DRAFT

1       Q.   AND WHAT WAS THE BASIS THEN FOR HIM GETTING

2   18 PERCENT OF STOCK?

3       A.   WHEN FRESH 'N HEALTHY WAS FORMED, WE JUST

4   ALLOCATED A CERTAIN NUMBER OF SHARES TO VARIOUS PEOPLE

5   BASED ON RESPONSIBILITIES AND INCENTIVE.

6       Q.   WAS MR. WILLIAMS PAID A SALARY FOR BEING CEO?

7       A.   YES.

8       Q.   WHAT WAS HIS SALARY?

9       A.   I BELIEVE IT WAS 240,000.

10      Q.   A YEAR?

11      A.   YES.

12      Q.   AND WHEN DID THAT SALARY COMMENCE?

13      A.   WE'RE TRYING TO FIGURE THAT OUT.  AND I SAY

14   THAT BECAUSE THE SALARY ACTUALLY COMMENCED IN I GUESS

15   FEBRUARY OF '07 AT THE TIME OF THE ACQUISITION OF

16   GOURMET VEG-PAQ, BUT WE FOUND THAT BOTH HE AND MARK

17   MCCORMICK, WHO WAS CFO AT THE TIME, HAD, HAD PAID EACH

18   OTHER FOR SERVICES RENDERED PRIOR TO THE TIME OF

19   CLOSING.

20      Q.   SO THAT HIS SALARY WAS SUPPOSED TO COMMENCE IN

21   FEBRUARY OF 2007 BUT YOU BELIEVE NOW THAT HE STARTED

22   TAKING SALARY EARLIER?

23      A.   HE ACCRUED SALARY EARLIER AND BOTH HE AND MARK

24   MCCORMICK, THE CFO, PAID EACH OTHER, I'M TRYING TO

25   FIGURE OUT HOW MUCH, FOR SERVICES RENDERED PRIOR TO THE

Rough Draft - 48                    NONCERTIFIED ROUGH DRAFT

1   CLOSING.  SO SORT OF BACK CONSULTING FEES.

2       Q.   WHERE DID IT GO BACK TO, WHAT TIME PERIOD?

3       A.   STILL TRYING TO FIGURE THAT OUT.  PROBABLY

4   THREE, FOUR, FIVE MONTHS.

Page 39

Cinelli.ROUGHD~1.TXT

 5    Q.   DO YOU KNOW WHERE MR. WILLIAMS IS LOCATED NOW?

 6    A.   I HAVE NO IDEA.

 7    Q.   WHEN WAS THE LAST TIME YOU SPOKE TO

 8  MR. WILLIAMS?

 9    A.   PROBABLY TWO MONTHS AGO.  IT'S MY UNDERSTANDING

10  HE TOOK OFF TO COSTA RICA.

11    Q.   WHAT IS HE DOING IN COSTA RICA?

12    A.   I HAVE NO IDEA.

13    Q.   AND THEN JACK PARSON, WAS HE INVOLVED IN THE

14  PRIVATE PLACEMENT AS AN EXINDIVIDUAL THAT IS LISTED ON

15  THE COMPLAINT HERE IN SC NO. 2?

16    A.   HE WAS A MEMBER OF THE MANAGEMENT TEAM.

17    Q.   DID HE CONTRIBUTE --

18    A.   NO, HE DID NOT.

19    Q.   OKAY.

20    A.   IN FACT, HE OWES THE COMPANY NEARLY $200,000.

21    Q.   WHY DOES HE OWE THE COMPANY $200,000?

22    A.   BECAUSE HE WAS -- HE'S INVOLVED IN A SEPARATE

23  COMPANY BY THE NAME OF DIVERSIFIED FOOD NETWORK.  AND HE

24  PURCHASED PRODUCT FROM FRESH 'N HEALTHY FOR RESALE, SOLD

25  THE PRODUCT, BUT DID NOT PAY FRESH 'N HEALTHY BACK.  AND

Rough Draft - 49                    NONCERTIFIED ROUGH DRAFT

 1  SO THERE IS A PRELIMINARY PACA FILING AGAINST HIM.

 2    Q.   WHEN WAS HE MAKING PURCHASES OF PRODUCE?

 3    A.   THROUGH THE FALL AND WINTER OF 2007.

 4    Q.   AND DID HE MAKE ANY CLAIMS THAT THE PRODUCT HE

 5  GOT FROM FRESH 'N HEALTHY HAD PROBLEMS OR --

 6    A.   NO.

 7    Q.   AS FAR AS YOU KNOW, THE PRODUCE WAS FINE, IT

 8  WAS PAID FOR BY THE CUSTOMERS AND THEN PARSON DID NOT

 9  PAY THE AGREED UPON PRICE TO FRESH 'N HEALTHY?

Page 40

Cinelli.ROUGHD~1.TXT

10    A.   THAT'S CORRECT.

11    Q.   AND DID JACK PARSON HAVE A SHAREHOLDER INTEREST

12 IN FRESH 'N HEALTHY?

13    A.   YES.

14    Q.   AND HOW MUCH?

15    A.   HE PROBABLY HAD 12 TO 15 PERCENT.

16    Q.   AND HE WAS -- HE CONTRIBUTED NO MONEY FOR THAT

17 INTEREST?

18    A.   NO, THAT'S CORRECT.

19    Q.   WHAT WAS JACK PARSON'S ROLE TO BE IN FRESH 'N

20 HEALTHY?

21    A.   HE BEGAN OVERSEEING THE I BELIEVE THE FARMING

22 OPERATION, AND HE DID SPECIAL PROJECTS FOR MARK

23 WILLIAMS, I DON'T KNOW TO WHAT EXTENT.

24    Q.   WAS HE ON SALARY?

25    A.   I THINK HE BEGAN WITH SALARY AND THEN HE MOVED

Rough Draft - 50                    NONCERTIFIED ROUGH DRAFT

1 TO A CONSULTANT.

2    Q.   DO YOU KNOW WHAT HE WAS PAID --

3    A.   I HAVE NO IDEA.

4    Q.   -- FOR THE CONSULTING FEE?

5    A.   I DON'T KNOW.  THAT WAS BETWEEN HE AND

6 WILLIAMS.

7    Q.   AND THEN THE NEXT PERSON THAT'S LISTED ON THIS

8 COMPLAINT IS YOURSELF, STEVEN CINELLI.

9    A.   YOU HAD -- OH, OKAY.

10    Q.   AND WERE -- DID YOU PARTICIPATE IN THIS PRIVATE

11 PLACEMENT THAT WE JUST DISCUSSED?

12    A.   NO, NOT IN THIS ONE.

13    Q.   AND DID YOU OBTAIN A SHAREHOLDER INTEREST IN

14 FRESH 'N HEALTHY?

15    A.   YES.  AT THE TIME OF ITS CREATION.

Page 41

Cinelli.ROUGHD~1.TXT

16        Q.   WHAT WAS THE SHAREHOLDER INTEREST?

17        A.   PROBABLY ABOUT 12 TO 15 PERCENT.

18        Q.   AND YOU SAID PREVIOUSLY THAT YOU MADE SOME KIND

19   OF CAPITAL CONTRIBUTION?

20        A.   VERY DE MINIMUS, TEN, $15,000 UP FRONT.  REALLY

21   TO DEFRAY CERTAIN EXPENSES.

22        Q.   THAT WAS FOR -- MOSTLY FOR LEGAL FEES --

23        A.   CORRECT.

24        Q.   -- IN THE FORMATION?

25        A.   CORRECT.

Rough Draft - 51                NONCERTIFIED ROUGH DRAFT

1         Q.   AND THEN AFTER YOU RECEIVED THE STOCK, DID YOU

2    EVER MAKE ANY ADDITIONAL CONTRIBUTIONS FOR THE STOCK

3    OTHER THAN TEN TO $15,000 YOU DID AT FORMATION?

4         A.   NO.  THE COMPANY AS PART OF THE ORIGINAL

5    TRANSACTION WAS LIABLE TO PAY ME A BANKING AND ADVISORY

6    FEE FOR COORDINATING THE FINANCING AS WELL AS AN ONGOING

7    ADVISORY FEE SUBSEQUENT TO THE CLOSING OF WHICH I

8    RECEIVED A LIMITED AMOUNT OF THAT.  AND THERE'S PROBABLY

9    A GOOD THREE TO FOUR HUNDRED THOUSAND DOLLARS IF NOT

10   MORE OF MONEYS DUE ME UNDER SPECIFIC CONTRACTS.

11        Q.   SO THE BANKING AND ADVISORY FEE FOR

12   COORDINATING THE FINANCING, HOW MUCH WAS THAT?

13        A.   IT WAS FORMULA BASED, IT WAS PROBABLY $450,000.

14        Q.   AND HOW MUCH OF THAT DID THE COMPANY PAY YOU?

15        A.   I THINK PROBABLY ABOUT 70.

16        Q.   AND THEN YOU SAID THERE WAS ONGOING FEES, WAS

17   THERE A SALARY OR WAS IT JUST A CONSULTING FEE?

18        A.   IT WAS A CONSULTING AGREEMENT APPROVED BY THE

19   BANK.

20        Q.   AND HOW MUCH WERE YOU GETTING PAID BY THE

Page 42

Cinelli.ROUGHD~1.TXT

21  CONSULTING AGREEMENT?

22      A.  I BELIEVE IT WAS $15,000 A MONTH AND I THINK I

23  GOT ONE MONTH, POSSIBLY TWO MONTHS OF THAT.

24      Q.  SO YOUR TESTIMONY IS THAT PROBABLY THE PAYMENTS

25  THAT YOU RECEIVED IN TOTAL FROM FRESH 'N HEALTHY WERE

Rough Draft - 52                    NONCERTIFIED ROUGH DRAFT

1  ABOUT A HUNDRED THOUSAND?

2      A.  YES, PROBABLY.

3      Q.  WERE YOU GETTING ANY INSURANCE OR BENEFITS?

4      A.  I DID GET FOR A PERIOD OF TIME HEALTH BENEFITS,

5  THEY COVERED MY HEALTH BENEFIT.

6      Q.  WHEN WAS THAT?

7      A.  PROBABLY FROM MARCH THROUGH DECEMBER.

8      Q.  OF '07?

9      A.  THAT'S CORRECT.

10      Q.  AND THIS WAS HEALTH INSURANCE THAT WAS BEING

11  GIVEN TO ALL THE EMPLOYEES?

12      A.  YES.  ALL SALARIED EMPLOYEES.

13      Q.  SO MARK WILLIAMS ALSO GOT THAT?

14      A.  YES, YES.

15      Q.  WHEN DID MARK WILLIAMS' SALARY TERMINATE?

16      A.  PROBABLY IN DECEMBER.

17      Q.  AND THEN THERE IS AN INDIVIDUAL HERE NAMED CHAD

18  HAGEN, H-A-G-E-N?

19      A.  YEAH.  HE WAS THE HEAD OF MARKETING FOR THE

20  COMPANY.

21      Q.  WAS HE ALSO A SHAREHOLDER?

22      A.  I DON'T BELIEVE THAT WAS CONSUMMATED.  HE

23  WAS -- WILLIAMS NEVER FINISHED UP THE OPTIONS TO

24  EMPLOYEES.

25      Q.  SO HE WAS SUPPOSED TO BE GIVEN AN OPTION BUT

Rough Draft - 53                    NONCERTIFIED ROUGH DRAFT

Page 43

Cinelli.ROUGHD~1.TXT

1    NEVER CONSUMMATED?

2        A.    THAT'S CORRECT.

3        Q.    DID -- AND MR. HAGEN DIDN'T INVEST ANY MONEY?

4        A.    NO, HE DID NOT.

5        Q.    AND WHEN DID HE WORK FOR THE COMPANY?

6        A.    PROBABLY FROM JANUARY, PROBABLY JANUARY OR

7    DECEMBER THROUGH MAY, MAY OR JUNE.

8        Q.    JANUARY OF 2006?

9        A.    '7.

10       Q.    SO THIS WAS BEFORE THE ACQUISITION HAPPENED?

11       A.    YES.  MARK WILLIAMS HAD RETAINED A SERIES OF

12   PEOPLE.  WE ANTICIPATED THAT THE TRANSACTION WAS GOING

13   TO CLOSE PRIOR TO THANKSGIVING OF '06, BUT BECAUSE OF

14   THE LEGAL NEGOTIATIONS, IT TOOK MUCH, MUCH LONGER.

15       Q.    WHO ELSE OTHER THAN CHAD HAGEN WAS ON FRESH 'N

16   HEALTHY PAYROLL PRIOR TO THE ACQUISITION CLOSING?

17       A.    MARK MCCORMICK, CFO.

18       Q.    AND DO YOU KNOW WHAT CHAD HAGEN'S SALARY WAS?

19       A.    NO, I DON'T.

20       Q.    DO YOU KNOW MARK MCCORMICK?

21       A.    NO, I DON'T.

22       Q.    ANYBODY ELSE?

23       A.    TOM PAVICH.  HE WAS THE HEAD OF SALES.  AND I

24   DON'T KNOW WHAT HE WAS COMPENSATED EITHER.

25       Q.    AND YOU HAD INDICATED PREVIOUSLY THAT TOM

Rough Draft - 54                  NONCERTIFIED ROUGH DRAFT

1    PAVICH WAS ONE OF THE ORIGINAL SHAREHOLDERS?

2        A.    I DON'T BELIEVE THAT WAS FINALIZED EITHER.

3        Q.    SO HE WAS TO BECOME ONE --

4        A.    YES.

5        Q.    -- BUT NEVER DID?

Page 44

Cinelli.ROUGHD~1.TXT

6      A.  YES.

7      Q.  DID HE EVER CONTRIBUTE ANY EQUITY?

8      A.  NO.

9      Q.  AND THEN SANTOS MARTINEZ?

10     A.  YES.

11     Q.  YOU SAID THAT HE WAS A SHAREHOLDER FROM THE

12  GET-GO?

13     A.  YES.

14     Q.  AND HE HAD THAT $1.2 MILLION CONTRIBUTION THAT

15  WAS A REBATE ESSENTIALLY OF WHAT HE WAS PAID FOR THE

16  ASSETS?

17     A.  FOR THE MOST PART, YES.

18     Q.  IN OTHER WORDS, HE WAS -- IT WAS MONEY THAT WAS

19  PAID OUT AND THEN HE CONTRIBUTED PART OF IT BACK?

20     A.  CORRECT.

21     Q.  AND ANY -- OTHER THAN THAT $1.2 MILLION

22  CONTRIBUTION FROM PART OF THE SALES PROCEEDS, DID HE

23  CONTRIBUTE ANY OTHER MONEY?

24     A.  NO.

25     Q.  AND WAS HE ON SALARY?

Rough Draft - 55                    NONCERTIFIED ROUGH DRAFT

1      A.  HE WAS ON A CONSULTING AGREEMENT, I THINK IT

2  WAS A THREE-YEAR CONSULTING AGREEMENT.

3      Q.  HOW MUCH WAS HE BEING PAID ON THAT?

4      A.  I DON'T KNOW.  I THINK IT WAS BETWEEN TEN AND

5  15,000 A MONTH, MY RECOLLECTION.

6      Q.  AND WHAT WAS HE DOING FOR THE CONSULTING FEE?

7      A.  YOU WOULD HAVE TO ASK MARK WILLIAMS.  MARK

8  ASSIGNED CERTAIN TASKS, I WOULD IMAGINE IT HAD TO DO

9  WITH OVERSEEING THE FARM OPERATION.  AND PROBABLY

10  BRINGING MARK WILLIAMS UP TO SPEED ON SOME OF THE

11  NUANCES OF THE BUSINESS.

Cinelli.ROUGHD~1.TXT

```
12        Q.   AND THEN YOU SAID THAT THERE WAS ALSO -- HE HAD

13   A NOTE BUT AS FAR AS YOU KNOW THERE WERE NO NOTE

14   PAYMENTS MADE?

15        A.   THAT'S CORRECT, THAT'S CORRECT.

16        Q.   AND THEN YOU INDICATED THERE WAS A LEASE OF THE

17   FACILITIES IN HOLLISTER AND GILROY?

18        A.   YES.  AS WELL AS FARMLAND THAT WAS OWNED BY

19   MARTINEZ.  AND THAT WAS ALL LEASED TO FRESH 'N HEALTHY

20   OF WHICH FRESH 'N HEALTHY MADE PAYMENTS.

21        Q.   OKAY.  SO THERE WAS A LEASE OF HOLLISTER AND

22   GILROY AND ALSO FARMLAND?

23        A.   CORRECT.

24        Q.   AND DO YOU KNOW WHAT THE LEASE PAYMENTS WERE?

25        A.   NO, I DON'T.
```

Rough Draft - 56                     NONCERTIFIED ROUGH DRAFT

```
 1        Q.   DO YOU KNOW IF THEY WERE ALL MADE?

 2        A.   THEY WERE MADE THROUGH PROBABLY THE FALL AND

 3   THEN WHEN FRESH 'N HEALTHY HAD CASH FLOW ISSUES, I

 4   BELIEVE WILLIAMS SUSPENDED THOSE PAYMENTS.

 5        Q.   WHEN YOU SAY THROUGH THE FALL, DO YOU REMEMBER

 6   WHAT MONTH IN THE FALL?

 7        A.   NO, NO.

 8        Q.   AND OTHER THAN THE CONSULTING ARRANGEMENT AND

 9   LEASE PAYMENTS, ANY OTHER COMPENSATION THAT SANTOS WAS

10   GETTING?

11        A.   JUST HIS EQUITY INTEREST IN THE COMPANY.

12        Q.   AND WHAT ABOUT DON BEAM, B-E-A-M?

13        A.   THE REST OF THE FOLKS WERE BASICALLY

14   PARTICIPANTS IN THE 1 1/2 MILLION PRIVATE PLACEMENT.

15        Q.   THAT ARE LISTED THERE ON THE COMPLAINT?

16        A.   UH-HUH.
```

Page 46

Cinelli.ROUGHD~1.TXT

17    Q.  DO YOU KNOW HOW MUCH DON BEAM CONTRIBUTED?

18    A.  OH, 25,000, 50,000.

19    Q.  AND DARRYL NICHOLSON?

20    A.  I CAN'T RECALL SPECIFICALLY WHAT THE DOLLAR

21  AMOUNTS ARE, IT RANGES ANYWHERE FROM 25,000 TO 200,000.

22    Q.  OF THE REST OF THE INDIVIDUALS LISTED?

23    A.  JUST TO BE SPECIFIC, PRESTWICK PARTNERS LLC

24  DOES NOT EXIST.  SOLSTICE VENTURE PARTNERS WAS AN

25  ENTITY.

Rough Draft - 57                    NONCERTIFIED ROUGH DRAFT

1    Q.  WAS PRESTWICK PARTNERS, INC., WAS THAT AN

2  INVESTOR IN THE PRIVATE PLACEMENT?

3    A.  NO, IT WASN'T.  THE SECURITIES THAT I OWN

4  PERSONALLY IN FRESH 'N HEALTHY WHICH RESULTED FROM THE

5  FOUNDERS STOCK ARE HELD IN PRESTWICK PARTNER INC, NOT IN

6  MY NAME PERSONALLY.

7    Q.  SO PRESTWICK PARTNERS LLC?

8    A.  THAT'S CORRECT.

9    Q.  PRESTWICK PARTNERS INC. HOLDS THE STOCK YOU

10  WERE GIVEN AS A FOUNDER FOR WHICH YOU PAID TEN TO

11  $15,000?

12    A.  CORRECT.

13    Q.  AND THEN PRESTWICK PARTNERS INC. MADE NO

14  INVESTMENT; IS THAT CORRECT?

15    A.  I THINK THE CONTRIBUTION WAS MADE THROUGH

16  PRESTWICK PARTNERS, TEN TO 15,000.

17    Q.  SO THEY MADE THAT TEN TO $15,000?

18    A.  CORRECT.

19    Q.  OKAY.  AND THEN THESE OTHER -- LET'S JUST GO

20  DOWN TO MAKE SURE.  SO DON BEAM YOU SAID WAS AN INVESTOR

21  IN THE PRIVATE PLACEMENT.  DARRYL NICHOLSON AN INVESTOR

22  IN THE PRIVATE PLACEMENT.  RICHARD MAY --

Cinelli.ROUGHD~1.TXT

```
            23      A.  YES.
            24      Q.  AN INVESTOR IN THE PRIVATE PLACEMENT.  THOMAS
            25   COLOGNA --
Rough Draft - 58                    NONCERTIFIED ROUGH DRAFT

             1      A.  YES.
             2      Q.  LET ME JUST FINISH MY QUESTION BEFORE YOU SAY
             3   YES.  HE WAS AN INVESTOR IN THE PRIVATE PLACEMENT?
             4      A.  YES.
             5      Q.  AND SOLSTICE VENTURE PARTNERS LLC?
             6      A.  SOLSTICE WAS A SEPARATE ENTITY THAT I
             7   PARTICIPATED IN WHICH RECEIVED SOME FOUNDERS STOCK.
             8      Q.  SO WHO IS INVOLVED IN SOLSTICE VENTURE PARTNERS
             9   LLC?
            10      A.  PRESTWICK PARTNERS AS WELL AS A THIRD
            11   INDIVIDUAL WHO I WAS CONDUCTING SOME ADVISORY BUSINESS
            12   WITH.
            13      Q.  WHO IS THAT?
            14      A.  SAAD, S-A-A-D, KHAN, K-H-A-N.
            15      Q.  SO IT WAS PRESTWICK PARTNERS INC., SAAD KHAN
            16   AND YOURSELF THAT WERE --
            17      A.  PART OF SOLSTICE.
            18      Q.  PART OF SOLSTICE.  AND YOU SAID SOLSTICE
            19   RECEIVED FOUNDERS STOCK?
            20      A.  YES.
            21      Q.  AND THERE WAS NO CAPITAL CONTRIBUTION?
            22      A.  THAT'S CORRECT.
            23      Q.  DO YOU KNOW HOW MUCH FOUNDERS STOCK?
            24      A.  I THINK 2 OR 3 PERCENT.
            25      Q.  AND WHAT ABOUT VFINANCE INVESTMENTS?
Rough Draft - 59                    NONCERTIFIED ROUGH DRAFT

             1      A.  VFINANCE INVESTMENTS IS AN INVESTMENT BANKING
```

Page 48

Cinelli.ROUGHD~1.TXT

2    FIRM BROKER DEALER WHERE BOTH SAAD KHAN AND I HELD OUR

3    SECURITIES LICENSES.  AND VFINANCE ALSO EMPLOYED

4    DIRECTLY LARRY KNUTSON WHO WAS A GENTLEMAN THAT

5    INTRODUCED ME TO JACK PARSON IN THE BEGINNING OF THIS

6    WHOLE THING.  AND FOR WHICH THEY RECEIVED SOME FOUNDERS

7    STOCK.

8        Q.  AND HOW MUCH FOUNDERS STOCK DID THEY GET?

9        A.  I THINK 2 OR 3 PERCENT.

10        Q.  AND DID VFINANCE INVESTMENTS, DID IT GET ANY --

11    DID IT GIVE ANY CAPITAL TO --

12        A.  NO, NO.

13        Q.  AND DOES VFINANCE INVESTMENTS STILL EXIST?

14        A.  YES.

15        Q.  IT'S A NEW YORK ENTITY?

16        A.  YES.

17        Q.  AND YOU SAID THAT YOU STILL HOLD A BROKER'S

18    LICENSE THROUGH THAT ENTITY?

19        A.  YES, I'M MOVING MY SECURITIES LICENSE TO A NEW

20    ENTITY.

21        Q.  BUT CURRENTLY YOU HAVE IT THROUGH THAT?

22        A.  YES.

23        Q.  AND THEN FMP VINEYARD LLC?

24        A.  THAT IS OWNED BY TOM PAVICH.

25        Q.  DID THAT ENTITY CONTRIBUTE MONEY IN THE PRIVATE
                         NONCERTIFIED ROUGH DRAFT

Rough Draft - 60

1    PLACEMENT?

2        A.  NO, IT DID NOT.

3        Q.  DID IT GET STOCK IN FRESH 'N HEALTHY, INC.?

4        A.  IT WAS TO GET STOCK, I DON'T BELIEVE MARK

5    WILLIAMS CONSUMMATED THAT.

6        Q.  AND IT CONTRIBUTED NO MONEY, RIGHT?

7        A.  THAT'S CORRECT.
                     Page 49

Cinelli.ROUGHD~1.TXT

8      Q.   WHAT ABOUT BUTTONWOOD OPTION LLC?

9      A.   ALL -- BUTTONWOOD AND THE RESIDUAL NAMES ALL

10   WERE PARTICIPANTS IN THE PRIVATE PLACEMENT.

11     Q.   SO BUTTONWOOD, DW LLC, M SOLAZZO TRUST 2002, P.

12   SOLAZZO TRUST 1998, GIBBONS FAMILY TRUST, BIXLER TRUST,

13   STEIGERWALD TRUST AND CARTER TRUST WERE ALL PARTICIPANTS

14   IN THE PRIVATE PLACEMENT?

15     A.   THAT'S CORRECT.

16     Q.   ARE THERE ANY OTHER NAMES THAT AREN'T LISTED

17   HERE THAT WERE PARTICIPANTS IN THE PRIVATE PLACEMENT?

18     A.   I THINK THERE WERE PROBABLY ONE OR TWO OTHER

19   NAMES WHICH I CAN PROVIDE.  BUT I DON'T HAVE THE

20   SHAREHOLDER LIST WITH ME.

21     Q.   WERE YOU THE ONE THAT SOLICITED THE INVESTMENTS

22   IN THE PRIVATE PLACEMENT BY ALL OF THESE INDIVIDUALS OR

23   ENTITIES?

24     A.   I FACILITATED.

25     Q.   WHEN YOU SAY A FACILITATED, WHAT DO YOU MEAN?

Rough Draft - 61              NONCERTIFIED ROUGH DRAFT

1      A.   MOST OF THEM WERE RELATIONS, WELL, TWO OF THE

2    ENTITIES, BUTTONWOOD AND ANOTHER GENTLEMAN WHO DID MAKE

3    AN INVESTMENT, WERE MONEY MANAGERS FOR THESE VARIOUS

4    ENTITIES, AND THROUGH DISCUSSIONS WITH MARK WILLIAMS AND

5    TO SOME EXTENT ME, WE WERE LOOKING TO RAISE A MILLION

6    1/2 DOLLARS.  AND THESE INVESTORS STEPPED UP AND

7    INVESTED A MILLION 1/2.

8      Q.   AND WERE ANY OF THESE INVESTORS REPAID --

9      A.   NO.

10     Q.   -- FOR THEIR INVESTMENT?

11     A.   NO.

12     Q.   DID THEY GET ANY DIVIDENDS?

**Page 50**

Cinelli.ROUGHD~1.TXT

13    A.    NO.

14    Q.    AND DID YOU PROVIDE ANY PERSONAL GUARANTEES TO

15    COMERICA BANK?

16    A.    YES.

17    Q.    AND YOU AS AN INDIVIDUAL OR YOUR ENTITIES, WHO

18    PROVIDED THOSE GUARANTEES?

19    A.    JOHN GIBBONS PROVIDED A $250,000 GUARANTEE AT

20    THE INCEPTION, AND THEN WHEN THE BANK WANTED TO

21    NEGOTIATE A FORBEARANCE AGREEMENT IN THE FALL OF 2006,

22    BOTH MARK WILLIAMS AND I WERE REQUIRED TO SIGN A

23    $1 MILLION GUARANTEE EACH.

24    Q.    ANYBODY ELSE THAT GAVE ANY PERSONAL GUARANTEES?

25    A.    NO.

Rough Draft - 62                    NONCERTIFIED ROUGH DRAFT

1    Q.    AND JOHN GIBBONS' PERSONAL GUARANTEE IS STILL

2    OUT THERE?

3    A.    I BELIEVE SO, YES.

4    Q.    AND DID MARK WILLIAMS HAVE ASSETS SUFFICIENT TO

5    BACK THE $1 MILLION GUARANTEE?

6    A.    I DON'T BELIEVE SO.  I'M NOT SURE.

7    Q.    DID THE BANK REQUIRE ANY SHOWING THAT HE HAD

8    MONEY TO BACK THE GUARANTEE?

9    A.    HE WAS REQUESTED TO SUBMIT A FINANCIAL

10    STATEMENT.  I DID NOT SEE THAT.  AND I DON'T KNOW

11    WHETHER HE SUBMITTED THAT.

12    Q.    DID YOU HAVE TO SUBMIT A FINANCIAL STATEMENT?

13    A.    YES, YES.

14    Q.    WHO WERE THE DIRECTORS OF FRESH 'N HEALTHY,

15    INC.?

16    A.    MARK WILLIAMS AND I AND THEN SANTOS MARTINEZ.

17    BUT MR. MARTINEZ, HE WAS GIVEN THE RIGHT TO SIT ON THE

18    BOARD, HE ATTENDED ONE OF THE -- THE INITIAL BOARD

Page 51

Cinelli.ROUGHD~1.TXT

19    MEETING.  AND I BELIEVE, YOU KNOW, THIS WAS PART AND

20    PARCEL OF HIS SERIES A.  BUT I WOULD IMAGINE HE CONTENDS

21    THAT HE'S NOT ON THE BOARD OF THIS COMPANY.

22        Q.  WHY WOULD HE SAY THAT?

23        A.  PROBABLY TO DISTANCE HIMSELF FROM THE COMPANY.

24        Q.  SO THERE WAS ONE BOARD MEETING THAT YOU KNOW HE

25    ATTENDED AND AFTER THAT HE NEVER ATTENDED ED AGAIN?

Rough Draft - 63                    NONCERTIFIED ROUGH DRAFT

1        A.  THAT'S CORRECT.

2        Q.  WAS HE INVITED TO ATTEND?

3        A.  WE DIDN'T HAVE DIRECT BOARD MEETINGS AFTER

4    THAT.  AND THAT WAS PROBABLY IN MAY.

5        Q.  MAY OF 2007?

6        A.  THAT'S CORRECT.

7        Q.  AND AFTER THAT, YOU DON'T RECALL ANY OTHER

8    BOARD MEETINGS?

9        A.  THAT'S CORRECT.

10        Q.  WHAT ABOUT SHAREHOLDER MEETINGS?

11        A.  WE DID NOT HAVE ANY SHAREHOLDER MEETINGS.  I

12    PROVIDED A BRIEF TO THE SHAREHOLDERS ON A PERIODIC BASIS

13    THROUGH A LETTER.

14        Q.  WHEN THE SHAREHOLDERS WERE SOLICITED IN THE

15    PRIVATE PLACEMENT FOR INVESTMENT, WHAT KIND OF OFFER

16    MATERIALS DID YOU PROVIDE TO THEM?

17        A.  LARGELY POWERPOINT PRESENTATION.

18            MS. ANASTASSIOU:  LET'S MARK THIS AS SC NO. 3.

19            (EXHIBIT SC-3 MARKED.)

20    BY MS. ANASTASSIOU:

21        Q.  AND I HAVE HANDED YOU A PRESENTATION THAT'S

22    CALLED FRESH 'N HEALTHY, THE NEXT FRONTIER OF HEALTH AND

23    NUTRITION JULY 2007.  AND IT'S BATES MARKED SNO 59

Page 52

Cinelli.ROUGHD~1.TXT

24   THROUGH SNO 79.  AND IF YOU CAN TAKE AN OPPORTUNITY TO

25   LOOK AT THAT.  LET ME KNOW WHEN YOU ARE READY FOR

Rough Draft - 64                    NONCERTIFIED ROUGH DRAFT

1    QUESTIONS.

2         A.   SURE.  GO AHEAD.

3         Q.   OKAY.  AND THIS PARTICULAR POWERPOINT

4    PRESENTATION WAS PROVIDED TO SNOW SEED IN CONNECTION

5    WITH NEGOTIATIONS BETWEEN SNOW SEED AND FRESH 'N

6    HEALTHY.  IS THIS THE POWERPOINT PRESENTATION THAT YOU

7    ARE REFERRING TO?

8         A.   I WOULD IMAGINE SO.

9         Q.   OKAY.  COULD YOU LOOK AT IT AND LET ME KNOW FOR

10   SURE?

11        A.   THERE WERE A SERIES ADVICE OF POWERPOINT

12   PRESENTATIONS.  IT WAS CONSTANTLY BEING UPDATED.  THIS

13   WAS CERTAINLY ONE OF THE PRESENTATIONS THAT WERE, YOU

14   KNOW, THAT WAS BEING DISCUSSED.

15        Q.   WHO PREPARED THESE POWERPOINT PRESENTATIONS?

16        A.   I PREPARED THEM WITH INPUT FROM THE MANAGEMENT

17   TEAM.

18        Q.   AND WHO WOULD YOU DEFINE AS THE MANAGEMENT

19   TEAM?

20        A.   MARK WILLIAMS, MARK MCCORMICK, TOM PAVICH, CHAD

21   HAGEN.

22        Q.   WHO WERE THE OFFICERS OF THE COMPANY?

23        A.   JUST WHO I NAMED.

24        Q.   WILLIAMS, MCCORMICK, PAVICH, HAGEN AND

25   YOURSELF?

Rough Draft - 65                    NONCERTIFIED ROUGH DRAFT

1         A.   I WAS NEVER AN OFFICER, I WAS THE DIRECTOR.

2              (OFF THE RECORD.)

3    BY MS. ANASTASSIOU:

Cinelli.ROUGHD~1.TXT

4       Q.   SO YOU SAID THAT YOU WERE NEVER AN OFFICER ONLY

5  A DIRECTOR?

6       A.   YES.

7       Q.   SO MR. WILLIAMS WAS AN OFFICER, WHAT WAS HIS

8  TITLE?

9       A.   CEO.  PRESIDENT AND CEO.

10      Q.   AND MR. MCCORMICK?

11      A.   CHIEF FINANCIAL OFFICER.

12      Q.   AND MR. MCCORMICK, HE LEFT FRESH 'N HEALTHY

13  SOMETIME IN MID-2007, CORRECT?

14      A.   THAT'S CORRECT.

15      Q.   SO WHO TOOK OVER HIS POSITION AS CFO WHEN HE

16  LEFT?

17      A.   HE LEFT PROBABLY IN AUGUST, AND THE COMPANY HAD

18  HIRED AN OUTSIDE RENT-A-CONTROLLER FROM AN OUTSIDE FIRM.

19  I CAN'T REMEMBER THE FIRM.

20      Q.   WHAT WAS THE NAME OF THE CONTROLLER?

21      A.   AJ CHANDRA.

22      Q.   SPELL THAT?

23      A.   C-H-A-N-D-R-A.

24      Q.   THEN HE WAS A LEASED EMPLOYEE?

25      A.   YES.

Rough Draft - 66                      NONCERTIFIED ROUGH DRAFT

1       Q.   AND HOW LONG DID HE WORK FOR FRESH 'N HEALTHY,

2  AJ CHANDRA?

3       A.   UP UNTIL PROBABLY EARLY -- OR JANUARY.

4       Q.   OF 2008?

5       A.   CORRECT.

6       Q.   AND THEN YOU SAID MR. PAVICH WAS AN OFFICER?

7       A.   YES.

8       Q.   WHAT WAS HIS TITLE?

Page 54

Cinelli.ROUGHD~1.TXT

9      A.   I THINK VICE PRESIDENT OF SALES.  I'M NOT SURE

10   WHETHER HE WAS A SALARIED EMPLOYEE OR COMPENSATED AS A

11   CONSULTANT.  AND, IN FACT, I DON'T KNOW WHETHER OR NOT

12   ANY OF THE MANAGEMENT TEAM WAS COMPENSATED AS SALARIED

13   EMPLOYEES OR AS CONSULTANTS.

14      Q.   YOU SAID MR. WILLIAMS I THOUGHT YOU SAID HAD A

15   $240,000 SALARY?

16      A.   THAT'S CORRECT.

17      Q.   SO HE DID GET A SALARY?

18      A.   YES, HE DID.

19      Q.   BUT OTHER THAN THAT YOU DON'T KNOW IF ANYONE

20   ELSE DID?

21      A.   THEY WERE ALL COMPENSATED, WHETHER OR NOT THEY

22   WERE COMPENSATED AS SALARIED EMPLOYEES OR CONSULTANTS, I

23   COULDN'T TELL YOU.  MCCORMICK WAS RUNNING ALL THE BOOKS.

24      Q.   DO YOU KNOW WHAT MR. MCCORMICK'S RATE OF

25   COMPENSATION WAS?

Rough Draft - 67                    NONCERTIFIED ROUGH DRAFT

1      A.   I BELIEVE IT WAS A HUNDRED AND 80,000.

2      Q.   A YEAR?

3      A.   YES.

4      Q.   AND THEN YOU SAID THAT HIS SALARY WAS SUPPOSED

5   TO START IN FEBRUARY OF 2007 BUT YOU BELIEVE HE WAS PAID

6   FOR PRIOR TO THAT?

7      A.   THAT'S CORRECT.

8      Q.   AND YOU DON'T KNOW HOW MUCH PRIOR?

9      A.   NO, I'M STILL TRYING TO FIGURE OUT HOW MANY

10   CHECKS WERE WRITTEN.

11      Q.   AND HAGEN, WHAT WAS HIS POSITION AS AN OFFICER

12   OF THE COMPANY?

13      A.   VICE PRESIDENT OF MARKETING.

14      Q.   AND THEN DO YOU KNOW WHAT HIS COMPENSATION WAS?

Cinelli.ROUGHD~1.TXT

15    A.    NO, I DON'T, NO, I DON'T.

16    Q.    AND WAS JACK PARSON AN OFFICER?

17    A.    I BELIEVE FOR A PERIOD OF TIME.  AND I THINK IT

18    WAS VP OF SPECIAL PROJECTS.  AND THEN THERE WAS SOME

19    DIFFERENCE OF OPINION BETWEEN HE AND WILLIAMS AND I

20    BELIEVE HE BECAME A CONSULTANT IN SOME FASHION.

21    Q.    AND WAS HE EVER, LIKE, EMPLOYED DAILY AT THE

22    COMPANY?

23    A.    YEAH, HE WAS THERE DAILY.

24    Q.    UNTIL WHAT PERIOD OF TIME?

25    A.    PROBABLY MIDYEAR AND THEN HE HAD A SEPARATE

Rough Draft - 68                    NONCERTIFIED ROUGH DRAFT

1    OFFICE THAT HE OPERATED OUT OF.

2    Q.    TO MID-2007 ARE YOU SAYING HE WAS DAILY?

3    A.    HE WAS DAILY AND THEN I THINK HE MOVED TO

4    SEPARATE OFFICES PROBABLY MIDYEAR.  BUT HE WAS STILL

5    COMPENSATED I BELIEVE AS A CONSULTANT OR ADVISER TO

6    WILLIAMS.

7    Q.    AND YOU DON'T KNOW WHAT THAT RATE OF

8    COMPENSATION WAS?

9    A.    NO, I DO NOT.

10    Q.    AND THEN DURING THIS WHOLE TIME PERIOD, YOU HAD

11    SAID THAT HE HAD THIS --

12    A.    HE HAD DIVERSIFIED FOOD NETWORK.

13    Q.    WAS HE INVOLVED IN THAT THE WHOLE TIME?

14    A.    YES.

15    Q.    AND THAT WAS A PRODUCE SALES COMPANY?

16    A.    YES.

17    Q.    AND WAS HE DOING SALES FOR THE COMPANY THE

18    WHOLE PERIOD IN WHICH FRESH 'N HEALTHY WAS IN OPERATION?

19    A.    I BELIEVE SO.

Page 56

Cinelli.ROUGHD~1.TXT

20      Q.   AND SO HE WAS GETTING COMPENSATED AS AN OFFICER

21   AND ALSO MAKING COMPENSATION AS A BROKER?

22      A.   I BELIEVE SO.

23      Q.   DO YOU KNOW WHAT THE TERMS OF THE ARRANGEMENTS

24   WERE BETWEEN DIVERSIFIED AND FRESH 'N HEALTHY?

25      A.   NO, I DON'T.

Rough Draft - 69                    NONCERTIFIED ROUGH DRAFT

1      Q.   WAS THERE A WRITTEN CONTRACT?

2      A.   I DON'T KNOW.  THAT WAS BETWEEN WILLIAMS,

3   MCCORMICK AND PARSON.

4      Q.   GETTING BACK TO THIS POWERPOINT PRESENTATION,

5   YOU BELIEVE THAT SOMETHING SIMILAR TO THIS WAS THE

6   INFORMATION YOU USED TO SOLICIT INVESTMENT?

7      A.   THAT'S CORRECT.

8      Q.   AND DID YOU HAVE ANY FINANCIAL STATEMENTS THAT

9   YOU PROVIDED TO THE INVESTORS?

10      A.   YEAH, THERE WERE SOME FINANCIALS, SOME

11   PROJECTIONS IN THE BACK.

12      Q.   IN SNO 76?

13      A.   UH-HUH.

14      Q.   I GUESS THERE WAS -- 75 AND 76?  ARE THOSE

15   PRIMARILY THE INFORMATION THAT WAS USED TO SOLICIT THE

16   INVESTORS?

17      A.   I BELIEVE SO.

18      Q.   AND YOU SAID THAT THIS DOCUMENT WAS UPDATED AND

19   CHANGED OCCASIONALLY?

20      A.   THAT'S CORRECT.

21      Q.   SO YOU ARE NOT SURE IF THIS WAS THE EXACT

22   DOCUMENT BUT IT WAS --

23      A.   CLOSE, I AM SURE IT'S CLOSE THERETO.

24      Q.   AND OTHER THAN THAT $1.5 MILLION PRIVATE

25   PLACEMENT THAT YOU HAVE TESTIFIED TO, WERE THERE ANY

1    OTHER EFFORTS TO RAISE MONEY FOR FRESH 'N HEALTHY?

2        A.   YES.

3        Q.   WHAT WERE THOSE?

4        A.   TWO THINGS, RAISING ADDITIONAL EQUITY TO

5    FACILITATE THE ACQUISITION OF A SEPARATE COMPANY, WHICH

6    IS ALLUDED TO IN THE PROJECTIONS.  AND THEN ALSO

7    DISCUSSIONS TO RAISE ADDITIONAL REAL ESTATE FUNDS.

8        Q.   WERE THESE EVER ACCOMPLISHED OR --

9        A.   NO, THEY WEREN'T.

10       Q.   OKAY.

11       A.   AND THE REASON --

12       Q.   LET ME JUST GO.  FIRST YOU SAID THAT YOU HAD

13   SOME EFFORTS TO RAISE ADDITIONAL EQUITY FOR ANOTHER

14   BUSINESS.  WHAT WAS THAT BUSINESS?

15       A.   BAY AREA HERBS AND SPECIALTIES.

16       Q.   WHAT WAS BAY AREA HERBS AND SPECIALTIES?

17       A.   BASICALLY A DISTRIBUTOR OF FRESH HERBS.

18       Q.   THAT WAS ANOTHER ENTITY THAT WAS IN BUSINESS?

19       A.   YES.

20       Q.   SEPARATE AND APART FROM GOURMET VEG-PAQ?

21       A.   THAT'S CORRECT.

22       Q.   WAS IT ALSO OWNED BY SANTOS MARTINEZ?

23       A.   NO, COMPLETELY SEPARATE ISSUE.

24       Q.   AND YOU GOT INTO DISCUSSIONS WITH THEM BUT THAT

25   PURCHASE WAS NEVER CONSUMMATED?

1        A.   WE HAD SIGNED A LETTER OF INTENT, WE WERE IN

2    THE MIDST OF BOTH DUE DILIGENCE AND FUND-RAISING, AND

3    THAT WAS NOT CONSUMMATED LARGELY BECAUSE FIRST FRESH 'N

4    HEALTHY COULD NOT PRODUCE HISTORICAL FINANCIAL

Cinelli.ROUGHD~1.TXT

5  STATEMENTS, AND THEN SECONDLY, ONCE WE -- OR ONCE FRESH

6  'N HEALTHY DID LARGELY THROUGH THE EFFORTS OF

7  MR. CHANDRA, THE RESULTS WERE PRETTY DISMAL.

8      Q.  SO THEY BACKED OUT OF IT?

9      A.  WE WERE HOLDING CONVERSATIONS WITH A NUMBER OF

10  PRIVATE EQUITY FUNDS WHO LIKED THE CONCEPT BUT WHEN THEY

11  SAW THE FRESH 'N HEALTHY NUMBERS, WELL, THEY WERE, YOU

12  KNOW, THEY WERE ANXIOUS TO SEE THE NUMBERS, WHICH I

13  DON'T BELIEVE FINANCIAL STATEMENTS WERE PRODUCED UNTIL

14  OCTOBER.  AND THAT WAS UNDER CHANDRA.  MR. MCCORMICK, HE

15  WAS LET GO LARGELY BECAUSE HE DIDN'T PUT THE FINANCIAL

16  RECORDS TOGETHER.

17      Q.  WHAT DID THOSE FINANCIAL RECORDS SHOW,

18  OBVIOUSLY YOU ARE GOING TO PRODUCE THEM, DO YOU RECALL

19  WHAT THEY SHOWED?

20      A.  THE FIRST INCOME STATEMENT THAT CAME OUT WAS

21  PROBABLY FOR THE MONTH OF AUGUST OR SEPTEMBER.  AND IT

22  SHOWED THAT FRESH 'N HEALTHY HAD LOST PROBABLY 2 1/2 TO

23  $3 MILLION FOR THE FIRST FIVE, SIX MONTHS OF OPERATION.

24      Q.  AND THEN YOU SAID THERE WAS A DISCUSSION ABOUT

25  SOME REAL ESTATE FUNDING ALSO?

Rough Draft - 72                   NONCERTIFIED ROUGH DRAFT

1      A.  YES.

2      Q.  WHAT WAS THAT WITH RESPECT TO?

3      A.  THAT WAS TO REFINANCE THE ORIGINAL FINANCING

4  FOR THE EL CENTRO FACILITY TO ARRANGE FINANCES FOR THE

5  HOLLISTER FACILITY, AND THEN ALSO TO ACQUIRE FARMLAND.

6      Q.  WAS THAT -- THE HOLLISTER FACILITY AND FARMLAND

7  WAS GOING TO BE PURCHASED FROM SANTOS MARTINEZ?

8      A.  THAT'S CORRECT.

9      Q.  AND WHAT HAPPENED WITH THAT TRANSACTION?

10      A.  THOSE CONVERSATIONS WERE EXHAUSTED LARGELY

Page 59

Cinelli.ROUGHD~1.TXT

11   BECAUSE OF THE NUMBERS THAT WERE FINALLY PRODUCED BY

12   FRESH 'N HEALTHY.

13       Q.   SO SANTOS SAID HE WASN'T INTERESTED IN GOING

14   FORWARD WITH IT?

15       A.   SANTOS WANTED TO SELL THE COMPANY, WAS UNABLE

16   TO ARRANGE THE FINANCING LARGELY BECAUSE OF THE

17   PERFORMANCE OF FRESH 'N HEALTHY.

18       Q.   SO WHO WERE YOU TALKING TO IN ORDER TO GET THE

19   FUNDING, THE REAL ESTATE FUNDING?

20       A.   A NUMBER OF PRIVATE EQUITY FUNDS THAT

21   SPECIALIZE IN REAL ESTATE.

22           MS. ANASTASSIOU:  LET'S MARK THIS AS SC NO. 4.

23           (EXHIBIT SC-4 MARKED.)

24   BY MS. ANASTASSIOU:

25       Q.   I HAVE HANDED THE WITNESS A DOCUMENT THAT IS
                     NONCERTIFIED ROUGH DRAFT

Rough Draft - 73

1   MARKED SC NO. 4.  IT'S BATES STAMP SNO 169, 170 AND 171.

2   AND IT CONSISTS OF SOME INFORMATION REGARDING AN

3   ENTITIES CALLED VFINANCE INC. AS WELL AS AN

4   ADVERTISEMENT BY VFINANCE INVESTMENTS INC. FOR AN

5   OFFERING $10,500,000 OFFER FOR FRESH 'N HEALTHY.  HAVE

6   YOU HAD AN OPPORTUNITY TO LOOK AT THIS DOCUMENT?

7       A.   YES.

8       Q.   OKAY.  TURNING TO THE LAST PAGE OF THAT

9   REPORT --

10       A.   YES.

11       Q.   -- THAT YOU HAVE THE TOMBSTONE.  WAS THAT

12   OFFERING EVER SOLICITED TO PEOPLE OR CAN YOU TELL ME

13   ABOUT THAT OFFERING, IS THAT SOMETHING THAT YOU WERE

14   INVOLVED WITH?

15       A.   THAT WAS NEVER DONE.  THIS IS THE FIRST TIME

Page 60

Cinelli.ROUGHD~1.TXT

16    I'VE SEEN THIS.  IT WASN'T AN INITIAL PUBLIC OFFERING.

17    IT WASN'T A FINANCING.  IT WAS BASICALLY -- IT WAS A

18    PRIVATE -- IT WAS FUND-RAISING SUCH AS I DESCRIBED, YOU

19    KNOW, COAMERICA, SOME PRIVATE INVESTORS, SELLER

20    FINANCING.  THE 10.5 MILLION WAS PROBABLY THE

21    TRANSACTION AMOUNT, BUT THERE WAS NO SECURITIES OFFERING

22    HERE, IT'S AN INCORRECT ADVERTISEMENT.

23        Q.  SO WHAT IS THIS, IT'S LIKE A -- IT LOOKS TO ME

24    KIND OF LIKE A TOMBSTONE OR A --

25        A.  IT IS A TOMBSTONE.

Rough Draft - 74                    NONCERTIFIED ROUGH DRAFT

1        Q.  OKAY.  AND SO THE TOMBSTONE WAS JUST A

2    REPRESENTATION OF --

3        A.  A TRANSACTION THAT WAS CONSUMMATED.

4        Q.  WITH --

5        A.  AND BECAUSE MY BROKER OR MY SECURITIES LICENSE

6    RESTED WITH THE FINANCE, THEY INCLUDED THAT AS A

7    TRANSACTION THAT, YOU KNOW, HAD THE INTEREST FINANCING

8    ON IT.  WHAT WAS WAS DESCRIBED HERE IN TERMS OF A DEALER

9    IN THE INITIAL PUBLIC OFFEIRNG IS ABSOLUTELY INCORRECT.

10        Q.  SO THERE WAS NO IPO, THIS IS JUST THE

11    TRANSACTION YOU PREVIOUSLY DESCRIBED TO ME WITH SANTOS

12    AND --

13        A.  THAT'S CORRECT.

14        Q.  -- THE PURCHASE OF THE EL CENTRO FACILITY?

15        A.  THAT'S CORRECT.  AND I HAVEN'T SEEN THIS THING,

16    SO.  I DO NOT KNOW IF IT WAS PUBLISHED.

17        Q.  AND GOING BACK TO THE VFINANCE, IT LISTS HERE

18    AS A HEADQUARTERS OF THAT OPERATION AS BOCA RATON,

19    FLORIDA.

20        A.  YES.

21        Q.  AND SO THERE'S -- THERE IS ALSO AN OFFICE

Page 61

Cinelli.ROUGHD~1.TXT

22    LISTED HERE IN NEW YORK?

23        A.   THAT'S CORRECT.

24        Q.   OKAY.  SO THERE'S TWO OFFICES?

25        A.   THERE IS A MULTITUDE OF OFFICES.  VFINANCE IS A

Rough Draft - 75                    NONCERTIFIED ROUGH DRAFT

1    REGISTERED BROKER DEALER, IT HAS A RETAIL BROKERAGE

2    BUSINESS, IT HAS AN INVESTMENT BANKING DIVISION.

3    INVESTMENT BANKING DIVISION IS LARGELY CONTRIVED OF A

4    VERY FEW SALARIED EMPLOYEES, YOU KNOW, MOSTLY OTHER

5    BANKERS HAVE AN INDEPENDENT CONTRACTOR RELATIONSHIP WITH

6    THE FINANCE.  I WAS ONE OF THOSE BANKERS AND ESSENTIALLY

7    THEY HELD MY SECURITIES LICENSES FOR WHICH ANY FEES THAT

8    I WOULD GENERATE IN INVESTMENT BANK ACTIVITIES THEY

9    WOULD PARTICIPATE.

10        Q.   ARE YOU AN OWNER IN THAT COMPANY, IN VFINANCE

11    INC.?

12        A.   I'VE GOT DE MINIMUS OPTIONS.

13        Q.   YOU SAID YOU ARE LIKE AN INDEPENDENT CONTRACTOR

14    WITH THEM?

15        A.   YES, BUT WE HAVE SEVERED THAT RELATIONSHIP

16    RECENTLY.

17        Q.   WHEN DID THAT HAPPEN?

18        A.   OVER THE LAST MONTH.

19        Q.   WHAT WAS THE REASON FOR THAT?

20        A.   THE RELATIONSHIP, IT WASN'T A WIN-WIN

21    SITUATION.

22        Q.   WHAT WAS THE REASON FOR THE SEVERANCE, WAS IT

23    YOUR INITIATIVE OR --

24        A.   IT WAS BOTH, IT WAS BOTH.  THEY WERE IN NEW

25    YORK, THEY DIDN'T SHARE BUSINESS OPPORTUNITIES, I WAS

Rough Draft - 76                    NONCERTIFIED ROUGH DRAFT

Cinelli.ROUGHD~1.TXT

1  CONSUMED WITH THIS SILLY FRESH 'N HEALTHY SITUATION,

2  WHICH SUCKED UP A LOT OF MY TIME, SO FROM AN INVESTMENT

3  BANKING PRODUCTION, I DIDN'T PRODUCE, YOU KNOW, FEES FOR

4  THEM, AND SO IT WAS A, AS I SAID, IT WASN'T A

5  COMPLEMENTARY RELATIONSHIP.

6      Q.  HOW LONG DID YOU HAVE THAT RELATION WITH THEM

7  FOR?

8      A.  I PROBABLY HAD -- ABOUT THREE YEARS I HAD MY

9  SECURITIES LICENSE WITH THEM.

10      Q.  AND SO THEN YOU HAVE DISCUSSED WITH ME ALL THE

11  EFFORTS OF FUND-RAISING THAT YOU RECALL --

12      A.  YES.

13      Q.  -- WITH RESPECT TO FRESH 'N HEALTHY, THERE WAS

14  THE $1.5 MILLION PRIVATE PLACEMENT, AND THEN THE TWO

15  OTHER FUNDING OPPORTUNITIES THAT DIDN'T HAPPEN, THE REAL

16  ESTATE FUNDING AND THE HERBS AND SPECIALTY FUNDING,

17  CORRECT?

18      A.  WE WERE LOOKING ON THE HERB BUSINESS, WE WERE

19  LOOKING TO RAISE ANOTHER $10 MILLION OF EQUITY, THREE

20  QUARTERS OF WHICH WAS DEVOTED TO THE ACQUISITIOIN, BAY

21  AREA HERBS, THE REST WOULD JUST BE WORKING CAPITAL FOR

22  FRESH 'N HEALTHY AT LARGE.  AND THEN WE WERE LOOKING TO

23  RAISE, OH, I GUESS 15 TO $20 MILLION FOR THE REAL

24  ESTATE.

25      Q.  AND THAT WAS ALL YOU HAD PERSONALLY THAT WAS --

Rough Draft - 77                NONCERTIFIED ROUGH DRAFT

1      A.  I WAS DRIVING THAT PROCESS.  MY ROLE WITHIN THE

2  COMPANY WAS SORT OF AN OUTSIDE ADVISER LOOKING AT

3  EXTERNAL OPPORTUNITIES.  I WAS NOT INVOLVED IN THE

4  DAY-TO-DAY MANAGEMENT OR -- INFORMATION I RECEIVED FROM

5  THE COMPANY WAS GIVEN BY MCCORMICK AND WILLIAMS.  WHICH

6  WAS USED LARGELY FOR PRESENTATION PURPOSES.

Page 63

Cinelli.ROUGHD~1.TXT

7          Q.   AND WHAT PRIOR EXPERIENCE HAD WILLIAMS HAD IN

8    RUNNING A PRODUCE COMPANY PRIOR TO BECOMING THE CEO AND

9    PRESIDENT OF FRESH 'N HEALTHY?

10         A.   HE WAS FORMERLY THE CEO OF A SUPERMARKET AND

11   WHOLESALE DISTRIBUTER BY THE NAME OF CARR GOTTSTEIN

12   FOODS UP IN ALASKA.  AND UNDER MARK, THE COMPANY RAMPED

13   UP FROM ABOUT 50 MILLION IN REVENUES TO ABOUT

14   800 MILLION.  THEY DID A MANAGEMENT BUYOUT WITH ONE OF

15   THE BIG PRIVATE EQUITY FIRMS.  SUBSEQUENTLY DID A

16   SUCCESSFUL INITIAL PUBLIC OFFERING AND THEN EVENTUALLY

17   SOLD TO SAFEWAY.

18         Q.   BUT YET YOU SAID THAT -- WHEN I ASKED YOU IF HE

19   HAD A MILLION DOLLARS OF ASSETS TO BACK UP HIS GUARANTEE

20   YOU SAID YOU DIDN'T THINK SO?

21         A.   I DON'T BELIEVE SO.

22         Q.   AND SO IF HE HAD --

23         A.   I HAVE NO IDEA.

24         Q.   IF HE DID THAT SUCCESSFUL MANAGEMENT BUYOUT AND

25   ALL THAT RAMP-UP, WHAT HAPPENED TO HIS MONEY?

Rough Draft - 78                    NONCERTIFIED ROUGH DRAFT

1          A.   I COULDN'T TELL YOU.

2          Q.   AND HOW DID YOU MEET MR. WILLIAMS, THROUGH MR.

3    PARSON?

4          A.   NO, NO, NO, MR. WILLIAMS AND I GOT TO KNOW EACH

5    OTHER PROBABLY TEN YEARS AGO.  I WAS ADVISING A SEPARATE

6    SUPERMARKET CHAIN DOWN IN THE CENTRAL VALLEY BY THE NAME

7    OF SAVE MART SUPERMARKETS, THEIR CFO SAVE MART TOOK A

8    JOB AT CARR GOTTSTEIN IN ALASKA AND THAT CFO ASKED ME TO

9    COME UP TO ADVISE CARR GOTTSTEIN IN SOME TRANSACTIONAL

10   WORK.

11         Q.   AND THAT'S HOW YOU MET MR. WILLIAMS?

Cinelli.ROUGHD~1.TXT

12    A.    THAT'S CORRECT.

13    Q.    AND NOW MR. WILLIAMS HAS JUST SKIPPED OUT TO

14   COSTA RICA?

15    A.    THAT'S THE LAST I HEARD.

16    Q.    DID HE EXPLAIN TO YOU WHY HE HAD GONE TO COSTA

17   RICA?

18    A.    NO.

19    Q.    SO YOU HAVE NO IDEA OF WHAT HIS INVOLVEMENT IS

20   THERE?

21    A.    NO.

22    Q.    WERE YOU EVER AWARE OF MR. WILLIAMS HAVING A

23   GIRLFRIEND NAMED SUE DAVIS?

24    A.    YES.

25    Q.    AND WHAT DID YOU KNOW ABOUT THEIR RELATIONSHIP?

Rough Draft - 79                    NONCERTIFIED ROUGH DRAFT

1    A.    AS FAR AS I, KNOW THEY WERE ENGAGED AND THEY

2   WERE LIVING TOGETHER DOWN IN ARIZONA SOMEWHERE.

3    Q.    DO YOU KNOW WHAT HAPPENED TO THAT RELATIONSHIP?

4    A.    NO, I DON'T.

5    Q.    DO YOU KNOW IF MR. WILLIAMS OWNS ANY REAL

6   PROPERTY?

7    A.    I ASSUME THAT HE OWNED HIS HOME DOWN IN

8   ARIZONA, BUT I'M NOT SURE.

9    Q.    DID YOU EVER GO TO THE HOME IN ARIZONA?

10    A.    I DON'T KNOW IF IT WAS THE SAME HOME, I DID

11   VISIT HIM TEN YEARS AGO.

12    Q.    WAS SUE DAVIS THERE OR SOMEBODY ELSE?

13    A.    I COULDN'T RECALL.

14    Q.    AND SO YOU HAVEN'T BEEN TO HIS PLACE IN ARIZONA

15   FOR ABOUT TEN YEARS?

16    A.    THAT'S CORRECT.

17    Q.    AND WHEN MR. WILLIAMS WAS WORKING FOR FRESH 'N

Cinelli.ROUGHD~1.TXT

18    HEALTHY, WHERE WAS HE RESIDING?

19        A.   I THINK HE MAINTAINED HIS RESIDENCE STILL DOWN

20    IN ARIZONA BUT HE WAS LEASING A CONDO I THINK SOMEWHERE

21    IN MONTEREY, OF WHICH THE COMPANY WAS PAYING FOR.

22        Q.   SO THE COMPANY PAID FOR THE CONDO IN MONTEREY?

23        A.   THAT'S CORRECT.

24            MS. ANASTASSIOU:  LET'S MARK THIS AS SC NO. 5.

25            (EXHIBIT SC-5 MARKED.)

Rough Draft - 80                    NONCERTIFIED ROUGH DRAFT

1    BY MS. ANASTASSIOU:

2        Q.   I HAVE JUST HANDED YOU A DOCUMENT MARKED SC

3    NO. 5 AND IT'S LABELED SNO 46.  AND THIS IS A DOCUMENT

4    THAT WAS PROVIDED TO SNOW SEED BY YOURSELF IN CONNECTION

5    WITH NEGOTIATIONS RELATING TO THE DEBT.  IF YOU CAN TAKE

6    AN OPPORTUNITY TO TAKE A LOOK AT THAT, LET ME KNOW WHEN

7    YOU ARE READY FOR QUESTIONS.

8        A.   I'M READY.

9        Q.   NOW, THIS PARTICULAR DOCUMENT SHOWS A PRETAX

10    LOSS FOR JULY OF 2007 IN THE AMOUNT OF $372,000.  DO YOU

11    SEE THAT?

12        A.   UH-HUH.

13        Q.   AND IT SHOWS A PRETAX LOSS FOR AUGUST OF

14    211,000.  DO YOU SEE THAT?

15        A.   UH-HUH.

16        Q.   NOW, THAT TO ME ADDS UP TO SOMETHING LIKE A

17    LITTLE LESS THAN $600,000 IN LOSSES FOR THOSE TWO

18    MONTHS, CORRECT?

19        A.   UH-HUH.

20        Q.   AND THEN YOU HAD SAID THOUGH PREVIOUSLY WHEN WE

21    WERE TALKING THAT ACTUALLY FRESH 'N HEALTHY DURING THE

22    INITIAL MONTHS OF ITS OPERATIONS HAD SUBSTANTIAL GREATER

Page 66

Cinelli.ROUGHD~1.TXT

23    LOSSES THAN THAT.

24         A.   UH-HUH.

25         Q.   AND WHEN WERE THOSE LOSSES INCURRED, IN THE

Rough Draft - 81                NONCERTIFIED ROUGH DRAFT

1    MARCH, APRIL, MAY?

2         A.   WHAT HAPPENED, FROM AN INFORMATION STANDPOINT,

3    IS THAT UNDER MARK MCCORMICK, NO FINANCIAL STATEMENTS

4    WERE PRODUCED.  SO WE REALLY -- WE DIDN'T HAVE ANY

5    NUMBERS FROM MARCH, APRIL, MAY, JUNE, JULY, AUGUST,

6    SEPTEMBER.  AJ CHANDRA CAME IN PROBABLY IN OCTOBER, LATE

7    OCTOBER, AND HAD TO GO THROUGH ALL THE BOOKS AND RECORDS

8    AS WELL AS HE COULD TO ESTABLISH THE HISTORICAL

9    FINANCIAL STATEMENTS FROM THE BEGINNING OF FRESH 'N

10   HEALTHY.  IN FACT, BEYOND THAT TO THE BEGINNING OF THE

11   YEAR, WHICH WOULD BE THREE MONTHS UNDER SANTOS MARTINEZ

12   OWNERSHIP.  AT THE TIME OF THIS STATEMENT, I BELIEVE AJ

13   HAD ONLY GOTTEN BACK AS FAR AS JULY.  HE HAD NOT

14   FINISHED UP THE PRIOR MONTHS.  WHEN THE PRIOR MONTHS DID

15   COME OUT, IT SHOWED THAT I THINK MAY, JUNE THERE WERE,

16   YOU KNOW, MILLION DOLLAR LOSSES.  AND, AGAIN, THESE

17   NUMBERS WERE PROVIDED BY AJ BASED ON THE INFORMATION

18   THAT HE ASSEMBLED FOR THESE MONTHS.

19        Q.   WHAT ABOUT HIS PROJECTED BUDGET SHOWING A

20   TURNAROUND FOR OCTOBER, NOVEMBER AND DECEMBER?

21        A.   THOSE WERE PROVIDED BY WILLIAMS.

22        Q.   AND DID THAT TURNAROUND ACTUALLY HAPPEN?

23        A.   NO, NO.  I BELIEVE OCTOBER WAS SORT OF

24   BREAKEVEN AND NOVEMBER AND DECEMBER WERE I BELIEVE

25   DISMAL.  I DON'T BELIEVE THAT AJ -- I THINK THE LAST

Rough Draft - 82                NONCERTIFIED ROUGH DRAFT

1    MONTH HE ACTUALLY PUT THE BOOKS TOGETHER WAS EITHER

2    OCTOBER OR NOVEMBER.

                    Page 67

Cinelli.ROUGHD~1.TXT

```
 3      Q.   AND THEN WHO DID IT AFTERWARDS?

 4      A.   THAT WAS IT.

 5      Q.   AND THEN THE COMPANY JUST SHUT DOWN?

 6      A.   CORRECT.

 7      Q.   WHO MADE THE DECISION TO SHUT DOWN THE COMPANY?

 8      A.   THE BANK.  COMERICA.

 9      Q.   AND COMERICA BANK JUST ONE DAY SAID, HEY, WE'RE

10  SHUTTING YOU DOWN?

11      A.   YEAH, THEY DIDN'T WANT TO INCUR ANY FURTHER

12  LIABILITIES.

13      Q.   WHAT FURTHER LIABILITIES WERE THEY INCURRING?

14      A.   WELL, THERE WERE PAYABLES THAT WERE INCURRED

15  AND THERE WAS A SERIES OF LAWSUITS AND SO THE

16  COMBINATION OF BURBANK AND COMERICA INDICATED THAT --

17      Q.   BURBANK?

18      A.   RUSS BURBANK, THE ADVISER.

19      Q.   WHEN DID RUSS BURBANK START BEING AN ADVICE-ER

20  TO FRESH 'N HEALTHY?

21      A.   SEPTEMBER, OCTOBER.

22      Q.   AND HE WAS -- YOU WERE TOLD BY COMERICA BANK

23  THAT MR. BURBANK SHOULD BECOME INVOLVED IN FRESH 'N

24  HEALTHY?

25      A.   YEAH, THEY REQUIRED THE COMPANY TO HIRE A
```

Rough Draft - 83                    NONCERTIFIED ROUGH DRAFT

```
 1  TURNAROUND ADVISER.  AND THEY GAVE US TWO OPTIONS, AND

 2  WE SELECTED BURBANK.

 3      Q.   WHO WAS THE OTHER OPTION?

 4      A.   SOME GENTLEMAN DOWN IN THE CENTRAL VALLEY.

 5      Q.   WHAT EXPERIENCE DID MR. BURR BURR HAVE WITH

 6  PRODUCE COMPANIES PRIOR TO WORKING FOR FRESH 'N HEALTHY?

 7      A.   HE HAD INDICATED HE HAD DONE SOME WORK WITH
```

Page 68

Cinelli.ROUGHD~1.TXT

8    FOOD AND PRODUCE COMPANIES, BUT FROM MY RECOLLECTION, HE

9    WASN'T TREMENDOUSLY LONG IN THAT EXPERIENCE.

10        Q.   AND YOU HAVE NO SPECIFIC RECOLLECTION OF ANY

11   FARMING COMPANIES HE HAD?

12        A.   I HAVE NO SPECIFIC RECOLLECTION, NO.

13        Q.   WHAT WAS -- WHAT WERE THE TERMS OF HIS

14   RETENTION, WAS HE BEING PAID?

15        A.   HE WAS GETTING PAID I THINK 495 AN HOUR.  AND

16   HE'S BEEN PAID INCREDIBLE AMOUNTS OF MONEY SINCE COMING

17   ON BOARD.  HE'S HAD GOT TO BE PUSHING A HUNDRED

18   THOUSAND.

19        Q.   AND THEN YOU SAID THAT ALSO COMERICA REQUIRED

20   FRESH 'N HEALTHY TO RETAIN MURRAY AND MURRAY?

21        A.   THEY REQUESTED THAT WE RETAIN COUNSEL.  I DID

22   NOT HAVE ANY PREVIOUS RELATIONSHIP WITH MURRAY AND

23   MURRAY, I BELIEVE BURBANK WAS THE ONE THAT BROUGHT

24   MURRAY AND MURRAY INTO THE EQUATION.

25        Q.   AND DO YOU KNOW WHAT THE TERMS OF THE

Rough Draft - 84              NONCERTIFIED ROUGH DRAFT

1    ARRANGEMENT IS WITH MURRAY & MURRAY?

2         A.   AN HOURLY BASIS.

3         Q.   AND WHAT ARE THEIR HOURLY RATES?

4         A.   I WOULD ASSUME BETWEEN FOUR AND FIVE HUNDRED AN

5    HOUR FOR STEVE O'NEILL, WHO IS THE MAIN ATTORNEY.  I

6    THINK TO DATE THE BILLINGS HAVE BEEN JUST UNDER 50,000.

7         Q.   AND FRESH 'N HEALTHY HAS BEEN MAKING TIMELY

8    PAYMENTS TO THESE TWO ENTITIES?

9         A.   THE BANK HAS CONTROL OF THE BANK ACCOUNT.  AND

10   THEY HAVE BEEN MAKING THE PAYMENTS ON BEHALF OF FRESH 'N

11   HEALTHY.

12        Q.   YOU SAID THAT THE BANK WANTED TO STOP INCURRING

13   LIABILITIES.  I MEAN, IF THEY HAD A LINE OF CREDIT THAT

Page 69

Cinelli.ROUGHD~1.TXT

14    WAS LIMITED TO A 1.5 MILLION TERM LOAN THAT WAS ALREADY

15    OUT THERE, WHAT WERE THEIR ADDITIONAL LIABILITIES THAT

16    THEY WERE ACCRUING?

17        A.   THEY WEREN'T ACCRUING, BUT THEY SAW THAT EVERY

18    MONTH THE COMPANY CONTINUED TO LOSE MONEY.  THEY BELIEVE

19    THAT THE RECEIVABLE -- THEY SAW THE RECEIVABLE LEVEL

20    DIMINISHING.  AND SO I GUESS THEY BELIEVED THAT THEIR

21    COLLATERAL POSITION WAS DIMINISHING.

22        Q.   DID ANY OF THE OFFICERS OR DIRECTORS OF FRESH

23    'N HEALTHY HAVE ANY SAY IN THE DECISION TO CLOSE DOWN OR

24    WAS IT JUST COMERICA JUST DEMANDED THAT IT SHUT DOWN?

25        A.   I WOULD SAY THE LATTER.  I WAS WORKING ON AS

Rough Draft - 85                     NONCERTIFIED ROUGH DRAFT

1    WAS WILLIAMS IN SOME RESPECT A COUPLE THIRD-PARTY JOINT

2    VENTURES TO SUSTAIN THE BUSINESS.  BUT AT THE

3    RECOMMENDATION OF BURBANK IN CONSULTATION WITH THE BANK,

4    THEY BASICALLY PULLED THE TRIGGER.

5        Q.   SO THEY MADE THE DECISION TO SHUT IT DOWN, IT

6    WASN'T THERE WAS A DIRECTORS MEETING OR SHAREHOLDERS

7    MEETING TO --

8        A.   NO.  THEY SUGGESTED TO MURRAY AND MURRAY AND I

9    BELIEVE THAT I -- THEY ASKED ME TO PUT TOGETHER A

10    CORPORATE RESOLUTION AUTHORIZING THE WIND-DOWN, THE

11    ORDERLY WIND DOWN OF THE BUSINESS.

12        Q.   SO THEY REQUESTED THAT YOU DO A CORPORATE

13    RESOLUTION?

14        A.   CORRECT.

15        Q.   DID YOU DO ONE?

16        A.   I BELIEVE I DID SIGN ONE.

17        Q.   AND YOU WERE THE ONLY ONE THAT SIGNED IT?

18        A.   I BELIEVE SO.

Page 70

Cinelli.ROUGHD~1.TXT

19    Q.   NOBODY ELSE SIGNED IT?

20    A.   NO.  AND IT WAS DRAFTED -- I THINK IT WAS

21  DRAFTED BY MURRAY & MURRAY.

22    Q.   AND DO YOU HAVE THAT CORPORATE RESOLUTION?

23    A.   I CAN GET THAT FROM MURRAY & MURRAY.

24    Q.   THAT'S PART OF THE DOCUMENTS THAT YOU INTEND TO

25  PRODUCE, CORRECT?

Rough Draft - 86                    NONCERTIFIED ROUGH DRAFT

1    A.   UH-HUH.

2    Q.   WHEN WAS THE DECISION ACTUALLY MADE TO SHUT

3  DOWN THE COMPANY?

4    A.   PROBABLY NOVEMBER OR DECEMBER.

5    Q.   YOU DON'T REMEMBER SPECIFICALLY?

6    A.   NO.

7    Q.   WAS IT THE DATE OF THE RESOLUTION OR --

8    A.   PRIOR TO THAT.

9    Q.   PRIOR TO THE DATE OF THE RESOLUTION?

10    A.   UH-HUH.

11    Q.   WHAT INVOLVEMENT DID WILLIAMS HAVE IN THE

12  DECISION TO SHUT DOWN THE COMPANY?

13    A.   YOU KNOW, HE HAD SUGGESTED THAT THE COMPANY

14  NEEDED MORE CASH TO SUSTAIN ITSELF.  AND WITHOUT THAT

15  CASH, YOU KNOW, HE WAS THROWING IN THE TOWEL.  THE

16  CHALLENGE, AS I MENTIONED BEFORE WAS, INITIALLY WE

17  DIDN'T HAVE ANY FINANCIAL INFORMATION COMING OUT OF THE

18  COMPANY UNTIL CHANDRA CAME IN, AND THEN WHEN THE NUMBERS

19  STARTED BEING PRODUCED, THE NUMBERS WERE PRETTY DISMAL,

20  WHICH CREATED A PROBLEM FOR ADDITIONAL CAPITAL COMING

21  IN.

22    Q.   AND SO WHEN DID WILLIAMS SAY THAT HE WAS

23  THROWING IN THE TOWEL SO TO SPEAK?

24    A.   PROBABLY DECEMBER, NOVEMBER, DECEMBER.  THE

Page 71

Cinelli.ROUGHD~1.TXT

25    BANK ASKED HIM TO ASSIST IN THE ORDERLY WIND DOWN.  HE
Rough Draft - 87                NONCERTIFIED ROUGH DRAFT

1    ELECTED NOT TO BECAUSE HE WASN'T GOING TO BE

2    COMPENSATED.

3        Q.  SO THEY ASKED HIM TO ASSIST IN THE ORDERLY WIND

4    DOWN AND HE SAID NO BECAUSE THEY WEREN'T GOING TO OFFER

5    HIM ANY MONEY?

6        A.  CORRECT.

7        Q.  BUT THEY WERE PAYING BURBANK 495 AN HOUR?

8        A.  YEAH.  I THINK WILLIAMS STUCK AROUND UNTIL

9    DECEMBER SOMETIME.  AND I TRIED TO ASSIST THIS, BUT I'M

10   NOT BEING COMPENSATED.

11       Q.  WHEN WERE THE EMPLOYEES OF FRESH 'N HEALTHY LET

12   GO?

13       A.  PROBABLY THE END OF DECEMBER.

14       Q.  WHO INFORMED THE EMPLOYEES THAT --

15       A.  I BELIEVE IT WAS WILLIAMS.

16       Q.  WILLIAMS DID?

17       A.  YES.

18       Q.  HOW MANY EMPLOYEES DID FRESH 'N HEALTHY HAVE AT

19   THE TIME IT CLOSED DOWN?

20       A.  I DON'T KNOW.

21       Q.  WAS THERE A PRESS RELEASE THAT WAS DONE TO THE

22   TRADE?

23       A.  I BELIEVE THAT MURRAY & MURRAY DRAFTED A LETTER

24   THAT WAS SENT OUT TO THE SUPPLIERS.

25       Q.  SO THEY WERE THE ONES BEHIND SENDING A LETTER,
Rough Draft - 88                NONCERTIFIED ROUGH DRAFT

1    MURRAY & MURRAY WITH COMERICA, UNDER THE DIRECTION OF

2    COMERICA?

3        A.  I DON'T KNOW UNDER THE DIRECTION OF COMERICA,

Page 72

Cinelli.ROUGHD~1.TXT

4    BUT I KNOW MURRAY AND MURRAY WAS THE ONE THAT SENT IT

5    OUT.

6        Q.   WERE THEY GETTING ADVICE FROM MANAGEMENT, FROM

7    ANY MANAGEMENT OR WHO WAS KIND OF MAKING THE DECISION?

8    BECAUSE THEY ARE A LAW FIRM SO THEY ARE TAKING ORDERS

9    FROM SOMEBODY.

10       A.   I BELIEVE BURBANK.

11       Q.   SO BURBANK ESSENTIALLY KIND OF TOOK OVER

12   RUNNING THE COMPANY AT SOME POINT?

13       A.   HE WAS OVERSEEING THE WIND DOWN.

14       Q.   AT WHAT POINT IN TIME DID MR. BURBANK

15   ESSENTIALLY TAKE CONTROL?

16       A.   HE SPEARHEADED THE ENTIRE WIND DOWN PROBABLY,

17   YOU KNOW, SORT OF IN THE NOVEMBER, DECEMBER TIME FRAME,

18   YOU KNOW, IN CONJUNCTION WITH THE BANK, BECAUSE I WAS

19   THE REMAINING DIRECTOR, THEY HAD ME SIGN DIFFERENT

20   THINGS THAT THEY BELIEVE HAD TO BE ACCOMPLISHED FROM A

21   CORPORATE STANDPOINT.  BUT THE DECISION-MAKING RESTED

22   WITH COMERICA AND BURBANK.

23           MS. ANASTASSIOU:  LET'S MARK THIS AS SC NO. 6.

24           (EXHIBIT SC-6 MARKED.)

25           MS. ANASTASSIOU:  I HAVE JUST HANDED THE

Rough Draft - 89                NONCERTIFIED ROUGH DRAFT

1    WITNESS A DOCUMENT THAT IS FIRST AMENDED COMPLAINT OF

2    SNOW SEED VERSUS FRESH 'N HEALTHY, ET AL.  IT'S

3    BATES-STAMPED SNO 1 THROUGH 45.  AND I WOULD LIKE TO

4    DIRECT YOUR ATTENTION TO EXHIBIT NO. B TO THE COMPLAINT,

5    WHICH IS BATES-MARKED SNO 36 THROUGH 38.

6           THE WITNESS:  OKAY.

7    BY MS. ANASTASSIOU:

8        Q.   AND IF YOU CAN TAKE A LOOK AT THAT, FAMILIARIZE

9    YOURSELF WITH IT AND LET ME KNOW WHEN YOU ARE READY?

Cinelli.ROUGHD~1.TXT

10      A.   I AM FAMILIAR WITH IT.

11      Q.   OKAY.  SO THERE WAS A PROMISSORY NOTE THAT

12   FRESH 'N HEALTHY SIGNED PROMISING TO PAY SNOW SEED AND

13   IT'S DATED NOVEMBER 2ND, 2007?

14      A.   UH-HUH.

15      Q.   AND YOU SIGNED THE NOTE AND MR. WILLIAMS SIGNED

16   THE NOTE; IS THAT CORRECT?

17      A.   CORRECT.

18      Q.   OKAY.  AT THE TIME THIS NOTE WAS SIGNED, WAS

19   COMERICA INFORMED THAT THE NOTE WAS BEING EXECUTED?

20      A.   WE HAD INDICATED THAT THERE WERE PAYMENT TERMS

21   THAT WERE REACHED WITH A HANDFUL OF DIFFERENT VENDORS.

22   I DON'T KNOW SPECIFICALLY, WE MIGHT HAVE MENTIONED SNOW

23   SEED AND THERE WAS ANOTHER SEED COMPANY THAT HAD AGREED

24   TO PAYMENT TERMS.

25      Q.   AND SO YOU RECALL INFORMING THE BANK THAT THERE

Rough Draft - 90                    NONCERTIFIED ROUGH DRAFT

1   WAS AN AGREEMENT MADE FOR PAYMENT TERMS, YOU DON'T

2   RECALL SPECIFICALLY WHETHER OR NOT YOU PROVIDED THIS

3   NOTE TO --

4      A.   THAT'S CORRECT.

5      Q.   -- COMERICA?

6      A.   THAT'S CORRECT.

7      Q.   OKAY.  BUT THEY WERE AWARE THAT THERE WERE

8   OTHER VENDORS THAT WERE -- PAYMENT TERMS WERE BEING

9   MADE?

10      A.   THAT'S CORRECT.

11      Q.   AND THERE WERE PAYMENTS THAT WERE REQUIRED TO

12   BE MADE UNDER THIS NOTE OF $7,500 A WEEK.  WHAT WAS THE

13   GAME PLAN AT THE TIME THAT THIS NOTE WAS EXECUTED AS FAR

14   AS HOW THESE PAYMENTS WERE GOING TO BE MADE?

Page 74

Cinelli.ROUGHD~1.TXT

15        A.   THE INTENT WAS THAT THE PAYMENTS WERE GOING TO

16   BE MADE OUT OF THE CASH FLOWS OF THE BUSINESS.

17        Q.   OKAY.  AND THEN YOU ARE SAYING THOUGH RIGHT

18   ABOUT THIS SAME TIME COMERICA WAS DECIDING TO JUST SHUT

19   DOWN THE BUSINESS, CORRECT?

20        A.   IN LATE NOVEMBER, EARLY DECEMBER.

21        Q.   SO WHEN THEY DECIDED TO SHUT DOWN THE BUSINESS,

22   WERE THEY INFORMED THAT THERE WERE VENDORS THAT WERE

23   RELYING ON THESE PAYMENTS?

24        A.   CORRECT.  THEY SAW THE PAYABLE LIST, THEY KNEW

25   THE EXTENT OF CERTAIN PAYMENT TERMS GENERICALLY WITH

Rough Draft – 91                    NONCERTIFIED ROUGH DRAFT

1   CERTAIN VENDORS.

2        Q.   AND YET THEY DECIDED TO SHUT IT DOWN

3   REGARDLESS?

4        A.   CORRECT.

5        Q.   AND WAS THIS PROMISSORY NOTE IN A FILE THAT

6   WOULD HAVE BEEN SEEN BY MR. BURBANK?

7        A.   I WOULD IMAGINE SO.

8        Q.   AND MR. WILLIAMS EXECUTED THIS NOTE, CORRECT?

9        A.   YES.

10        Q.   WHAT WERE YOUR CONVERSATIONS WITH MR. WILLIAMS

11   AT THE TIME THE NOTE WAS BEING EXECUTED?

12        A.   THE CONVERSATIONS WERE THERE WAS QUITE A LARGE

13   AMOUNT OF PAYABLES AND THE ABILITY OF THE COMPANY TO

14   HANDLE THOSE PAYABLES ON A CURRENT BASIS WAS

15   PROBLEMATIC, SO WE BEGAN CONVERSATIONS WITH A NUMBER OF

16   VENDORS INCLUDING SNOW SEED ABOUT EXTENDED PAYMENT

17   TERMS, BELIEVING THAT THE COMPANY'S CASH FLOW WOULD

18   IMPROVE TO SERVICE THESE PARTICULAR NOTES.

19        Q.   AND YOU SAID THAT AT THE TIME THAT COMERICA

20   MADE THE DECISION TO SHUT DOWN THAT YOU HAD SOME

Page 75

Cinelli.ROUGHD~1.TXT

21    NEGOTIATION PENDING FOR A PARTNERSHIP TRANSACTION?

22        A.  WE HELD CONVERSATIONS WITH A NUMBER OF MAJOR

23    COMPANIES TO PROCESS DIFFERENT PRODUCT ON A CONTRACT

24    BASIS, AND WHILE THOSE WERE BEING ADVANCED, THE BUSINESS

25    BASICALLY CRASHED.  SOME OF THE THINGS THAT UNDERMINED

Rough Draft - 92                    NONCERTIFIED ROUGH DRAFT

1    IT WAS MARTINEZ CAME INTO A COUPLE OF THE PLANTS AND

2    TOOK SOME OF THE EQUIPMENT.

3        Q.  MARTINEZ CAME INTO THE PLANTS AND JUST TOOK THE

4    EQUIPMENT?

5        A.  YEAH.  AND HIS CONTENTION IS THAT SOME OF THE

6    EQUIPMENT WAS SUBJECT -- WHEN WE CONSUMMATED THE

7    TRANSACTION IN MARCH, FEBRUARY OR MARCH, CERTAIN PIECES

8    OF THE EQUIPMENT WERE SUBJECT TO CAPITAL LEASES,

9    THIRD-PARTY LEASES.  AND IT WAS INCUMBENT ON FRESH 'N

10    HEALTHY TO HAVE THOSE LEASES ASSIGNED OR ASSUMED.

11    MCCORMICK DID NOT DO A GOOD JOB OF HAVING THOSE

12    ASSIGNED.  SOME OF THE, FROM WHAT I UNDERSTAND, SOME OF

13    THE LESSORS SOURCE WOULD NOT ASSIGN THOSE WITHOUT A

14    PERSONAL GUARANTEE.

15        Q.  SO MCCORMICK WAS -- OH, MARK --

16        A.  HE WAS THE CFO.

17        Q.  OKAY.  AND HE WAS SUPPOSED TO MAKE SURE THAT

18    THEY WERE ASSIGNED OR ASSUMED AND THAT THEY DIDN'T GET

19    ASSIGNED OR ASSUMED?

20        A.  AND THERE WAS A PROVISION WITHIN THE ASSET

21    PURCHASE AGREEMENT SAYING THAT IF, IN FACT, THOSE WERE

22    NOT ASSIGNED, THAT IN EFFECT TITLE TO THOSE ASSETS DID

23    NOT TRANSFER AND THUS MR. MARTINEZ BELIEVED THAT HE WAS

24    ENTITLED AS THE RESPONSIBLE PARTY TO TAKE -- TO

25    BASICALLY SELF-HELP HIMSELF TO KEY EQUIPMENT.

Rough Draft - 93                    NONCERTIFIED ROUGH DRAFT
                                        Page 76

Cinelli.ROUGHD~1.TXT

1      Q.    AND THERE WAS NO COURT ORDER THAT HE GOT?

2      A.    NO.

3      Q.    AND NOBODY DID ANYBODY TO STOP HIM?

4      A.    THAT BECOME A CONTENTIOUS ISSUE, BECAUSE

5    BURBANK WAS OVERSEEING THIS, I INDICATED TO BURBANK THAT

6    SHOULDN'T THERE BE SOMEONE OVERSEEING THE EQUIPMENT AND

7    THE PLANT AND EVERYTHING ELSE, AND, YOU KNOW, NOTHING

8    WAS DONE ON THAT FRONT.  SO MARTINEZ CAME INTO THE EL

9    CENTRO PLANT AND PULLED OUT SOME OF THE CRITICAL

10   EQUIPMENT WHICH BASICALLY UNDERMINED SORT OF THIS

11   RESTART OF THE EL CENTRO FACILITY.

12     Q.    WOW.

13     A.    THIS IS A BLOODY MESS.  AND OTHER VENDORS

14   HELPED THEMSELVES TO IRRIGATION PIPES.  OTHER VENDORS

15   CAME INTO THE DAVIDSON FACILITY AND SELF-HELPED

16   THEMSELVES TO OTHER EQUIPMENT.  AND SO THERE'S -- AND

17   THIS ASSUME IS ALL CONFIDENTIAL?

18     Q.    WELL, THIS IS ACTUALLY A DEPOSITION, IT'S UNDER

19   OATH THAT'S KIND OF COURT TESTIMONY.

20     A.    OKAY.

21     Q.    SO --

22     A.    BUT IS IT GOING TO BE ON PUBLIC RECORD?

23     Q.    WELL, IT CAN BE USED AS PUBLIC RECORD, CORRECT.

24   I SHOULD HAVE -- WHY DON'T WE GO BACK.  I JUST ASSUMED

25   THAT YOU WERE AWARE OF THE NATURE OF A DEPOSITION.  LET

Rough Draft - 94                NONCERTIFIED ROUGH DRAFT

1    ME JUST GO BACK.  SO YOU'VE NEVER BEEN DEPOSED BEFORE?

2      A.    NO.

3      Q.    A DEPOSITION, YOU ARE UNDER OATH, THE COURT

4    REPORTER IS TAKING YOUR TESTIMONY UNDER OATH, YOUR

5    TESTIMONY HAS THE SAME WEIGHT AS IF YOU WERE IN COURT

Cinelli.ROUGHD~1.TXT

6   EVEN THOUGH YOU ARE IN AN INFORMAL SETTING HERE IN MY

7   OFFICE.

8        A.  OKAY.

9        Q.  AND THIS TESTIMONY CAN BE USED IN COURT.  FOR

10  EXAMPLE, IF WE WERE TO HAVE A COURT PROCEEDING AND YOU

11  WEREN'T THERE, IT COULD BE USED IN LIEU OF YOU APPEARING

12  OR IT ALSO COULD BE USED IN THE EVENT YOU APPEARED IN

13  COURT AND TESTIFIED DIFFERENTLY THAN THE WAY YOU TESTIFY

14  TODAY, IT COULD BE USED TO IMPEACH YOU IN COURT.  IF,

15  FOR EXAMPLE, YOU SAID TODAY THAT I REMEMBER INVESTING

16  TEN TO $15,000 AND IT TURNED OUT THAT THAT WAS INVESTED

17  BY SOMEBODY ELSE, AND YOU TESTIFIED DIFFERENTLY, THEN I

18  COULD BRING THAT UP TO COURT AND THAT BECOMES A

19  CREDIBILITY ISSUE.  SO THIS TESTIMONY IS UNDER OATH AND

20  CAN BE USED FOR THAT PURPOSE.  SO, BUT I MEAN, YOU KNOW,

21  AS FAR AS WHAT YOU ARE AWARE OF, I MEAN, I'M ENTITLED,

22  YOU KNOW, TO GET ALL THE RELEVANT INFORMATION.

23       A.  SURE.

24       Q.  AND SO TO THE EXTENT THAT YOU DON'T KNOW WHO

25  EXACTLY TOOK THE EQUIPMENT, YOU CAN LET ME KNOW THAT, TO

Rough Draft - 95                NONCERTIFIED ROUGH DRAFT

1   THE EXTENT THAT YOU BELIEVE THAT IT WAS A CERTAIN

2   PERSON, YOU CAN TELL ME THAT, AND, YOU KNOW, IF YOU ARE

3   UNSURE, YOU CAN TELL ME THAT YOU ARE UNSURE.

4        A.  OKAY.

5        Q.  SO YOU BELIEVE THAT AT THE SAME TIME THAT THIS

6   RUSS BURBANK WAS IN THERE, THEN WHAT CREATED THE CRISIS

7   WAS THE FACT THAT SANTOS CAME IN TO PULL OUT THAT

8   EQUIPMENT AND THEN AT THE SAME TIME OTHER VENDORS WERE

9   PULLING EQUIPMENT FROM FRESH 'N HEALTHY?

10       A.  CORRECT.

Page 78

Cinelli.ROUGHD~1.TXT

11      Q.   AND THESE WERE PEOPLE THAT HAD INTERESTS IN THE

12  EQUIPMENT AS LESSORS OF THE EQUIPMENT?

13      A.   I BELIEVE, WITH THE EXCEPTION OF MARTINEZ, WHO

14  WAS STILL ON THE LEASE LIABILITY AND FELT HE WAS

15  ENTITLED TO TAKE THAT EQUIPMENT, I BELIEVE THAT OTHER

16  SUPPLIERS IN ORDER TO COMPENSATE THEM FOR OUTSTANDING

17  PAYABLES STARTED TAKING OTHER EQUIPMENT.  INCLUDING SOME

18  OF THE IRRIGATION PIPES.

19      Q.   SO, IN OTHER WORDS, THESE WEREN'T SECURED

20  PARTIES --

21      A.   NO.

22      Q.   -- THESE WERE JUST PEOPLE THAT WERE OWED MONEY?

23      A.   THAT'S CORRECT.

24      Q.   SO, FOR EXAMPLE, IF SOMEBODY WAS OWED MONEY FOR

25  FUEL, THEY JUST MAY HAVE COME OUT AND TAKEN SOME

Rough Draft - 96                    NONCERTIFIED ROUGH DRAFT


1  IRRIGATION PIPE --

2      A.   CORRECT.

3      Q.   -- TO COMPENSATE THEM FOR THE FUEL BILL?

4      A.   THAT'S RIGHT.

5      Q.   WHO WAS GIVING THEM AUTHORITY TO COME IN --

6      A.   NO ONE.

7      Q.   -- AND TAKE THIS EQUIPMENT?

8      A.   NO ONE.

9      Q.   WHAT WAS THE BASIS FOR THEM COMING OUT TO DO

10  THAT, DO YOU KNOW?  WAS IT CONVERSATIONS BETWEEN SANTOS

11  AND THE SUPPLIERS?  DO YOU HAVE ANY IDEA AS TO WHY

12  PEOPLE WOULD JUST COME IN AND START TAKING EQUIPMENT?

13      A.   I KNOW THAT CHANDRA HAD CONVERSATIONS WITH SOME

14  SUPPLIERS, I KNOW BURBANK I BELIEVE HAD CONVERSATIONS.

15  BUT AS FAR AS I KNOW, AND YOU CAN CORROBORATE THIS WITH

16  CHANDRA AND BURBANK, A NUMBER OF SUPPLIERS JUST

Page 79

Cinelli.ROUGHD~1.TXT

17    SELF-HELPED THEMSELVES TO EQUIPMENT.

18        Q.   AND CAN YOU IDENTIFY ANY OF THOSE SUPPLIERS?

19        A.   I COULDN'T.  I WOULD HAVE TO CHAT WITH EITHER

20    CHANDRA OR BURBANK ON THAT.  POSSIBLY WILLIAMS.  I KNOW

21    THAT WILLIAMS HAD NEGOTIATED WITH ONE OF THE BIG PRODUCE

22    SUPPLIERS THE EXCHANGE OF CERTAIN PIPE FOR OUTSTANDING

23    PAYABLES IN THE HUNDREDS OF THOUSANDS OF DOLLARS.

24        Q.   DO YOU KNOW WHO THE --

25        A.   I CAN'T RECALL.

Rough Draft - 97                 NONCERTIFIED ROUGH DRAFT


1        Q.   WHO IT WAS?

2        A.   NO.

3        Q.   SO WHAT STARTED HAPPENING IS MARTINEZ CAME IN

4    AND THEN THERE WERE NEGOTIATIONS WITH CHANDRA, BURBANK

5    OR WILLIAMS, AND THESE SUPPLIERS WHO SAID, HEY, WE WILL

6    FORGIVE OUR DEBT IF YOU GIVE US X AMOUNT OF FRESH 'N

7    HEALTHY EQUIPMENT?

8        A.   THAT HAPPENED IN A COUPLE OF OCCASIONS.  BUT

9    THERE WAS A DISCUSSION, LARGELY WILLIAMS NEGOTIATING

10    WITH SOME OF THE VENDORS ABOUT THE SWAP OF PAYABLES FOR

11    EQUIPMENT.  BUT OTHERS, INCLUDING MARTINEZ, TOOK THE

12    LIBERTIES OF JUST GOING IN AND TAKING THE EQUIPMENT.

13        Q.   AND THERE WAS NO COURT RECORDS TO DO ANY OF

14    THAT?

15        A.   THAT'S CORRECT.

16        Q.   AND DID BURBANK ATTEMPT TO TAKE ANY LEGAL

17    ACTION AGAINST ANY OF THESE PEOPLE?

18        A.   NO, NO.

19        Q.   WHAT ABOUT MURRAY & MURRAY?

20        A.   NO.

21        Q.   WAS THERE EVER ANY DISCUSSION ABOUT TAKING

Page 80

Cinelli.ROUGHD~1.TXT
22  LEGAL ACTION AGAINST THESE --

23      A.  YOU HAD SUGGESTED TAKING LEGAL ACTION, AND I

24  GUESS THE CONCLUSION I DREW IS THAT THE COMBINATION OF

25  THE BANK, MURRAY & MURRAY AND BURBANK DIDN'T WANT TO

Rough Draft - 98                NONCERTIFIED ROUGH DRAFT

1   INCUR A COST OF TAKING LEGAL ACTION.  IN FACT,

2   COMERICA'S ATTORNEY OPINED THAT SANTOS MARTINEZ WAS

3   ENTITLED TO TAKE THAT EQUIPMENT.  I HAD A DIFFERENT

4   OPINION BY THE BAKER & MCKENZIE FOLKS WHO REPRESENTED US

5   SAYING THAT REGARDLESS OF WHAT IT SAID IN THE DOCUMENT,

6   WE PURCHASED THE EQUIPMENT FOR FAIR VALUE AND FRESH 'N

7   HEALTHY WAS STILL ENTITLED TO THE EQUIPMENT.

8       Q.  PLUS THE FACT THAT SELF-HELP IS ILLEGAL UNDER

9   CALIFORNIA LAW WITHOUT YOUR CONSENT.

10      A.  WELL, YEAH, TALK TO MR. MARTINEZ ABOUT THAT.

11      Q.  IN OTHER WORDS, YOU CAN HAVE A RIGHT IN A

12  DOCUMENT, BUT IN ORDER TO GET IT ENFORCED YOU HAVE TO

13  EITHER GO TO COURT OR HAVE CONSENT, ONE OF THE TWO.

14      DO YOU KNOW WHETHER OR NOT FRESH 'N HEALTHY

15  EVER CONSENTED TO MR. MARTINEZ TAKING THE EQUIPMENT?

16      A.  NO.  WE FOUND OUT ONE WEEKEND THAT SOME SCALES

17  AND A BIG PACK MAT MACHINE WERE TAKEN SOME SATURDAY

18  NIGHT, SUNDAY OR WHATEVER WHEN NO ONE WAS AT THE PLANT.

19      Q.  AND DID MR. MARTINEZ STILL HAVE THE KEYS TO THE

20  PLANT?

21      A.  HE HAD THE COMBINATION TO THE LOCK.  AGAIN, HE

22  WAS ENGAGED AS A CONSULTANT STILL.

23      Q.  AND HE OWNS STOCK IN THE COMPANY, WAS A

24  DIRECTOR?

25      A.  HE OWNED STOCK IN THE COMPANY AND HE WAS, YOU

Rough Draft - 99                NONCERTIFIED ROUGH DRAFT

1   KNOW, HE WAS -- SOME OF THE OTHER THINGS THAT, AGAIN,
                        Page 81

Cinelli.ROUGHD~1.TXT

2    THERE IS A, THERE IS A SEPARATE ACTION BEING PUT

3    TOGETHER ON THIS WHOLE THING.  BUT I WON'T GO INTO

4    DETAIL ON THAT.  BUT IT'S MY BELIEF HE BREACHED HIS

5    CONFIDENTIALITY TERMS WITHIN THE CONSULTING AGREEMENT.

6    AND HE BREACHED OTHER THINGS IN THE ASSET PURCHASE

7    AGREEMENT AS WELL AS THE CONSULTING.  BUT THAT'S A

8    SUBJECT OF A DIFFERENT DISCUSSION.

9        Q.  NOW, WHEN THEY WERE -- THE ACQUISITION WAS

10   INITIALLY MADE FROM SANTOS MARTINEZ -- WE WILL TAKE A

11   BREAK FOR LUNCH IN A COUPLE OF MINUTES.  I KNOW IT'S --

12       A.  I'VE GOT A -- HOW MUCH LONGER DO YOU

13   ANTICIPATE?  BECAUSE I'VE GOT A BOARD MEETING I HAVE TO

14   ATTEND IN SAN FRANCISCO.

15       Q.  OKAY.  WHY DON'T WE TALK ABOUT THAT.  WHAT TIME

16   IS YOUR BOARD MEETING?

17       A.  AT 4 O'CLOCK.

18       Q.  AND SO YOU'LL HAVE TO LEAVE HERE --

19       A.  2:30.

20       Q.  NO, PROBABLY TWO.

21       A.  I DRIVE FAST.

22       Q.  YOU DRIVE FAST.

23       A.  PROBABLY SAY 2:15 OR SO.

24       Q.  WE ARE GOING TO NEED RECONVENE WITH ALL THE

25   DOCUMENTS THAT WE HAVE BEEN DISCUSSING.

Rough Draft - 100                    NONCERTIFIED ROUGH DRAFT

1        A.  SURE.

2        Q.  SO I DON'T KNOW WHAT YOU WANT TO DO FOR LUNCH,

3    IF YOU WANT TO MAYBE TRY TO GO THROUGH FOR ANOTHER HOUR

4    AND THEN YOU CAN GO TO LUNCH AND GO TO YOUR MEETING

5    OR --

6        A.  THAT'S FINE, I WOULD LIKE TO IF YOU ARE GAME TO

Page 82

Cinelli.ROUGHD~1.TXT
 7  CONTINUE.

 8      Q.  GOOD.  SO, YEAH, BECAUSE I SAW YOU LOOKING AT

 9  YOUR WATCH.  ALSO, WHY DON'T I JUST TAKE A BREAK FOR A

10  MINUTE AND GET MY CALENDAR AND WE CAN TALK ABOUT DATES

11  TO RESCHEDULE.

12      A.  I'LL GO OUT TO MY CAR TO GET MY BLACKBERRY.

13          MS. ANASTASSIOU:  WHY DON'T WE TAKE A

14  FIVE-MINUTE BREAK THEN.

15          (BREAK.)

16          MS. ANASTASSIOU:  BACK ON THE RECORD.  THE

17  WITNESS HAS A PRIOR APPOINTMENT TODAY FOR 4 O'CLOCK IN

18  SAN FRANCISCO SO WE ARE GOING TO RECESS THIS DEPOSITION

19  EARLY TODAY.  AND ALSO THE WITNESS DID NOT BRING THE

20  DOCUMENTS THAT WERE REQUESTED PURSUANT TO THE DEPOSITION

21  NOTICE AND HE IS GOING TO BE GATHERING DOCUMENTS AND WE

22  ARE GOING TO RECONVENE FOR A CONTINUED DEPOSITION ON

23  TUESDAY, MARCH 25, AT 9 A.M. HERE AT THIS OFFICE AT 242

24  CAPITOL STREET, SALINAS, CALIFORNIA.

25
Rough Draft - 101                    NONCERTIFIED ROUGH DRAFT

 1  BY MS. ANASTASSIOU:

 2      Q.  OKAY.  SO YOU WERE LOOKING IN YOUR BLACKBERRY

 3  TO GET ME SOME ADDRESS OR INFORMATION?

 4      A.  YEAH, I'M LOOKING FOR IT RIGHT NOW.  I'VE GOT

 5  HER OLD ADDRESS.  LET'S CALL HER.

 6          (OFF THE RECORD.)

 7  BY MS. ANASTASSIOU:

 8      Q.  GOING BACK ON THE RECORD THEN.  IN CONNECTION

 9  WITH THE COMERICA BANK LOAN, WAS FRESH 'N HEALTHY MAKING

10  LOAN PAYMENTS TO COMERICA BANK ON A REGULAR BASIS?

11      A.  YEAH, PROBABLY UP UNTIL MAYBE JULY, AUGUST, OR

12  ACTUALLY AUGUST, SEPTEMBER.

Cinelli.ROUGHD~1.TXT

13      Q.   OF 2007?

14      A.   CORRECT.

15      Q.   AND HOW MUCH WERE THE MONTHLY PAYMENTS TO

16  COMERICA, OR WERE THEY WEEKLY PAYMENTS OR HOW DID IT

17  WORK EXACTLY?

18      A.   IT WAS QUARTERLY PAYMENTS.  I THINK INTEREST

19  WAS PAYABLE MONTHLY AND THEN QUARTERLY PAYMENTS OF

20  SOMETHING LIKE A HUNDRED AND FIFTY THOUSAND DOLLARS.

21      Q.   AND DID COMERICA JUST DO A SWEEP OF THE ACCOUNT

22  TO MAKE THE PAYMENT OR WAS THE PAYMENT LIKE A CHECK THAT

23  WAS PHYSICALLY CUT FROM FRESH 'N HEALTHY, DO YOU KNOW?

24      A.   I BELIEVE THEY JUST DEBITED THE ACCOUNT.

25      Q.   THEY DEBITED THE ACCOUNT?

Rough Draft - 102                    NONCERTIFIED ROUGH DRAFT

1       A.   CORRECT.

2       Q.   AND THIS WAS THE ACCOUNT THAT FRESH 'N

3   HEALTHY --

4       A.   THE GENERAL ACCOUNT.

5       Q.   THE GENERAL ACCOUNT THAT FRESH 'N HEALTHY USED

6   FOR ITS GENERAL BUSINESS OPERATIONS?

7       A.   THAT'S CORRECT.

8       Q.   SO THAT WHEN A PAYMENT WAS DUE THEY DEBITED THE

9   ACCOUNT.  AND THAT WAS BOTH FOR INTEREST AND PRINCIPAL

10  PAYMENTS?

11      A.   CORRECT.

12      Q.   AND THEN YOU SAID IN AUGUST OR SEPTEMBER OF

13  2007 THERE STARTED TO BE NOT ENOUGH MONEY TO MAKE THE

14  PAYMENTS, OR WHAT HAPPENED?

15      A.   YEAH, THAT WAS THE CASE, THAT THE CASH FLOWS OF

16  THE COMPANY WERE LIMITED, THERE WERE OVERDRAFTS BEING

17  CREATED.  AND I KNOW THAT COME THE TAIL END OF THE YEAR,

Page 84

Cinelli.ROUGHD~1.TXT

18    PROBABLY IN OCTOBER OR NOVEMBER, THE COMPANY AND THE

19    BANK SIGNED A FORBEARANCE AGREEMENT.  SO IT ELONGATED

20    THE PAYMENTS.  I BELIEVE IN THE FORBEARANCE AGREEMENT

21    THERE WAS A STIPULATION THAT THE COMPANY AT LEAST FOR A

22    PERIOD OF TIME MADE MONTHLY PAYMENTS, I CAN'T REMEMBER

23    THE DOLLAR AMOUNT THERE, TO TRY TO CATCH UP, AND I

24    BELIEVE AFTER THE FIRST MONTH, THE COMPANY VIOLATED

25    THAT.

Rough Draft - 103                NONCERTIFIED ROUGH DRAFT

1        Q.    THOSE MONTHLY PAYMENTS AGAIN WERE STILL BEING

2    JUST TAKEN OUT OF THE GENERAL ACCOUNT BY COMERICA?

3        A.    YEAH.  THEY NOT ONLY DEBITED THE ACCOUNT FOR

4    PRINCIPAL AND INTEREST BUT THEY WOULD DEBIT THE ACCOUNT

5    FOR --

6        Q.    LATE FEES?

7        A.    -- THEIR OWN ATTORNEY'S FEES, LATE FEES,

8    WHATEVER.

9        Q.    SO PRINCIPAL, INTEREST, LATE FEES, ATTORNEY'S

10   FEES.  AND THEN THEY STARTED DEBITING THE ACCOUNT FOR

11   THE MURRAY & MURRAY FEES?

12       A.    NO, THE MURRAY & MURRAY FEES WERE AFTER THE

13   FACT.  MURRAY & MURRAY RECENTLY GOT ENGAGED TOWARD THE

14   TAIL END OF THE WIND DOWN AND COMERICA HAS CONTROL OF

15   THE RECEIVABLE COLLECTION.  AND I GUESS THEY HAVE AN

16   ACCOUNT SET ASIDE THROUGH WHICH BURBANK, COMERICA'S

17   COUNSEL AND MURRAY & MURRAY ARE BEING PAID.

18       Q.    AND THAT'S FROM THE PRODUCE RECEIVABLES THAT

19   THEY ARE COLLECTING?

20       A.    THAT'S CORRECT.

21       Q.    ARE THEY AWARE THAT THE -- IS COMERICA AWARE

22   THAT THERE ARE PACA CREDITORS OUT THERE?

23       A.    ABSOLUTELY.  AS FAR AS I KNOW THEY ARE

Page 85

Cinelli.ROUGHD~1.TXT

24    EARMARKING MONEYS TO ADDRESS THE PACA PAYABLES FIRST.

25        Q.  BUT THEY HAVEN'T BEEN PAYING ANY PACA PAYABLES

Rough Draft - 104                NONCERTIFIED ROUGH DRAFT

1    BUT THEY HAVE BEEN PAYING MURRAY & MURRAY AND BURBANK

2    CURRENTLY?

3        A.  I DON'T KNOW IF THEY HAVE MAKING PAYMENTS ON

4    THE PACA PAYABLES YET.

5        Q.  AND HOW DO YOU KNOW THAT THEY'RE AWARE OF THE

6    PACA PAYABLES?

7        A.  PROBABLY ALL THE OUTSTANDING PACA PAYABLES ARE

8    SUBJECT TO LAWSUITS NOW.

9        Q.  SO THEY ARE AWARE OF ALL THOSE LAWSUITS?

10       A.  ABSOLUTELY.

11       Q.  AND I KNOW THAT THERE WAS -- I HAVE A COPY OF

12   THAT LAWSUIT HERE SOMEWHERE TOO.

13           MS. ANASTASSIOU:  MARK THIS AS SC NO. 7.

14           (EXHIBIT SC-7 MARKED.)

15           MS. ANASTASSIOU:  I HAVE JUST HANDED THE

16   WITNESS A DOCUMENT THAT WE MARKED AS SC NO. 7.  IT'S

17   BATES STAMPED SNO 452 THROUGH 460.  IT CONSISTS OF A

18   STIPULATING REGARDING COMPLAINT FOR CONSENT JUDGMENT AND

19   ORDER REGARDING PRIDE OF SAN JUAN INC. VERSUS FRESH 'N

20   HEALTHY THAT WAS FILED IN COURT IT LOOKS LIKE ON

21   AUGUST 23RD, 1007.  DO YOU KNOW WHETHER COMERICA BANK

22   WAS AWARE OF THIS LAWSUIT WITH PRIDE OF SAN JUAN AND

23   FRESH 'N HEALTHY?

24       A.  I DON'T KNOW.  BUT AS FAR AS I KNOW THIS HAS

25   ALL BEEN PAID.

Rough Draft - 105                NONCERTIFIED ROUGH DRAFT

1        Q.  RIGHT.  BUT I WAS ASKING YOU WHETHER OR NOT

2    THEY WERE AWARE THAT THERE WAS A SUIT FROM PRIDE OF SAN

Page 86

Cinelli.ROUGHD~1.TXT
3    JUAN REGARDING FAILURE TO PAY?

4         A.  I DON'T KNOW.

5         Q.  DO YOU KNOW HOW COMERICA -- WHAT KIND OF

6    INFORMATION COMERICA BANK WAS GETTING ON A REGULAR

7    BASIS?

8         A.  THAT WAS ONE OF THE BIG PROBLEMS AND THAT'S ONE

9    OF THE REASONS THE BANK GOT A LITTLE AGGRESSIVE IN THAT

10   THE COMPANY VIOLATED THE TERMS OF THE CREDIT AGREEMENT

11   BECAUSE IT DIDN'T PRODUCE REGULAR FINANCIAL STATEMENTS.

12   IT WAS SUPPOSED TO SUBMIT I BELIEVE MONTHLY FINANCIAL

13   STATEMENTS.  BUT UNDER MARK MCCORMICK, AND HE ALWAYS

14   COMPLAINED ABOUT DIFFERENT THINGS, HE NEVER PRODUCED ANY

15   FINANCIAL STATEMENTS FOR THE BANK.  IT WASN'T UNTIL AJ

16   CHANDRA CAME IN THAT ANY FINANCIAL REPORTS WERE

17   PROVIDED.  I BELIEVE THE BANK RECEIVED RECEIVABLE AGINGS

18   AND PAYABLE AGINGS, BUT RELATIVE TO PURE FINANCIAL

19   STATEMENTS, THE BANK NEVER GOT THOSE UNTIL PROBABLY

20   OCTOBER, NOVEMBER.

21        Q.  SO THEY GETTING RECEIVABLE AGINGS AND PAYABLE

22   AGINGS ON A REGULAR BASIS THROUGHOUT THE EXISTENCE OF

23   FRESH 'N HEALTHY?

24        A.  I BELIEVE SO.

25        Q.  BUT THEY DIDN'T GET FINANCIAL STATEMENTS
Rough Draft - 106                NONCERTIFIED ROUGH DRAFT

1    BECAUSE THEY WEREN'T BEING PRODUCED?

2         A.  THAT'S CORRECT.

3         Q.  AND THE RECEIVABLE -- THE PAYABLE AGINGS AGENTS

4    WOULD HAVE SHOWN MONEYS OWED TO PACA PEOPLE THAT WEREN'T

5    BEING PAID, CORRECT?

6         A.  CORRECT.  AND THERE, FROM WHAT I REMEMBER THERE

7    WAS SOME ISSUES THAT THERE WERE DISCREPANCIES BETWEEN

8    WHAT SOME OF THE SUPPLIERS BELIEVED THEY WERE OWED AND
Page 87

Cinelli.ROUGHD~1.TXT

9   WHAT FRESH 'N HEALTHY BELIEVED THEY OWED.

10        Q.   AND WHEN WERE THOSE DISCREPANCIES, AT THE TIME

11   OF CLOSING OF THE BUSINESS OR --

12        A.   I THINK THROUGHOUT THE PERIOD.  BECAUSE THERE

13   WERE RETURNS AND THERE WERE CREDITS AND THE WHOLE

14   FINANCIAL REPORTING SIDE OF THE BUSINESS WAS NEVER PUT

15   TOGETHER PROPERLY.  AND I LOOK AT MCCORMICK FOR THAT.

16        Q.   AS FAR AS YOU KNOW THERE WAS NEVER ANY

17   COMPLAINT OR ARGUMENT BY ANYBODY THAT THE AMOUNT SNOW

18   SEED CLAIMS IT WAS OWED FOR SEED WAS DUE AND OWING?

19        A.   I DON'T BELIEVE SO.

20        Q.   JUST OTHER SUPPLIERS?

21        A.   SOME OF THE OTHER SUPPLIERS.  THE THING THAT I

22   AM CONFUSED ABOUT, I KNOW THERE WAS A TREMENDOUS AMOUNT

23   OF SEED INVENTORY AT THE TIME OF THE ACQUISITION, AND MY

24   UNDERSTANDING IS IT WAS PROBABLY SUFFICIENT TO COVER A

25   NUMBER OF SEASONS, SO I'M, AGAIN, I WASN'T THE ONE THAT

Rough Draft - 107                    NONCERTIFIED ROUGH DRAFT

1   PROCURED ANY OF THESE SEED PURCHASES.  SO JUST A LOT OF

2   QUESTIONS.

3        Q.   AND DO YOU KNOW WHETHER OR NOT THERE WAS SOME

4   KIND OF A DISSIPATION OF SEED INVENTORY OR LOSS THAT

5   WASN'T USED FOR COMPANY BUSINESS?

6        A.   I DON'T KNOW, I DON'T KNOW.  BUT DURING THE DUE

7   DILIGENCE PERIOD, MR. MARTINEZ SHOWED ME THE SEED

8   INVENTORY THAT WAS PART OF THE ACQUISITION AND I HAVE NO

9   IDEA WHAT HAPPENED TO THAT.

10        Q.   SO IS THERE ANY SEED INVENTORY THAT IS

11   CURRENTLY BEING HELD?

12        A.   I DON'T KNOW, I DON'T KNOW.

13        Q.   SO WHO WOULD KNOW WHAT ASSETS CURRENTLY EXIST

Page 88

Cinelli.ROUGHD~1.TXT

14    IN FRESH 'N HEALTHY?

15        A.   PROBABLY BURBANK.

16        Q.   HE WOULD BE THE ONLY ONE?

17        A.   YEAH, HE HAS BEEN TRYING TO KEEP ME INFORMED,

18    BUT THE INFORMATION HAS BEEN SOMEWHAT LIMITED.

19        Q.   WHEN YOU SAY INFORMATION IS SOMEWHAT LIMITED,

20    WHAT DO YOU MEAN BY THAT?

21        A.   YOU KNOW, AN ASSESSMENT OF THE EQUIPMENT THAT

22    IS OUT THERE, AN ASSESSMENT OF THE EQUIPMENT THAT'S

23    BEING SOLD, DISCREPANCIES BETWEEN WHAT MCCORMICK

24    INDICATED WAS PURCHASED UNDER FRESH 'N HEALTHY AND WHAT

25    EQUIPMENT IS ACTUALLY PART OF THE AUCTION.   THINGS LIKE

Rough Draft - 108                    NONCERTIFIED ROUGH DRAFT

1    THAT.

2        Q.   LET ME -- I HAVE SOME INFORMATION THAT WE GOT

3    FROM THE INTERNET ABOUT WHAT APPEARS TO BE PART OF THE

4    AUCTION.  LET'S MARK THIS AS EXHIBIT SC-8.

5          (EXHIBIT SC-8 MARKED.)

6    BY MS. ANASTASSIOU:

7        Q.   AND I HAVE JUST HANDED THE WITNESS A DOCUMENT

8    THAT'S MARKED SC NO. 8 AND IT'S BATES-STAMPED SNO 188

9    THROUGH 193.  AND I'LL REPRESENT TO YOU IT'S SOME

10    INFORMATION MY OFFICE PULLED FROM OFFLINE REGARDING THE

11    PUBLIC AUCTION OF FRESH 'N HEALTHY EQUIPMENT.  WERE YOU

12    INVOLVED AT ALL IN PUTTING TOGETHER THIS AD FOR THE

13    AUCTION?

14        A.   NO.

15        Q.   ARE YOU AWARE OF WHAT'S BEING SOLD AT THE

16    AUCTION OF FRESH 'N HEALTHY EQUIPMENT?

17        A.   VERY GENERAL TERMS.

18        Q.   WHAT DO YOU MEAN BY THAT, VERY GENERAL TERMS?

19        A.   I KNOW THAT THERE'S SOME ROLLING STOCK, SOME

Page 89

Cinelli.ROUGHD~1.TXT

20    PROCESSING EQUIPMENT AND SOME FARM EQUIPMENT, THAT'S

21    ABOUT IT.

22        Q.  DO YOU KNOW WHAT THE VALUE OF THAT EQUIPMENT

23    IS?

24        A.  THE FAIR MARKET VALUE BASED ON APPRAISAL DATING

25    BACK TO LATE '06 WAS TWO POINT SOME MILLION DOLLARS.

Rough Draft - 109                  NONCERTIFIED ROUGH DRAFT

1    THERE WAS APPROXIMATELY, ACCORDING TO MCCORMICK BECAUSE

2    I SPOKE TO HIM, PROBABLY AN ADDITIONAL $600,000 OF

3    EQUIPMENT THAT WAS PURCHASED BY FRESH 'N HEALTHY.  AND I

4    DON'T KNOW THE VALUE OF THE ASSETS THAT WERE ABSCONDED

5    BY MARTINEZ, BECAUSE THOSE AREN'T INCLUDED IN THIS.

6        Q.  SO THERE WAS APPROXIMATELY -- WHAT YOU ARE

7    SAYING INITIALLY BASED ON APPRAISAL FRESH 'N HEALTHY

8    PAID APPROXIMATELY 2.2 OR WHATEVER IT WAS APPRAISED

9    VALUE FOR THE EQUIPMENT?

10        A.  YEAH, THE FAIR MARKET VALUE IS CERTAINLY

11    DIFFERENT THAN THE LIQUIDATION VALUE.

12        Q.  BUT THE INITIAL PURCHASE OF THE EQUIPMENT IN

13    MARCH OF '07 WAS APPROXIMATELY -- THE ALLOCATED VALUE

14    WAS APPROXIMATELY TWO POINT SOMETHING?

15        A.  I THINK THE VALUE WAS ROUGHLY -- FAIR MARKET

16    WAS 2.6, 2.3 OR 2.6.  AND THEN DURING THE OVERSIGHT OF

17    FRESH 'N HEALTHY FROM FEBRUARY THROUGH SEPTEMBER,

18    MCCORMICK HAD INDICATED ABOUT FIVE TO SIX HUNDRED

19    THOUSAND DOLLARS OF ADDITIONAL EQUIPMENT HAD BEEN

20    PURCHASED.

21        Q.  SO APPROXIMATELY $3 MILLION DURING THE SHORT

22    LIFE OF FRESH 'N HEALTHY WAS EQUIPMENT THAT WAS

23    PURCHASED?

24        A.  YEAH.

                        Page 90

Cinelli.ROUGHD~1.TXT
Rough Draft - 110

25    Q.   AND THEN YOU SAID THAT YOU'RE NOT SURE HOW MUCH
                      NONCERTIFIED ROUGH DRAFT

1    OF THAT EQUIPMENT WAS ABSCONDED BY MARTINEZ?

2        A.   CORRECT.   AND I DON'T KNOW HOW MUCH EQUIPMENT

3    HAD BEEN TAKEN LARGELY IRRIGATION PIPES THROUGH OTHER

4    SUPPLIERS.

5        Q.   THROUGH SELF-HELP THAT YOU WERE DESCRIBING?

6        A.   BOTH SELF-HELP AND TRANSACTIONS THAT WILLIAMS

7    DID TO COVER SOME OF THE PAYABLE OUTSTANDINGS.   I KNOW

8    THAT THE RESIDUAL EQUIPMENT THAT IS SUBJECT TO THIS

9    AUCTION, ASHMAN HAS COMMITTED TO BUY ALL THE STUFF FOR I

10   THINK 525,000.   AND THAT WAS SOMETHING THAT WAS AGREED

11   ON BETWEEN THE BANK, BURBANK, AND ASHMAN.

12       Q.   DO YOU KNOW WHETHER THAT'S A FAIR VALUE OR NOT,

13   YOU PERSONALLY?

14       A.   I DON'T KNOW.

15       Q.   AND DO YOU KNOW WHAT QUALIFICATIONS ASHMAN HAS

16   TO AUCTION OFF FARM EQUIPMENT?

17       A.   AS MUCH AS I KNOW, HE'S BEEN IN BUSINESS DOING

18   THIS FOR QUITE SOME TIME.

19       Q.   FARM EQUIPMENT OR OTHER EQUIPMENT?

20       A.   I ASSUME VIRTUALLY EVERYTHING.

21       Q.   BUT DO YOU KNOW?

22       A.   I DON'T KNOW SPECIFICALLY.

23       Q.   AND WAS ASHMAN SOMEBODY THAT WAS SELECTED BY

24   BURBANK?

25       A.   BURBANK AND THE BANK.
Rough Draft - 111                  NONCERTIFIED ROUGH DRAFT

1        Q.   AND THE BANK.   AND DID YOU REALLY HAVE ANY SAY

2    IN --

3        A.   NO.

4        Q.   -- SELECTING THEM?
                        Page 91

Cinelli.ROUGHD~1.TXT

5       A.   NO.  I HAD TO APPROVE THE ASHMAN DEAL AS A SOLE

6  DIRECTOR UNDER THE REQUEST OF THE BANK AND BURBANK.

7       Q.   SO THEY BASICALLY TOLD YOU THAT YOU HAD TO

8  APPROVE IT?

9       A.   BASICALLY.

10       Q.   DID YOU HAVE ANY OPTION NOT TO APPROVE IT?

11       A.   I GUESS I DID, BUT THEY WERE ORCHESTRATING THE

12  ENTIRE DISPOSITION OF THINGS, AND IT JUST APPEARS THAT

13  THEIR MOTIVATION IS TO EXPEDITE THIS WHOLE PROCESS.

14       Q.   AND WHY ARE THEY IN SUCH A RUSH TO GET

15  EVERYTHING DONE?  DO YOU KNOW?

16       A.   NO.  I GUESS ONE OF THE THINGS THAT BURBANK

17  SAID IS THAT THE LONGER YOU WAIT, THE ASSETS BECOME LESS

18  VALUABLE.  AND SO HE AND THE BANK ARE HIGHLY MOTIVATED

19  TO GET THIS THING DONE.

20       Q.   WHAT ABOUT THE FACT THAT WHEN YOU RUSH TO SALE

21  SOMETHING AND IT'S A FIRE SALE YOU GET LESS MONEY FOR

22  IT?

23       A.   SUBJECT TO SPECULATION.

24       Q.   SO THAT'S JUST -- THEIR ARGUMENT IS THAT, GEE,

25  WE NEED TO GET IT DONE?

Rough Draft - 112              NONCERTIFIED ROUGH DRAFT

1       A.   CORRECT.

2       Q.   AND DO YOU KNOW WHY ALL OF A SUDDEN LIKE AT THE

3  END OF '07 THAT THE BANK BECAME IN SUCH A RUSH TO SHUT

4  DOWN THE COMPANY AND LIQUIDATE ASSETS?

5       A.   AGAIN, THEY WERE LOOKING AT THE NEGATIVE CASH

6  FLOW, THEY WERE LOOKING AT THE INCREASED LIABILITIES AND

7  THEY WERE LOOKING AT THE EROSION OF THEIR COLLATERAL

8  POSITION.

9       Q.   BECAUSE OF SANTOS TAKING THE EQUIPMENT?

Page 92

Cinelli.ROUGHD~1.TXT

10    A.    AND JUST -- I GUESS LOOKING AT THEY DIDN'T WANT

11    TO INCUR ANY EMPLOYEE LIABILITIES, THEY DIDN'T WANT TO

12    INCUR MORE PAYROLL TAX LIABILITIES.  I FIND OUT LATER

13    WHICH I AM SURE YOU PROBABLY HAVE SEEN, MCCORMICK AND

14    WILLIAMS NEVER PAID PAYROLL TAXES.

15    Q.    I DIDN'T KNOW THAT.

16    A.    AND SO THERE IS ABOUT A MILLION DOLLAR OVERHANG

17    OF PAYROLL TAXES THAT ARE UNPAID.

18    Q.    WOW.

19    A.    AND WE DIDN'T FIND THAT OUT UNTIL AJ CHANDRA

20    CAME IN.

21    Q.    AND WAS CHANDRA BROUGHT IN BY COMERICA BANK?

22    A.    THEY HAD REQUESTED AN OUTSIDE PARTY COME IN.  I

23    DON'T KNOW WHO, I THINK BURBANK, EITHER BURBANK OR

24    WILLIAMS FOUND CHANDRA THROUGH CFOS TO GO.  AND SO HE

25    CAME IN.

Rough Draft - 113                 NONCERTIFIED ROUGH DRAFT

1    Q.    SO BURBANK, YOU SAID EVEN BACK THEN AS EARLY AS

2    AUGUST OR SEPTEMBER, BURBANK WAS INVOLVED?

3    A.    YEAH, I THINK SEPTEMBER, OCTOBER.  I THINK

4    SEPTEMBER, OCTOBER.

5         MS. ANASTASSIOU:  JUST ONE SECOND.

6         (OFF THE RECORD.)

7    BY MS. ANASTASSIOU:

8    Q.    WHEN THE ACQUISITION OF GOURMET VEG-PAQ WAS

9    MADE, THERE WERE CROPS IN GROUND THAT WERE ALREADY

10    GROWING, CORRECT?

11    A.    CORRECT.

12    Q.    WHO VALUED THOSE CROPS IN GROUND AS FAR AS WHAT

13    THEY WERE WORTH IN CONNECTION WITH THE --

14    A.    THE VALUE WAS PLACED ON BY SANTOS AND HIS

15    ACCOUNTANT.  AND I BELIEVE AT THE TIME THEY HAD

Page 93

Cinelli.ROUGHD~1.TXT

16  REPRESENTED THE VALUE TO BE ABOUT A MILLION THREE, A

17  MILLION FOUR.  WE COME TO FIND OUT THAT THE VALUE THAT

18  WAS ACTUALLY IN THE GROUND WAS SUBSTANTIALLY LESS THAN

19  THAT.

20     Q.  SO JUST GOING BACK, THAT WAS THE VALUE OF THE

21  CROPS IN GROUND BUT LATER THAT YOU LEARNED THAT THE

22  VALUE WAS LESS, WAS THAT AS A RESULT OF FINANCIAL

23  INFORMATION THAT YOU LEARNED LATER ON OR --

24     A.  THE UNDERSTANDING IN REVIEWING WHAT TRANSPIRED

25  AND THIS IS BASED ON COMMENTS AND REPORTS BY MCCORMICK

Rough Draft - 114              NONCERTIFIED ROUGH DRAFT

1  AND OTHERS IS IF WE TAKE A STEP BACK, THE TRANSACTION

2  WAS INITIALLY TO CLOSE PRIOR TO THANKSGIVING.

3     Q.  '06?

4     A.  '06, CORRECT, JUST AS THE COMPANY WAS

5  TRANSITIONING DOWN TO THE SOUTH FOR THE WINTER SEASON.

6     Q.  RIGHT.

7     A.  THE ATTORNEYS ON BOTH SIDES DIDN'T GET ALONG.

8  AND NOT POINTING THE FINGERS AT ANYONE IN PARTICULAR, IT

9  TOOK MONTHS TO CONCLUDE THE TRANSACTION.  IT'S MY

10  CONTENTION, AND THIS IS PERSONAL, AND THEN SOMEWHAT

11  CORROBORATED BY JUST INPUT FROM OTHERS, IS THAT SANTOS

12  BASICALLY CHECKED OUT FROM A DAY-TO-DAY OPERATION.  HE

13  WAS MOTIVATED TO SELL.  DIDN'T APPLY THE PROPER

14  AMENDMENTS AND WHATNOT TO THE GROUND.  WHEREBY THE FIRST

15  CROP CAME UP WAS SUCCESSFULLY PROCESSED AND SOLD.  BUT

16  THE SUBSEQUENT FROM WHAT I UNDERSTAND FIVE TO SEVEN

17  CROPS FAILED DUE TO LACK OF WHATEVER THEY ADD TO THE

18  GROUND TO KEEP THE GROUND UP.

19     Q.  SO, IN OTHER WORDS, WHEN YOU INITIALLY CLOSED

20  THE DEAL, THERE WAS SOME CROPS THAT WERE HARVESTED BUT

Page 94

Cinelli.ROUGHD~1.TXT

21    THEN THERE WAS A PROBLEM WITH PRODUCTION THAT WAS DUE TO

22    POOR CULTURAL PRACTICES THAT HAD OCCURRED PRIOR TO THE

23    ACQUISITION?

24        A.    THAT'S THE CONCLUSION BEING DRAWN.

25        Q.    WHO DREW THAT CONCLUSION, WHO WAS THE AG EXPERT

Rough Draft - 115                    NONCERTIFIED ROUGH DRAFT

1    SO TO SPEAK THAT WAS MAKING THAT CONCLUSION?

2        A.    MCCORMICK, PARSON, PEOPLE WHO WERE MORE

3    FAMILIAR WITH WHAT WAS GOING ON IN THE FIELD.  THERE IS

4    A BIG LAUNDRY LIST OF ITEMS THAT'S BEING PUT TOGETHER

5    REGARDING MISREPRESENTATIONS OF THE ORIGINAL DEAL.

6        Q.    IT WASN'T DUE TO HOW SOMETIMES THERE IS A CROP

7    FAILURE DUE TO WEATHER CONDITIONS, IT WAS OTHER PEOPLE

8    IN THE AREA WERE HAVING GOOD CROPS BUT THESE CROPS WERE

9    FAILING AND IT WAS --

10        A.    YES, THAT'S MY UNDERSTANDING THAT WAS THE CASE.

11        Q.    AND THE CONCLUSION WAS REACHED THAT THERE

12    WERE --

13        A.    THAT THE AREA WAS FULL OF WEEDS AND WHATNOT.

14        Q.    SO THAT IT WASN'T -- THE GROUND WASN'T BEING

15    FARMED IN A FORMAL LIKE FASHION AS THEY SAY.  AND THAT

16    WAS DURING THE PERIOD OF THANKSGIVING TO CLOSING OF THE

17    ACQUISITION?

18        A.    YEAH.  AND THE RESULTS OF THAT BASICALLY

19    MANIFESTED ITSELF DURING THE FIRST HALF-DOZEN CROP

20    CYCLES.

21        Q.    WERE THERE A LOT OF CLAIMS ON CROPS THAT WERE

22    SOLD, IN OTHER WORDS, DURING THE COURSE OF THE FRESH 'N

23    HEALTHY OPERATIONS, WOULD YOU GET CLAIMS FROM CUSTOMERS

24    WHERE YOU HAD TO REDUCE PRICE BECAUSE THE CROPS DIDN'T

25    ARRIVE WELL AT DESTINATION DUE TO --

Rough Draft - 116                    NONCERTIFIED ROUGH DRAFT

Cinelli.ROUGHD~1.TXT

1       A.  IT'S MY UNDERSTANDING THAT SOME OF THE, AND

2   THIS IS HEARSAY, SOME OF THE CROPS WERE RETURNED.  AND I

3   DON'T KNOW THE REASON FOR THAT.

4       Q.  SO THERE WERE CLAIMS THAT YOU DON'T KNOW THE

5   DETAILS ABOUT THAT?

6       A.  I DO NOT.

7       Q.  WHO WOULD KNOW THAT INFORMATION?

8       A.  PROBABLY PAVICH.  AND THE GENTLEMAN THAT RAN

9   THE PLANT, JULIO, AND I DON'T KNOW WHAT JULIO'S LAST

10  NAME IS.

11      Q.  WOULD HAVE THE INFORMATION ABOUT THE CLAIMS?

12      A.  ABOUT THE QUALITY OF THE PRODUCT THAT WAS

13  COMING OUT OF THE PLANT.

14          MS. ANASTASSIOU:  SO LET'S MARK THIS AS

15  EXHIBIT 9.

16          (EXHIBIT SC-9 MARKED.)

17  BY MS. ANASTASSIOU:

18      Q.  AND I HAVE JUST HANDED THE WITNESS A DOCUMENT

19  MARKED SC NO. 9, BATES STAMPED SNO 84 THROUGH 92.  IT

20  CONSISTS OF AN ANNOUNCEMENT BY FRESH 'N HEALTHY ABOUT

21  GOURMET VEG-PAQ AND SOME CORPORATE INFORMATION ABOUT

22  GOURMET VEG-PAQ I'D LIKE TO GO OVER WITH YOU?

23      A.  I'VE NEVER SEEN THIS, SO.

24      Q.  OKAY.  THE FIRST DOCUMENT IS A NOTICE TO

25  VENDORS FROM FRESH 'N HEALTHY FARMS BY MARK MCCORMICK,

Rough Draft - 117              NONCERTIFIED ROUGH DRAFT

1   CFO FRESH 'N HEALTHY FARMS.  IF YOU CAN TAKE AN

2   OPPORTUNITY TO READ THAT AND LET ME KNOW IF YOU HAVE

3   EVER SEEN THAT PRIOR TO TODAY?

4       A.  NO, I HAVE NOT.

5       Q.  SO YOU WEREN'T CONSULTED AS FAR AS AN

Page 96

Cinelli.ROUGHD~1.TXT

```
 6   ANNOUNCEMENT TO TRADE VENDORS AS TO --

 7        A.   NO.

 8        Q.   -- WHAT THEY WERE DOING ABOUT THE ACQUISITION?

 9        A.   NO.

10        Q.   WAS THERE ANY KIND OF GENERAL PRESS RELEASE

11   THAT WENT OUT AT THE TIME GOURMET VEG-PAQ WAS ACQUIRED?

12        A.   NOT TO MY KNOWLEDGE.

13        Q.   SO --

14        A.   IF IT DID HAPPEN THEN IT WOULD BE UNDER THE

15   AUSPICES CHAD HAGEN.

16        Q.   SO YOU WEREN'T INVOLVED IN ANY GENERAL PRESS

17   RELEASE AND YOU WEREN'T INVOLVED IN MAKING VENDOR

18   ANNOUNCEMENTS?

19        A.   NOT AT ALL.

20        Q.   AND SO WHEN FRESH 'N HEALTHY OPENED ITS DOORS,

21   GOURMET VEG-PAQ CLOSED DOWN AND FRESH 'N HEALTHY OPENED

22   ITS DOORS, WAS THERE ANY KIND OF ATTEMPT TO INTRODUCE

23   FRESH 'N HEALTHY TO THE INDUSTRY OR WHAT WAS DONE?

24        A.   COULDN'T TELL YOU.

25        Q.   WHO HAVE BEEN INVOLVED IN THAT OTHER THAN --
```

Rough Draft - 118                     NONCERTIFIED ROUGH DRAFT

```
 1        A.   MARK WILLIAMS, MARK MCCORMICK.  TOM PAVICH AND

 2   CHAD HAGEN.  AND I GUESS PARSON TOO.

 3        Q.   THEY WOULD HAVE BEEN DOING THE INDUSTRY

 4   ANNOUNCEMENTS AND GENERAL PRESS RELEASES AND YOU WEREN'T

 5   CONSULTED ABOUT HOW IT WAS PRESENTED?

 6        A.   NO.

 7        Q.   AND WHAT DID -- WHAT WAS YOUR UNDERSTANDING OF

 8   THE OWNERSHIP OF GOURMET VEG-PAQ AT THE TIME, IT WAS AN

 9   ASSET PURCHASE, RIGHT, IT WASN'T A CORPORATE --

10        A.   YEAH, MARTINEZ, THEY WERE HAVING FIVE OR SIX

11   DIFFERENT LEGAL ENTITIES ALL OF WHICH WERE OWNED BY
```

Page 97

Cinelli.ROUGHD~1.TXT

12    EITHER MARTINEZ OR MEMBERS OF HIS FAMILY.  AND THEY WERE

13    SET UP I'M ASSUMING FOR TAX REASONS AND THE FRESH 'N

14    HEALTHY BASICALLY ACQUIRED THE ASSETS OF EACH OF THOSE

15    LEGAL ENTITIES.  ONE OF THE ENTITIES, I CAN'T REMEMBER

16    WHICH ONE, WAS ACTUALLY DONE ON A STOCK PURCHASE BASIS

17    FOR TAX REASONS, THE REST WERE PURE ASSET SALES.

18        Q.  AND GOURMET VEG-PAQ INC. WASN'T A STOCK

19    PURCHASE, IT WAS AN ASSET PURCHASE?

20        A.  IT WAS AN ASSET PURCHASE, CORRECT.

21        Q.  AND WHO WAS INVOLVED IN KIND OF SETTING UP

22    TRADE CREDIT WITH PEOPLE AT SNOW SEED, THAT WOULD HAVE

23    BEEN MCCORMICK AND WILLIAMS?

24        A.  MCCORMICK, WILLIAMS, PAVICH AND PARSON.

25        Q.  AND SO HERE IT LOOKS LIKE, IF YOU LOOK AT SNO

Rough Draft - 119                NONCERTIFIED ROUGH DRAFT

1    85, IT LOOKS LIKE THERE IS AN ENTITY CALLED GOURMET

2    VEG-PAQ CORPORATION, AND THEN IF YOU LOOK AT SNO 86

3    THERE IS ALSO ENTITIES CALLED GOURMET VEG-PAQ, INC AND

4    DO YOU KNOW WHICH ONE THAT FRESH 'N HEALTHY ACQUIRED

5    ASSETS FROM OR WAS IT BOTH?

6        A.  I BELIEVE IT WAS INC.  DO YOU HAVE THE ASSET

7    PURCHASE AGREEMENT?

8        Q.  NO.

9        A.  OKAY.  THAT'S ONE OF THE THINGS ON MY TO DO

10    LIST.

11        Q.  OKAY.  AND THEN DO YOU KNOW THE NAMES OF ANY OF

12    THE OTHER ENTITIES THAT YOU ACQUIRED ASSETS FROM?

13        A.  THERE WAS GILROY MACHINE.  THERE WAS SOVENCHA

14    (PHONETIC).  THERE WERE THREE OTHERS, I BELIEVE.  I

15    CAN'T RECALL OFF THE TOP.

16        Q.  HERE'S SOME MORE ANNOUNCEMENTS.  LET'S MARK

Cinelli.ROUGHD~1.TXT
17    THIS AS SC NO. 10.

18         (EXHIBIT SC-10 MARKED.)

19    BY MS. ANASTASSIOU:

20         Q.  I HAVE HANDED THE WITNESS A DOCUMENT THAT IS

21    MARKED SC NO. 10, IT CONSISTS OF THREE PAGES

22    BATES-STAMPED SNO 93, 94 AND 95.  IF YOU CAN TAKE AN

23    OPPORTUNITY TO LOOK AT THAT?

24         A.  I HAVE.

25         Q.  HAVE YOU PREVIOUSLY SEEN ANY OF THIS

Rough Draft - 120              NONCERTIFIED ROUGH DRAFT

1     CORRESPONDENCE PRIOR TO TODAY?

2          A.  NO.

3          Q.  OKAY.  AND SO AGAIN THIS LETTER FROM SANTOS

4     MARTINEZ WASN'T SOMETHING THAT HE RAN BY THE FRESH 'N

5     HEALTHY BOARD OR TALKED TO THE BOARD ABOUT, HE JUST PUT

6     IT TOGETHER HIMSELF ON HIS OWN?

7          A.  I WOULD IMAGINE SO.  HE'S COPYING MARK WILLIAMS

8     ON IT, BUT I NEVER SAW THIS.

9          Q.  WHO IS JAMES GUMBERG, ESQ., AND PATANE GUMBERG?

10         A.  THAT'S SANTOS'S ATTORNEY.  PATANE GUMBERG IS

11    THE NAME OF THEIR FIRM.

12         Q.  SO SANTOS SENT THESE LETTERS OUT BUT I GUESS HE

13    COPIED MARK WILLIAMS AS CEO BUT YOU WEREN'T AWARE OF

14    THIS GOING ON?

15         A.  UH-UH.

16         Q.  AND THERE WASN'T ANY KIND OF GAME PLAN, AGAIN,

17    THERE MAY HAVE BEEN BUT YOU WEREN'T AWARE OF EXACTLY

18    WHAT IT WAS AS FAR AS INTRODUCING THE TRADE TO FRESH 'N

19    HEALTHY?

20         A.  NO.

21         Q.  AND YOU WERE INVOLVED IN PRIMARILY MARKETING

22    FRESH 'N HEALTHY TO THE INVESTMENT TRADE; IS THAT --
               Page 99

Cinelli.ROUGHD~1.TXT

23    A.  YEAH, REALLY EXTERNAL RELATIONSHIPS LOOKING AT

24  OTHER POSSIBLE ACQUISITIONS.  AND THEN WITH THOSE

25  ACQUISITIONS STRUCTURE AND FINANCING OF THOSE.
Rough Draft - 121                NONCERTIFIED ROUGH DRAFT

1    Q.  BUT NOT DEALING WITH THE DAY-TO-DAY VENDORS

2  OR --

3    A.  NO.

4    Q.  -- BUSINESS OF FRESH 'N HEALTHY?

5    A.  UH-UH.

6    Q.  YOU HAD NO INVOLVEMENT IN THAT?

7    A.  NO.

8    Q.  WAS COMERICA BANK -- IS COMERICA AWARE THAT YOU

9  WEREN'T REALLY INVOLVED IN THE DAY-TO-DAY BUSINESS

10  OPERATIONS OF FRESH 'N HEALTHY PRIOR TO THE CLOSING?

11    A.  I BELIEVE SO.

12    Q.  AND WHY ARE THEY LOOKING TO YOU TO EXECUTE

13  RESOLUTIONS THEN?

14    A.  I'M THE LAST MAN STANDING.

15    Q.  SO THAT YOU ARE THE ONLY PERSON THAT THEY CAN

16  GET INTO CONTACT WITH, IS THAT WHY?

17    A.  MARK WILLIAMS FLED THE COUNTRY, HE RESIGNED

18  FROM THE BOARD AND HIS POSITION OF CEO, ALL THE OTHER

19  EMPLOYEES HAVE BEEN LET GO AND I'M TRYING TO BE ETHICAL

20  ABOUT, YOU KNOW, THE WIND DOWN.

21    Q.  AND YOU SAID THAT WILLIAMS RESIGNED HIS

22  POSITION.  WAS THERE A FORMAL LETTER OF RESIGNATION?

23    A.  HE SENT AN EMAIL.

24    Q.  DO YOU HAVE A COPY OF THAT EMAIL?

25    A.  I BELIEVE I DO.
Rough Draft - 122                NONCERTIFIED ROUGH DRAFT

1    Q.  MAYBE YOU CAN BRING THAT TO YOUR NEXT

Cinelli.ROUGHD~1.TXT

2  DEPOSITION.  DO YOU REMEMBER THE DATE OF THE EMAIL?

3      A.  NO, I DON'T.

4          MS. ANASTASSIOU:  LET'S MARK THIS AS SC NO. 11.

5          (EXHIBIT SC-11 MARKED.)

6          MS. ANASTASSIOU:  SC-11 ARE EXCERPTS FROM THE

7  FRESH 'N HEALTHY WEBSITE, SNO 47 AND 48.  WERE YOU

8  INVOLVED IN CREATING THE WEBSITE FOR FRESH 'N HEALTHY?

9          THE WITNESS:  NO.

10  BY MS. ANASTASSIOU:

11     Q.  WHO WAS INVOLVED IN DOING THAT?

12     A.  CHAD HAGEN.

13     Q.  AND DID CHAD REPORT --

14     A.  TO MARK WILLIAMS.

15     Q.  HE REPORTED TO MARK WILLIAMS?  OKAY.  AND SO

16  HOW WAS THE DECISION MADE AS TO WHAT WENT ON THE WEBSITE

17  OR HOW FRESH 'N HEALTHY PRESENTED ITSELF?

18     A.  I THINK IT WAS REALLY DRIVEN BY CHAD'S VIEW OF

19  WHAT SHOULD BE REPRESENTED AND DEVELOPING A LOGO,

20  DEVELOPING THE CONTENT.

21     Q.  WAS THERE ANY APPROVAL OF THAT BY THE BOARD OF

22  DIRECTORS OR JUST CHAD WORKING WITH WILLIAMS?

23     A.  CHAD WORKING WITH WILLIAMS.

24     Q.  AND THEN HOW MUCH REPORTING WENT ON TO THE BANK

25  AS FAR AS WHAT FRESH 'N HEALTHY WAS DOING?  YOU SAID

Rough Draft - 123                    NONCERTIFIED ROUGH DRAFT

1  THAT THEY DIDN'T HAVE FINANCIAL INFORMATION.  DID THEY

2  HAVE OTHER INFORMATION ON AN ONGOING BASIS AS TO WHAT

3  WAS GOING ON?

4      A.  THEY WERE PROVIDED RECEIVABLE AGINGS AND

5  PAYABLE AGINGS.  AND THEN I KNOW THAT THERE WAS DIALOGUE

6  BETWEEN THE BANK AND WILLIAMS AND MCCORMICK ON AN

7  UPDATED BASIS BECAUSE RELATIVELY QUICKLY THERE WERE

Page 101

Cinelli.ROUGHD~1.TXT

8    OVERDRAFTS IN THE ACCOUNT.

9         Q.   SO YOU ARE SAYING BASICALLY FROM INCEPTION

10   THERE WERE -- THERE WAS A DIALOGUE GOING AS OVERDRAFTS

11   HAPPENED?

12        A.   I DON'T THINK THE OVERDRAFTS CAME IN UNTIL

13   PROBABLY THE SEPTEMBER TIME FRAME.

14        Q.   WASN'T MCCORMICK GONE BY THEN?

15        A.   I THINK MIKE MCCORMICK TOOK OFF IN AUGUST.

16        Q.   SO YOU HAD PREVIOUSLY SAID THAT THE BANK AND

17   WILLIAMS AND MCCORMICK WERE HAVING DIALOGUE?

18        A.   YEAH, I THINK JUST UPDATED AS TO WHAT WAS GOING

19   ON AND WHATNOT.  I DON'T BELIEVE THERE WERE OVERDRAFTS

20   CERTAINLY IN THE JUNE, JULY PERIOD BECAUSE THAT WAS WHEN

21   THE EXTRA MILLION-AND-A-HALF CAME IN, EQUITY CAME IN.

22   BUT THAT WAS ABSORBED RELATIVELY QUICKLY WITH PAST DUE

23   PAYABLES.

24        Q.   DO YOU KNOW WHAT KIND OF DIALOGUES THAT

25   WILLIAMS AND MCCORMICK AND THE BANK WERE HAVING PRIOR TO

Rough Draft - 124              NONCERTIFIED ROUGH DRAFT

1    THAT, TO OVERDRAFTS HAPPENING, I MEAN WAS THE BANK

2    GETTING UPDATED AS FAR AS WHAT THE BUSINESS PLAN WAS OR

3    ANYTHING LIKE THAT?

4         A.   YEAH, I BELIEVE THE COMPANY WAS PROVIDING SALES

5    REPORTS, AGAIN, AGINGS, RECEIVABLES AND PAYABLES.  AND I

6    DON'T KNOW WHAT OTHER SPECIFIC CONVERSATIONS THE BANK

7    WAS HAVING WITH THE MANAGEMENT TEAM.

8         Q.   DID WILLIAMS EVER TELL YOU WHEN HE WAS -- WHAT

9    KIND OF CONVERSATIONS HE WAS HAVING?

10        A.   NO, I JUST KNOW THAT CERTAINLY ALMOST FROM THE

11   OUTSET MARK WAS LOOKING FOR ADDITIONAL CAPITAL TO COME

12   INTO THE BUSINESS.

Cinelli.ROUGHD~1.TXT

13    Q.   WHY WAS THAT?

14    A.   AGAIN THIS IS SPECULATION, WHICH AGAIN IS A

15  POTENTIAL ACTION WHICH I'D LIKE OFF THE RECORD, BUT I

16  GUESS IT'S YOUR CALL, EFFIE.

17         MS. ANASTASSIOU:  OKAY.  OFF THE RECORD.

18         (OFF THE RECORD.)

19         MS. ANASTASSIOU:  ON THE RECORD.

20  BY MS. ANASTASSIOU:

21    Q.   AND SO YOU INDICATED THAT AT THE TIME THAT THE

22  TRANSACTION WAS CONSUMMATED WITH GOURMET VEG-PAQ THAT

23  THERE WAS A CERTAIN BALANCE SHEET THAT WAS PROVIDED AS

24  TO WHAT THE PAYABLES WERE AND RECEIVABLES.

25    A.   UH-HUH.

Rough Draft - 125                    NONCERTIFIED ROUGH DRAFT

1     Q.   AND THE PAYABLES ON THE BALANCE SHEET, WHAT WAS

2   THE AMOUNT THAT WAS SHOWN AS OF THE DATE OF CLOSING?

3     A.   ZERO.  NO, $50,000.

4     Q.   APPROXIMATELY $50,000.  AND SUBSEQUENTLY YOU

5   LEARNED THAT THAT NUMBER MAY HAVE BEEN INCORRECT?

6     A.   THAT'S CORRECT.

7     Q.   AND THEN ALSO WAS THERE ON THE BALANCE SHEET A

8   CERTAIN REPRESENTATION REGARDING ACCOUNTS RECEIVABLE?

9     A.   YES.

10    Q.   AND HOW MUCH WAS THAT?

11    A.   I BELIEVE A MILLION ONE.

12    Q.   AND WAS THAT --

13    A.   AND THEY WERE REPRESENTED TO BE ALL

14  COLLECTIBLE, WHICH WASN'T THE CASE.

15    Q.   SO THERE WAS A 1.1 MILLION APPROXIMATELY AS

16  ACCOUNTS RECEIVABLE ALL COLLECTIBLE, AND IN FACT YOU

17  FOUND OUT THAT THAT WASN'T THE CASE?

18    A.   CORRECT.

Page 103

Cinelli.ROUGHD~1.TXT

19        Q.   AND APPROXIMATELY DO YOU KNOW APPROXIMATELY HOW

20   MUCH?

21        A.   ABOUT 80,000 WAS NOT COLLECTIBLE.

22        Q.   AND SO AS A RESULT OF THE FACT THAT THERE

23   WAS -- THAT THE BALANCE SHEET THAT THE COMPANY STARTED

24   OUT AT WAS NOT REPRESENTED AS IT WAS STATED AT CLOSING,

25   THEN WAS THERE AN ISSUE WITH RESPECT TO CASH FLOW FROM

Rough Draft - 126                NONCERTIFIED ROUGH DRAFT

1    THE START OF THE COMPANY?

2         A.   YES.

3         Q.   AND SO WHAT DID THE COMPANY DO TO TRY TO REMEDY

4    THAT?

5         A.   RAISE ANOTHER MILLION AND A HALF OF EQUITY.

6         Q.   AND WAS COMERICA BANK TOLD ABOUT THE ISSUE WITH

7    THE CASH FLOW EARLY ON?

8         A.   OH, THEY COULD SEE IT BY THE RECEIPTS AND THE

9    PAYABLES COMING IN AND, YOU KNOW, THE MOVEMENT OF MONEY

10   IN AND OUT OF THE ACCOUNT.

11        Q.   SO THEY WERE AWARE THAT THERE WAS A PROBLEM

12   FROM THE BEGINNING?

13        A.   YEAH, CLEAR AT THE TIME THAT CASH FLOW WAS

14   STRAINED BECAUSE WE WERE BUILDING THE BUSINESS PRETTY

15   RAPIDLY AND RECEIVABLES WERE GROWING PRETTY RAPIDLY.

16   THE COLLECTION PERIOD FOR THE RECEIVABLES ARE ABOUT 45

17   DAYS, PAYABLES ABOUT 30 DAYS.  IN A GROWTH COMPANY YOU

18   MAY BE CASH FLOW CONSTRAINED JUST BY PURE GROWTH.  SO

19   THE CONCLUSION AT THE TIME WAS THE GROWTH IMPACTED THE

20   CASH FLOWS.  BUT IT'S MY CONCLUSION THAT WHAT IMPACTED

21   THE CASH FLOWS WERE CERTAIN LEVEL OF UNRECORDED

22   LIABILITIES THAT HAD TO BE PAID UP AND MCCORMICK PAID

23   THEM AND ALL OF A SUDDEN IT SUCKED UP CASH.

Page 104

Cinelli.ROUGHD~1.TXT
24    Q.   SO WAS WILLIAMS TALKING TO THE BANK ABOUT THIS

25    ISSUE AS IT WAS HAPPENING?

Rough Draft - 127                    NONCERTIFIED ROUGH DRAFT

1    A.   I WOULD IMAGINE BOTH WILLIAMS AND MCCORMICK

2    WERE.

3    Q.   AND DO YOU KNOW WHETHER THE BANK INCREASED

4    FRESH 'N HEALTHY'S LINE OF CREDIT TO TRY AND ASSIST THEM

5    IN DEALING WITH THE PROBLEM?

6    A.   BECAUSE THE LINE WAS BASED ON RECEIVABLE

7    BALANCES, THERE WAS ENOUGH AVAILABILITY UNDER THE LINE

8    AS RECEIVABLES GREW.

9    Q.   BUT THEN AT SOME POINT IN TIME THERE WASN'T

10   ENOUGHLY LIQUIDITY UNDER THE LINE, CORRECT?

11   A.   CORRECT.

12   Q.   AND WHEN DID THAT OCCUR?

13   A.   PROBABLY SEPTEMBER, SEPTEMBER, OCTOBER.

14   Q.   AND THAT'S WHEN BURBANK STARTED GETTING

15   INVOLVED AT THAT POINT?

16   A.   PROBABLY OCTOBER, NOVEMBER.

17   Q.   AND DID BURBANK HAVE ANY SUGGESTIONS FOR THE

18   COMPANY OTHER THAN SHUTTING IT DOWN?

19   A.   HE AND WILLIAMS WORKED ON ELIMINATING THE

20   FARMING OPERATION WHEREBY ALL THE PRODUCE THAT WAS

21   PROCESSED, HISTORICALLY, SANTOS MARTINEZ ONLY PROCESSED

22   WHEN HE GREW, IT WAS A VERTICAL OPERATION.  UNDER

23   WILLIAMS AND PARSON AND, YOU KNOW, WHOEVER ELSE WAS IN

24   THE FARMING OPERATION, AND CERTAINLY THE QUALITY OF THE

25   LAND AS WE TALKED ABOUT BEFORE, CREATED DISMAL RESULTS

Rough Draft - 128                    NONCERTIFIED ROUGH DRAFT

1    IN FARMING AND THERE WAS A DECISION IN THE FALL TO GET

2    OUT OF THE FARMING BUSINESS AND RELY SOLELY ON OUTSIDE

3    SUPPLIERS TO PROVIDE INVENTORY TO FRESH 'N HEALTHY.
                        Page 105

Cinelli.ROUGHD~1.TXT

```
 4        Q.   AND THAT'S WHEN THE DEALS WERE MADE WITH ASA

 5   FARMS AND BRAGA RANCH?

 6        A.   I BELIEVE SO.

 7        Q.   WERE YOU INVOLVED IN STRUCTURING THOSE DEALS?

 8        A.   NO.

 9        Q.   BURBANK WAS INVOLVED IN STRUCTURING?

10        A.   I DON'T BELIEVE SO.

11        Q.   WHO --

12        A.   WHEN YOU SAY THE DEALS, BASICALLY THE TRADE

13   ARRANGEMENTS?

14        Q.   THE ARRANGEMENTS WITH -- YOU INDICATED THAT

15   THEY DECIDED TO GET OUT OF THE FARMING BUSINESS AND TO

16   GO DIRECT --

17        A.   TO GROWERS.

18        Q.   -- TO THE GROWERS.  AND WAS -- WEREN'T THOSE

19   GROWERS ASA FARMS AND BRAGA RANCHES?

20        A.   YES.

21        Q.   WHAT I WAS ASKING YOU WAS WHO WAS INVOLVED IN

22   STRUCTURING THOSE DEALS ON BEHALF OF FRESH 'N HEALTHY,

23   WAS THAT WILLIAMS AND BURBANK?

24        A.   NO, BURBANK WASN'T INVOLVED.  WILLIAMS,

25   MCCORMICK EARLY ON AND PARSON AND TO SOME EXTENT PAVICH.
```

Rough Draft - 129                    NONCERTIFIED ROUGH DRAFT

```
 1        Q.   BURBANK JUST SUGGESTED THE MODEL BUT DIDN'T GET

 2   INVOLVED IN THE DETAILS?

 3        A.   THE PURCHASING -- BURBANK GOT INVOLVED IN

 4   LOOKING AT THE BUSINESS TO RESTRUCTURE IT TO BEGIN WITH,

 5   REDUCING THE OVERHEAD SO THAT THE COMPANY WOULD GENERATE

 6   POSITIVE CASH FLOW.  THE DECISION, I DON'T KNOW IF

 7   BURBANK WAS INVOLVED, I BELIEVE IT PREDATED BURBANK.

 8   WILLIAMS MADE THE DECISION TO GET OUT OF THE FARMING
```

Cinelli.ROUGHD~1.TXT

9    BUSINESS ALTOGETHER AND THEN AT THAT TIME RELY ON

10   OUTSIDE SUPPLIERS.

11       Q.  SO IT WAS PRIOR TO BURBANK THAT HE MADE THAT

12   DECISION?

13       A.  CORRECT, CORRECT.

14       Q.  AND THEN BUT BURBANK VALIDATED IT OR -- BECAUSE

15   I THOUGHT YOU SAID THAT BURBANK AND WILLIAMS GOT

16   TOGETHER AND DECIDED THAT THEY SHOULD GET OUT OF

17   FARMING?

18       A.  BURBANK WASN'T PART OF THE DECISION TO GET OUT

19   OF FARMING, BURBANK WAS TRYING TO ASSIST IN

20   RESTRUCTURING THE BUSINESS TO GENERATE A POSITIVE CASH

21   FLOW.  PART AND PARCEL OF THAT WAS A DECISION THAT

22   WILLIAMS MADE JUST BEFORE THAT TO GET OUT OF THE FARMING

23   OPERATION.

24       Q.  WHAT DID BURBANK DO TO, YOU KNOW, KIND OF GIVE

25   THE COMPANY AN OPPORTUNITY TO ACTUALLY RESTRUCTURE

Rough Draft - 130                    NONCERTIFIED ROUGH DRAFT

1    ITSELF?

2        A.  HE STARTED PUTTING TOGETHER SPREADSHEETS,

3    OVERHEAD, LAYOUTS AND WHAT THE BUSINESS WOULD LOOK LIKE

4    IN A REORGANIZED FASHION.

5        Q.  BUT HE NEVER ALLOWED ANY OF THAT TO BE

6    IMPLEMENTED, RIGHT, THERE WAS NEVER ANY TIME TO

7    IMPLEMENT THAT OR REALLY TRY TO SEE --

8        A.  HE WAS WORKING WITH WILLIAMS TO BASICALLY KEEP

9    DOWN THE OVERHEAD, ELIMINATE THE FARMING OPERATION,

10   DECISION WAS TO LET CHAD HAGEN GO AND SOME OF THE OTHER,

11   YOU KNOW, OFFICERS.

12       Q.  BUT ESSENTIALLY THERE WAS NEVER -- IT WAS NEVER

13   CARRIED OUT BECAUSE YOU NEVER DID THE WINTER SEASON, SO

14   THERE WAS NEVER AN OPPORTUNITY FOR THE GAME PLAN TO

                          Page 107

Cinelli.ROUGHD~1.TXT

15    WORK?

16        A.  THERE WAS A TRANSITION DOWN TO THE SOUTH IN

17    NOVEMBER.

18        Q.  RIGHT.

19        A.  AND THE SUPPLY, SUPPLY CHAIN OR SUPPLY LINES

20    CAME FROM OUTSIDE GROWERS.

21        Q.  RIGHT.

22        A.  AND -- BUT AT THE TIME, THE GROWING OPERATION

23    HAD BEEN SHUT DOWN, SO FRESH 'N HEALTHY WASN'T GROWING

24    ANYTHING FOR ITS OWN ACCOUNT.

25        Q.  RIGHT.  BUT IT WAS IMPLEMENTING THIS NEW GAME

Rough Draft - 131                        NONCERTIFIED ROUGH DRAFT

1    PLAN TO GET OUT OF THE FARMING BUSINESS, AND WHAT I'M

2    SAYING IS, THAT YOU NEVER ALLOWED IT TO GO THROUGH THE

3    SEASON, THAT WOULD HAVE BEEN THE WINTER SEASON THAT

4    WOULD HAVE STARTED THE END OF DECEMBER, EARLY -- END OF

5    NOVEMBER, EARLY DECEMBER AND GONE THROUGH MARCH.  AND

6    THAT WAS NEVER IMPLEMENTED BECAUSE THEY SHUT IT DOWN

7    AFTER ONLY ABOUT A MONTH AND A HALF OF THE SEASON,

8    RIGHT?

9        A.  JUST TO BE CLEAR, THE DECISION TO GET OUT OF

10    THE FARMING BUSINESS PREDATED THE MOVE DOWN TO THE

11    SOUTH, MOVING DOWN TO THE SOUTH.

12        Q.  BUT JUST TO BE CLEAR, THE FARMING BUSINESS WHEN

13    FRESH 'N HEALTHY WAS IN SALINAS AND THE SURROUNDING

14    AREAS HERE IN NORTHERN CALIFORNIA, THEY WERE IN THE

15    FARMING IN THE SPRING AND SUMMER?

16        A.  CORRECT.  AND I THINK IT WAS PROBABLY LATE

17    SUMMER THAT WILLIAMS DECIDED TO GET OUT OF THE FARMING

18    BUSINESS.

19        Q.  RIGHT.  AND AT THAT POINT IN TIME THEY WERE

Page 108

Cinelli.ROUGHD~1.TXT

20  GETTING READY TO TRANSITION DOWN SOUTH?

21      A.  CORRECT.

22      Q.  MY POINT TO YOU IS, THE COMPANY WAS NEVER

23  ALLOWED TO OPERATE THROUGH THE FULL SEASON OF BEING OUT

24  OF THE FARMING BUSINESS --

25      A.  THAT'S CORRECT.

Rough Draft - 132                 NONCERTIFIED ROUGH DRAFT

1      Q.  -- BEFORE IT WAS SHUT DOWN, RIGHT?

2      A.  CORRECT.

3      Q.  AND WHAT WAS MR. BURBANK'S RATIONALE FOR NOT

4  ALLOWING THE COMPANY TO GO THROUGH A FULL SEASON OF

5  OPERATION DOWN IN THE DESERT TO SEE WHETHER OR NOT THEY

6  COULD TURN IT AROUND JUST BEING A MARKETING COMPANY?

7      A.  THE DECISION THAT BURBANK, OR THE CONCLUSIONS

8  DRAWN BY BOTH BURBANK AND THE BANK.  IN ADDITION, I

9  THINK TO WILLIAMS IS THAT THE COMPANY WAS GENERATING

10  NEGATIVE CASH FLOW ON A MONTHLY BASIS, INCURRING

11  ADDITIONAL LIABILITIES, AND WITHOUT AN INFUSION OF

12  CAPITAL, IT WAS A DYING BUSINESS.  YOU KNOW, WILLIAMS

13  WAS OPERATING THIS BUSINESS AT A LOSS.  AND YOU CAN ONLY

14  TAKE LOSSES FOR SO LONG.

15      Q.  AND JUST BEING A MARKETING COMPANY WASN'T

16  ENOUGH?

17      A.  WELL, IT'S A PROCESSING COMPANY AND A MARKETING

18  COMPANY.

19      Q.  RIGHT.  NOBODY HAD DONE THE MATH TO FIGURE OUT

20  WHETHER IT WOULD BE PROFITABLE OPERATING IT AS A

21  PROCESSING MARKETING COMPANY ALONE?

22      A.  WILLIAMS, MCCORMICK HAD DONE SOME PRELIMINARY

23  STUFF BEFORE HE TOOK OFF.  WILLIAMS WAS OVERSEEING

24  TRYING TO PUT TOGETHER A NEW BUDGET IN CONJUNCTION WITH

25  BURBANK AND WITH SOME ASSISTANCE FROM CHANDRA.  THEY CUT

Cinelli.ROUGHD~1.TXT

Rough Draft - 133                    NONCERTIFIED ROUGH DRAFT

1    SOME OF THE OVERHEAD, WHICH AT LEAST ON PAPER SUGGESTED

2    THAT SEPTEMBER WAS A PROFITABLE MONTH.  SO THEY THOUGHT

3    SOME OF THE ACTIONS THAT WERE TAKEN ARE WORKING.  BUT

4    THEN IT CONTINUED TO SLIDE IN THE SUBSEQUENT MONTHS.

5    AND IN TRANSITION DOWN TO THE DESERT DOWN TO EL CENTRO

6    CONTINUED THE POOR OPERATING PERFORMANCE.

7        Q.   AND THERE WERE CONTRACTS THAT WERE ENTERED INTO

8    BETWEEN FRESH 'N HEALTHY AND BRAGA AND ASA FARMS FOR THE

9    DESERT SEASON, RIGHT?

10       A.   I BELIEVE SO.

11       Q.   THAT WAS YOUR UNDERSTANDING?

12       A.   YES.

13       Q.   WHO TOOK OVER THE CONTRACTS ONCE FRESH 'N

14   HEALTHY SHUT DOWN, WAS THAT SANTOS MARTINEZ?

15       A.   I DON'T KNOW.

16       Q.   DO YOU KNOW WHAT HAPPENED WITH THE CONTRACTS?

17       A.   WELL, FRESH 'N HEALTHY WASN'T BUYING PRODUCT

18   AND CERTAINLY A NUMBER OF THE SUPPLIERS ARE OWED MONEY

19   FROM FRESH 'N HEALTHY.  AS TO WHAT THE FARMERS DID WITH

20   THE ADDITIONAL PRODUCT, I DON'T KNOW.

21       Q.   SO YOU DON'T KNOW WHETHER SANTOS CAME IN AND

22   STARTED TAKING THEIR CROPS AND MARKETING THEM?

23       A.   I DON'T KNOW.

24       Q.   DO YOU KNOW WHAT SANTOS IS CURRENTLY DOING?

25       A.   AS FAR AS I HEAR, AGAIN THIS IS HEARSAY, HE'S

Rough Draft - 134                    NONCERTIFIED ROUGH DRAFT

1    SECURED NEW FARMLAND, HE'S GROWING, WE UNDERSTAND THAT

2    HE IS PROCESSING.

3        Q.   HE'S PROCESSING OUT OF WHAT FACILITY?

4        A.   I DON'T KNOW.  I DON'T KNOW.

Page 110

Cinelli.ROUGHD~1.TXT

5      Q.   IS HE USING ANY OF THE FACILITIES THAT FRESH 'N

6  HEALTHY WAS FORMERLY USING?

7      A.   HE CAN'T USE THE PROCESSING FACILITY AT EL

8  CENTRO.  BUT HE -- OBVIOUSLY HE'S PROCESSING SOMEWHERE

9  BECAUSE HE TOOK THE EQUIPMENT OUT OF FRESH 'N HEALTHY.

10  AND I DON'T BELIEVE AT THIS TIME OF THE YEAR HE'S

11  PROCESSING UP IN HOLLISTER BECAUSE TRANSPORTATION.

12      Q.   AND THE HOLLISTER AND GILROY FACILITIES, HAVE

13  THEY BEEN TAKEN BACK BY SANTOS?

14      A.   YES.

15      Q.   WHEN DID THAT HAPPEN?

16      A.   WITHIN THE LAST 60 DAYS.

17      Q.   AND WAS THAT SOMETHING WHERE SANTOS JUST CAME

18  IN AND TOOK IT OVER OR HOW DID THAT HAPPEN?

19      A.   PRETTY MUCH JUST TOOK THEM OVER BECAUSE THERE

20  WERE LEASES IN ARREAR, LEASE PAYMENTS IN ARREAR.

21      Q.   AND DO YOU KNOW WHEN THAT HAPPENED?

22      A.   I BELIEVE IN JANUARY, JANUARY, FEBRUARY.

23      Q.   AND WHEN DID FRESH 'N HEALTHY OFFICIALLY SHUT

24  DOWN ITS STORES?

25      A.   SOMETIME IN JANUARY.  I THINK THE LAST PAYROLL

Rough Draft - 135                    NONCERTIFIED ROUGH DRAFT

1  WAS DECEMBER 31.

2      Q.   AND THEN SHORTLY AFTER THAT, THEY JUST MOVED

3  ALL THE FURNITURE AND STUFF OUT OR IS THERE FURNITURE

4  STILL THERE OR WHAT HAPPENED?

5      A.   FOR THE MOST PART, AS FAR AS I KNOW, AGAIN THIS

6  HAS BEEN HANDLED BY BURBANK, THEY ARE TRYING TO GET A

7  SENSE OF THE EQUIPMENT ASSETS AND ALL THE OTHER ASSETS

8  THAT ARE AVAILABLE, THE BANK IS TAKING CONTROL OF

9  RECEIVABLES.  AND THE BANK AND BURBANK ARE FACILITATING

10  THIS AUCTION.

                        Page 111

Cinelli.ROUGHD~1.TXT

11      Q.   WHAT ABOUT THINGS LIKE DESKS AND COMPUTERS AND

12  ALL OF THAT, WHO HAS ALL OF THAT EQUIPMENT?

13      A.   THERE WAS A SALES OFFICE FOR BOTH MCCORMICK AND

14  WILLIAMS' OFFICE AND I THINK ALL THE EQUIPMENT WAS -- OR

15  ALL THE FURNITURE WAS LEASED AND I THINK THE FURNITURE

16  LEASING COMPANY CAME BACK AND REPOSSESSED THAT.

17      Q.   WHAT ABOUT COMPUTERS?

18      A.   BURBANK WAS SUPPOSED TO BASICALLY EITHER PULL

19  THE COMPUTERS OR PULL ALL THE INFORMATION OFF THE

20  COMPUTERS AND SERVER.  AND HE SUPPOSEDLY HAS CDS WITH

21  ALL THE INFORMATION.  I HAVE NOT RECEIVED A COPY OF

22  THAT.

23      Q.   WHAT HAPPENED TO THEIR COMPUTERS?

24      A.   I THINK HE BASICALLY LEFT THE PHYSICAL

25  COMPUTERS DOWN THERE BUT REMOVED ALL INFORMATION OFF

Rough Draft - 136                 NONCERTIFIED ROUGH DRAFT

1   THEM.

2       Q.   HE LEFT THEM AT THE FACILITY?

3       A.   YES, LARGELY AT DAVIDSON.

4       Q.   AND THAT'S IN GILROY?

5       A.   YES.  THE DAVIDSON PROPERTY.

6       Q.   DO YOU KNOW WHO RAYMOND NAVA IS?

7       A.   I BELIEVE HE'S RELATED TO SANTOS AND I THINK HE

8   WAS RUNNING THE GILROY MACHINE OPERATION.

9       Q.   SO THERE IS SOME MACHINING EQUIPMENT THAT IS

10  BEING SOLD TO RAYMOND NAVA FOR $60,000?

11      A.   YES.

12      Q.   DO YOU KNOW WHETHER OR NOT THAT'S FAIR VALUE

13  FOR THAT EQUIPMENT?

14      A.   I COULDN'T TELL YOU.  THAT WAS A PRICE

15  NEGOTIATED BY THE BANK AND BURBANK.

Page 112

Cinelli.ROUGHD~1.TXT

16    Q.  WITH RAYMOND NAVA?

17    A.  YES.

18    Q.  AND DO YOU KNOW WHAT EFFORTS THEY MADE TO SELL

19  THAT EQUIPMENT TO THIRD PARTIES?

20    A.  I QUESTION WHETHER THERE WAS A BIG EFFORT OR

21  NOT.  I THINK NAVA APPROACHED BURBANK SAYING THAT HE

22  WANTED TO BUY IT.  THAT WAS SUSPECT BECAUSE THERE IS TWO

23  VEHICLES THAT AMOUNTED TO AT LEAST $60,000 IF NOT MORE

24  AND THERE WAS SOME SUBSEQUENT EQUIPMENT.

25    Q.  AND DO YOU KNOW WHAT WAS THE VALUE OF THAT

Rough Draft - 137              NONCERTIFIED ROUGH DRAFT

1  EQUIPMENT THAT'S BEING SOLD TO RAY NAVA ON THE BOOKS?

2    A.  I THINK THE APPRAISED VALUE WAS, I DON'T KNOW,

3  A HUNDRED FIFTY THOUSAND, 200,000.

4    Q.  AND THEN THEY SOLD IT TO HIM FOR 60?

5    A.  YES.  AGAIN, I DON'T KNOW WHAT THE LIQUIDATION

6  VALUE IS.  AGAIN, MY VIEW IS THEY ARE TRYING TO

7  ACCELERATE ALL THIS STUFF AND TRYING TO GET A

8  LIQUIDATION VALUE FOR THIS AS OPPOSED TO A HIGHER VALUE.

9  BUT THEY SAY THEY ARE THE PROFESSIONALS, SO.

10    Q.  AND DO YOU KNOW WHAT WAS SOLD TO -- THE

11  MACHINING EQUIPMENT, DO YOU KNOW WHAT'S INCLUDED IN

12  THAT?  YOU SAID THERE WERE TWO VEHICLES?

13    A.  I THINK THERE'S TWO VEHICLES.

14    Q.  WHAT KIND OF VEHICLES ARE THEY?

15    A.  I THINK THEY ARE TRUCKS.  ONE OF WHICH WAS NEW,

16  BECAUSE IT WAS PURCHASED UNDER FRESH 'N HEALTHY.  AND I

17  THINK MISCELLANEOUS REPAIR EQUIPMENT.

18    Q.  DO YOU KNOW WHETHER SANTOS HAS PURCHASED ANY

19  OTHER ASSETS FROM FRESH 'N HEALTHY?

20    A.  I WOULD IMAGINE HE'S GOING TO BE AN ACTIVE

21  BIDDER IN THE AUCTION.

Cinelli.ROUGHD~1.TXT

22      Q.   WHY DO YOU SAY THAT?

23      A.   HE'S GEARING UP TO RESTART THE BUSINESS.  HE

24 SOLD IT FOR X MILLIONS AND HE IS GOING TO PICK UP THE

25 PIECES FOR LESS THAN A MILLION DOLLARS.

Rough Draft - 138                NONCERTIFIED ROUGH DRAFT

1      Q.   AND I GUESS ANYTHING OVER THE 520,000 THAT --

2      A.   THE AUCTIONEER IS GOING TO GET.

3      Q.   IS GOING TO GET.

4           MS. ANASTASSIOU:  TAKE A BRIEF BREAK AND THEN

5 WE ARE GOING TO NEED TO SHUT THIS DOWN FOR THE DAY

6 BECAUSE I KNOW YOU NEED TO GET GOING.

7           THE WITNESS:  THANK YOU.

8           (OFF THE RECORD.)

9 BY MS. ANASTASSIOU:

10      Q.   GOING BACK TO WHEN FRESH 'N HEALTHY WAS IN

11 BUSINESS, YOU SAID ITS GENERAL BUSINESS ACCOUNT WAS WITH

12 COMERICA?

13      A.   CORRECT.

14      Q.   WAS THE PAYROLL ACCOUNT WITH THEM AS WELL?

15      A.   YES, THERE WAS.

16      Q.   WAS THERE ANY OTHER BUSINESS ACCOUNTS WITH

17 ANYBODY ELSE OTHER THAN COMERICA?

18      A.   NOT THAT I KNOW OF.

19      Q.   AND SO BY VIRTUE OF SEEING CASH FLOW COMING IN

20 AND OUT OF ACCOUNTS, COMERICA ALSO HAD INFORMATION ABOUT

21 HOW THE COMPANY WAS DOING, CORRECT?

22      A.   CORRECT.

23      Q.   AND DID -- WHO WAS THE BANK OFFICER AT COMERICA

24 THAT WAS INVOLVED IN SERVICING THE ACCOUNT?

25      A.   IT BEGAN AS A LADY, MISAKO STEWART,

Rough Draft - 139            NONCERTIFIED ROUGH DRAFT

Cinelli.ROUGHD~1.TXT
1    M-I-S-A-K-O, STEWART, AND HER BOSS, MIKE SILVA.  I

2    BELIEVE MIKE HAS BEEN ASKED FOR A DEPOSITION.

3        Q.  UH-HUH.  AND THEY ARE THE ONES THAT WERE

4    INVOLVED IN INITIALLY STRUCTURING THE DEAL?

5        A.  YES.

6        Q.  AND THEY APPROVED THE LOAN?

7        A.  YES.

8        Q.  DO YOU KNOW WHAT KIND OF DUE DILIGENCE THE BANK

9    DID WHEN THEY APPROVED THE LOAN AS FAR AS REVIEWING, YOU

10   KNOW, THE ACQUISITION DOCUMENTS AND THAT KIND OF STUFF?

11       A.  THEY WERE PART AND PARCEL TO ALL OF THE

12   DOCUMENTS OF THE ACQUISITION.  THEY CERTAINLY REVIEWED

13   THE FINANCIAL INFORMATION, THE HISTORIC FINANCIAL

14   INFORMATION THAT WAS PROVIDED, THEY REVIEWED THE

15   PROJECTIONS AT THE TIME, THEY LOOKED AT THE RECEIVABLES

16   AND INVENTORY, HAD, YOU KNOW, EXTENSIVE CONVERSATIONS

17   WITH THE MANAGEMENT TEAM.

18       Q.  AND HOW -- WHAT WAS THE PROJECTION FOR HOW

19   OPERATING CAPITAL WAS GOING TO BE COMING IN TO THE

20   COMPANY?

21       A.  THE INITIAL CAPITALIZATION WAS -- WE WENT

22   THROUGH THE CAPITAL STRUCTURE TO BEGIN WITH.

23       Q.  RIGHT.  BUT THE OPERATING CAPITAL WAS JUST

24   GOING TO BE THE LINE OF CREDIT?

25       A.  THE LINE OF CREDIT AND SOME ADDITIONAL CASH AND
Rough Draft - 140              NONCERTIFIED ROUGH DRAFT


1    THEN AS I MENTIONED EARLIER --

2        Q.  THE SUBSEQUENT FINANCING, THE 1.5?

3        A.  YEAH, BUT PRIOR TO THAT THE ASSUMPTION WAS THAT

4    THE BALANCE SHEET THAT WAS DELIVERED AT CLOSING ASSUMED

5    NO PAYABLES AND ABOUT A MILLION ONE IN RECEIVABLES,

6    WHICH SHOULD HAVE BEEN COLLECTED IN THE FIRST SIX WEEKS.
                    Page 115

Cinelli.ROUGHD~1.TXT

7    SO THAT WAS ANOTHER MILLION TWO, MILLION ONE, MILLION

8    TWO OF CASH COMING IN TO THE BUSINESS WITHOUT

9    CORRESPONDING PAYABLES AT THE TIME.

10        Q.  IN FACT, THAT WASN'T CORRECT?

11        A.  THAT'S CORRECT.  THERE WERE PAYABLES THAT

12   SHOWED UP WHICH ATE UP WHAT I BELIEVE A MILLION TWO

13   WOULD HAVE BEEN JUST FOR CASH.

14        Q.  DID ANYBODY EVER VERIFY THAT THOSE PAYABLES

15   WERE ACTUAL DEBT THAT HAD BEEN INCURRED BY THE COMPANY?

16        A.  THAT WAS WHAT AJ WAS WORKING ON.  NOT UNTIL

17   PROBABLY OCTOBER, NOVEMBER WHEN HE GOT ON BOARD.

18        Q.  SO NOBODY REALLY KNOWS WHETHER THEY WERE

19   ACTUALLY PROPER ACCOUNTS PAYABLE?

20        A.  CORRECT.  AND THAT'S -- AGAIN, THAT'S WHY

21   MCCORMICK DIDN'T DO ANY OF THAT.  HE WAS SUPPOSED TO,

22   BUT HE DIDN'T.  AND SO MCCORMICK NEVER PUT FINANCIAL

23   STATEMENTS TOGETHER.  AND HE NEVER RECORDED CERTAIN

24   ASSET PURCHASES.  HE WAS A DISASTER.  AT LEAST THAT'S MY

25   OPINION.  IT WASN'T UNTIL AJ CAME IN TO START CLOSING

Rough Draft - 141                NONCERTIFIED ROUGH DRAFT

1    THE BOOKS FOR THE VARIOUS MONTHS THAT WE REALLY STARTED

2    LOOKING AT, YOU KNOW, WHAT BALANCE SHEET WAS DELIVERED

3    AT THE TIME OF CLOSING.

4        Q.  AND THE BANK HAD THEIR OWN LIKE KIND OF STAFF

5    THAT DID THEIR OWN DUE DILIGENCE ANALYSIS?

6        A.  YES.

7        Q.  DID THEY HAVE ANY AG PERSON GO OUT THERE AND

8    KIND OF TAKE A LOOK AT VALUATIONS OR ANYTHING?

9        A.  I DON'T KNOW IF THEY HAD SOMEONE PHYSICALLY GO

10   OUT ON THE VALUATION SIDE.  THEY WERE IN -- THE OFFICE

11   THAT HANDLED THIS WAS IN SAN FRANCISCO, THEY DIDN'T HAVE

Cinelli.ROUGHD~1.TXT

12    REALLY ANY AG EXPERIENCE.  I HAD A RELATIONSHIP WITH

13    THEM AND ONE OF THE INVESTORS HAD A LONGSTANDING

14    RELATIONSHIP WITH THEM.  AND I KNOW THAT THEY CONVERSED

15    WITH A COUPLE OF THE PEOPLE WITHIN COMERICA THAT DID A

16    LOT OF AG LENDING AND STUFF IN THE PRODUCE BUSINESS.

17        Q.  BUT THE PARTICULAR OFFICERS THAT WERE INVOLVED

18    WITH IT WEREN'T REALLY KNOWLEDGEABLE ABOUT AG?

19        A.  YEAH, THEIR EXPERIENCE WAS LIMITED.

20        Q.  AND WHERE THERE WERE THESE CASH FLOWS PROBLEMS

21    THAT STARTED COMING UP AFTER THE NEXT SEVERAL MONTHS,

22    DID YOU EVER GET A CALL FROM MIKE SILVA SAYING, HEY,

23    WHAT'S GOING ON OR WAS HE TALKING PRIMARILY WITH

24    WILLIAMS?

25        A.  I HAD A COUPLE CALLS, MISAKO WAS REALLY THE

Rough Draft - 142                    NONCERTIFIED ROUGH DRAFT

1    POINT PERSON FOR COMERICA AND SHE WAS TALKING TO BOTH

2    MCCORMICK AND WILLIAMS PRETTY REGULARLY.

3        Q.  AND THEN SHE WOULD ALSO TALK TO YOU?

4        A.  YEAH, I CALLED, I WOULD CALL IN TO HER JUST TO

5    SEE, YOU KNOW, HOW THINGS WERE GOING FROM THE BANK'S

6    STANDPOINT.

7        Q.  AND THAT'S -- AND SHE TOLD YOU THAT SHE WAS

8    TALKING TO WILLIAMS AND MCCORMICK REGULARLY AND GETTING

9    UPDATES?

10        A.  YEAH.  AND THEN WILLIAMS AND MCCORMICK KEPT

11    COMING TO ME SAYING WE NEED MORE MONEY, WE NEED MORE

12    MONEY, WHICH CONFUSED ME, BECAUSE THE ASSUMPTION WAS WE

13    SHOULD HAVE HAD A LOT OF CASH COMING IN THE FIRST SIX

14    WEEKS.

15        Q.  SO THEY WERE TELLING YOU YOU NEEDED MORE MONEY,

16    WERE THEY ALSO TELLING THE BANK THAT TOO?

17        A.  THEY WERE TRYING TO GET MORE AVAILABILITY INTO
                         Page 117

Cinelli.ROUGHD~1.TXT

18    THE LINE OF CREDIT.

19         Q.    AND WAS MISAKO TALKING TO YOU ABOUT THAT TOO?

20         A.    YEAH, WE WOULD KEEP IN TOUCH ABOUT WHAT WAS

21    TRANSPIRING.  THE BANK REALLY GOT IRKED WHEN THEY NEVER

22    GOT FINANCIAL REPORTS.  THEY NEVER GOT FINANCIAL

23    STATEMENTS.  THE COMPANY WAS SUPPOSED TO PROVIDE

24    FINANCIAL STATEMENTS ON A MONTHLY BASIS, THE TRANSACTION

25    CLOSED IN LATE FEBRUARY, EARLY MARCH OR SO, AND SO, YOU

Rough Draft - 143                NONCERTIFIED ROUGH DRAFT

1    KNOW, MARCH STATEMENTS NEVER CAME OUT, APRIL, MAY, JUNE,

2    JULY.  THEY NEVER GOT ANY FINANCIAL STATEMENTS UNTIL AJ

3    CAME IN LATE IN THE YEAR.  AND SO THE BANK WAS SORT OF

4    RUNNING BLIND.  THE MANAGEMENT TEAM OBVIOUSLY WAS

5    RUNNING BLIND.

6         Q.    WAS THE BANK BEHIND FIRING MCCORMICK?

7         A.    THEY WERE CRITICAL OF MCCORMICK.  BUT I THINK

8    WILLIAMS MADE THE CALL.

9         Q.    BUT THEY WERE CRITICAL OF MCCORMICK TO WILLIAMS

10    AND THEN --

11         A.    CORRECT.

12         Q.    -- THEN WILLIAMS AFTER THEY WERE CRITIQUING HIM

13    DECIDED TO MAKE THE CALL?

14         A.    WILLIAMS MADE THE CALL.

15         Q.    BUT THE BANK WAS CRITIQUING MCCORMICK?

16         A.    SURE.

17         Q.    AND COMPLAINING THAT HE WASN'T DOING A GOOD

18    JOB?

19         A.    I DON'T KNOW IF IT WAS DIRECTED SPECIFICALLY AT

20    MCCORMICK, BUT IT WAS CERTAINLY DIRECTED AT THE

21    MANAGEMENT TEAM FOR NOT PRODUCING FINANCIAL STATEMENTS.

22         Q.    WELL, DID YOU EVER GET ANY COMPLAINTS FROM

Page 118

Cinelli.ROUGHD~1.TXT

23  MISAKO ABOUT MCCORMICK SPECIFICALLY OR JUST ABOUT THE

24  FINANCIAL SITUATION GENERALLY?

25       A.  WELL, THEY EXHIBITED A HIGH LEVEL OF

Rough Draft - 144                NONCERTIFIED ROUGH DRAFT

1  FRUSTRATION WITH MCCORMICK.  AND SUGGESTED SOMETHING HAD

2  TO BE DONE UNTIL WILLIAMS SAYS SOMETHING GOT TO BE DONE

3  AND HE KEPT RUNNING WITH MCCORMICK UNTIL SUCH TIME AS

4  IT'S THE END OF FALL AND THEN MCCORMICK LEFT.  YOU KNOW,

5  IT'S -- WHETHER OR NOT WILLIAMS ACTUALLY FIRED HIM OR

6  MCCORMICK JUST SAID ENOUGH'S ENOUGH, IT'S SPECULATION,

7  BUT THE FIRM THAT MCCORMICK IS NOW WORKING FOR SOMEONE

8  SUGGESTED HE WAS ON THE PAYROLL OF BOTH COMPANIES FOR A

9  PERIOD OF TIME.

10       Q.  SO WHAT YOU ARE SAYING IS THAT HE MAY HAVE SEEN

11  THE HANDWRITING ON THE WALL AND HAD BEEN WORKING TWO

12  JOBS?

13       A.  POSSIBLY.

14       Q.  SO YOU ARE NOT CERTAIN WHETHER HE WAS FIRED OR

15  HE QUIT OR WHAT HAPPENED?

16       A.  WILLIAMS WAS THE ONE THAT COULD ANSWER THAT.

17       Q.  SO THERE WAS NO DECISION OF THE BOARD OF

18  DIRECTORS THAT SAID WE ARE GOING TO TERMINATE MCCORMICK?

19       A.  NO.

20       Q.  AND THEN YOU SAID THAT CHANDRA PERSON WAS

21  BROUGHT IN, THAT WAS AS A RESULT OF A RECOMMENDATION BY

22  BURBANK?

23       A.  AT THE RECOMMENDATION OF I THINK THE BANK AND

24  BURBANK AND JUST THE COMPANY IN GENERAL THAT WE NEEDED

25  SOMEONE TO PUT BOOKS AND RECORDS TOGETHER.  BECAUSE FROM

Rough Draft - 145                NONCERTIFIED ROUGH DRAFT

1  INCEPTION IN FEBRUARY, MARCH, NO FINANCIAL STATEMENTS

2  WERE PRODUCED.

Page 119

Cinelli.ROUGHD~1.TXT

3      Q.   WHAT WAS THE ROLE OF SANTOS MARTINEZ WHILE

4  FRESH 'N HEALTHY WAS OPERATING?  YOU SAID HE WAS A

5  CONSULTANT.  WHAT WAS HE, CONSULTING ON?

6      A.   AS FAR AS I KNOW, WILLIAMS WAS THE ONE THAT

7  INTERFACED WITH HIM ON A DAILY BASIS, PLANT OPERATIONS,

8  THE FARMING OPERATION.  WILLIAMS WAS SORT OF BEING

9  TUTORED IN MY OPINION THROUGH THE FIRST NUMBER OF

10  MONTHS.  AND THEN I THINK THERE WAS -- I HAD A COUPLE OF

11  CONVERSATIONS WITH SANTOS INDEPENDENTLY BECAUSE IT

12  APPEARED WILLIAMS WASN'T GETTING THE JOB DONE AND

13  CERTAINLY FINANCIAL STATEMENTS WEREN'T COMING OUT AND

14  SANTOS WAS AT THE TIME CRITICAL OF HOW MARK WAS RUNNING

15  THE BUSINESS.

16      Q.   SO SANTOS EXPRESSED CRITICISMS TO YOU ABOUT

17  WILLIAMS?

18      A.   YES, IT'S GOING DOWN THE WRONG PATH.

19      Q.   AND WHAT WAS HIS OPINION AS TO THE BASIS FOR

20  THAT?

21      A.   I CAN'T RECALL SPECIFICALLY.  IT WAS LIKE SORT

22  OF THE BASIC OPERATIONS, HE WAS LOOKING AT THE FARMING

23  OPERATION, YOU KNOW, HE WAS A BIG BELIEVER THAT YOU HAD

24  TO BE IN THE FARMING BUSINESS TO MAKE MONEY.  AND WHEN

25  WILLIAMS DECIDED TO GET OUT OF FARMING, SANTOS BELIEVED

Rough Draft - 146                NONCERTIFIED ROUGH DRAFT

1  THAT WAS THE WRONG THING.  BUT WILLIAMS LOST A WHOLE

2  BUNCH OF MONEY ON THE FARMING SIDE.  HOW MUCH WAS

3  ATTRIBUTED TO WHAT SANTOS LEFT ON THE TABLE, THAT IS

4  SUBJECT TO SPECULATION.

5      Q.   WAS SANTOS INTERFACING AT ALL WITH THE BANK?

6      A.   I DON'T BELIEVE SO.  NOT UNTIL LATE IN THE GAME

7  WHERE THE BANK WANTED TO SHUT THE THING DOWN.  I KNOW

Cinelli.ROUGHD~1.TXT

8   THAT THERE WERE SOME CONVERSATIONS DIRECTLY BETWEEN

9   SANTOS AND THE BANK, UNBEKNOWNST TO THE COMPANY.  AND I

10  DON'T KNOW WHAT THE NATURE OF THOSE CONVERSATIONS WERE.

11      Q.  AND SO THAT WAS PRIOR TO THE SHUTDOWN THEY

12  STARTED HAVING CONVERSATIONS?

13      A.  CORRECT.

14      Q.  AND THEN YOU SAID THAT WHEN SANTOS CAME IN AND

15  KIND OF STARTED TAKING STUFF FROM THE EL CENTRO

16  FACILITY, YOU SAID THAT BURBANK RECOMMENDED THAT YOU NOT

17  DO ANYTHING TO STOP THEM?

18      A.  YEAH, HE RECOMMENDED IT, AND THE BANK'S COUNSEL

19  LOOKED AT THE AGREEMENT AND AS MENTIONED, THERE WAS A

20  PROVISION THAT IF CERTAIN LEASES WEREN'T TRANSFERRED

21  TITLE DIDN'T TRANSFER.  WHICH IS IN CONTRAVENTION OF

22  WHAT SOME OF THE FOLKS AT BAKER SAID.  AND THE BANK

23  SAID, YES, SANTOS HAS A RIGHT TO TAKE THAT EQUIPMENT.

24      Q.  AND DID THEY GIVE HIM CONSENT OR THEY --

25      A.  ALLOWED IT TO HAPPEN.

Rough Draft - 147                NONCERTIFIED ROUGH DRAFT

1       Q.  -- JUST ALLOWED IT TO HAPPEN?

2       A.  UH-HUH.  THEY VIEWED THAT THAT EQUIPMENT WAS

3   NOT UNDER THEIR UCC FILING.

4       Q.  AND DID THEY ALSO ALLOW KIND OF LIKE A

5   SELF-HELP VENDORS THING TO HAPPEN AS WELL?

6       A.  THEY ALLOWED IT TO HAPPEN.  THEY DIDN'T TAKE

7   ANY ACTION, ANY CRIMINAL ACTION AGAINST THOSE PEOPLE.

8       Q.  AND I GUESS MR. BURBANK HAD -- I THINK HE HAD

9   INDICATED IN SOME OF THESE COURT FILINGS THAT THERE WERE

10  PEOPLE THAT WERE TAKING EQUIPMENT OR BEING, YOU KNOW,

11  THAT THE EQUIPMENT WAS BEING KIND OF, YOU KNOW, IT

12  WAS -- LET ME SEE.  WELL, I DON'T WANT TO PUT WORDS IN

13  HIS MOUTH.  I DON'T KNOW WHERE IT IS IN THE COURT

Page 121

Cinelli.ROUGHD~1.TXT

14    PAPERS, SO LET'S JUST STRIKE ALL THAT.

15         LET'S JUST GO BACK TO, WERE THERE OPPORTUNITIES

16    FOR FRESH 'N HEALTHY TO PREVENT PEOPLE FROM TAKING

17    EQUIPMENT THAT YOU THINK MR. BURBANK DIDN'T, YOU KNOW,

18    HE COULD HAVE PERHAPS PREVENTED BY TAKING -- FILING

19    ACTIONS WITH AUTHORITIES OR PURSUING PEOPLE.

20         A.   I INQUIRED MANY TIMES AS TO THE BANK AND

21    BURBANK WERE ORCHESTRATING THIS PROCESS, WHY AREN'T

22    THERE SECURITY GUARDS, WHY AREN'T THINGS LOCKED UP.  AND

23    THEY JUST DIDN'T TAKE ANY ACTION.  WHETHER OR NOT THAT

24    WAS BECAUSE THEY DIDN'T WANT TO PAY FOR IT, THEY DIDN'T

25    WANT TO DEAL WITH IT, THEY JUST DIDN'T TAKE ANY ACTION.

Rough Draft - 148              NONCERTIFIED ROUGH DRAFT

1         Q.   AND THERE WERE NO -- AS FAR AS YOU KNEW, THERE

2    WEREN'T ANY REPORTS MADE LIKE TO THE SHERIFF, HEY, WE

3    JUST LOST --

4         A.   NOT THAT I KNOW OF.

5         Q.   OKAY.  I THINK IT'S -- I WANT YOU TO GET TO

6    YOUR MEETING.

7         A.   WE CAN GO FOR ANOTHER TEN MINUTES, 15 MINUTES.

8         MS. ANASTASSIOU:  ALL RIGHT.

9         THIS WILL BE NO. 12.

10         (EXHIBIT SC-12 MARKED.)

11         MS. ANASTASSIOU:  I HAVE JUST HANDED THE

12    WITNESS A DOCUMENT WE HAVE MARKED AS IS SC NO. 12 AND

13    IT'S INFORMATION TAKEN FROM THE WEB AND IT'S MARKED SNO

14    57 AND 58 REGARDING THE PACA LICENSE FOR FRESH 'N

15    HEALTHY AND FRESH 'N HEALTHY BEING LISTED WITH THE

16    DEPARTMENT OF FOOD AND AG AS A LICENSEE.  WERE YOU

17    INVOLVED IN GETTING THE LICENSES THAT FRESH 'N HEALTHY

18    GOT UNDER THE PERISHABLE AGRICULTURAL COMMODITIES ACT?

Page 122

Cinelli.ROUGHD~1.TXT

19    A.  NO.

20    Q.  NO.  DID YOU EVER SIGN ANY OF THOSE LICENSE --

21    A.  NO.

22    Q.  -- AGREEMENTS?

23    A.  UH-UH.

24    Q.  DID ANYBODY EVER GET INFORMATION FROM YOU?

25    A.  NO.

Rough Draft - 149                    NONCERTIFIED ROUGH DRAFT

1    Q.  SO DO YOU KNOW WHY YOU WERE LISTED AS A

2  PRINCIPAL ON THE PACA LICENSE?

3    A.  THE ONLY THING I CAN THINK OF IS I WAS A

4  SHAREHOLDER OR A DIRECTOR.

5    Q.  OKAY.  SO YOU NEVER, YOU NEVER SAW THE ACTUAL

6  LICENSE?

7    A.  (WITNESS SHAKES HEAD.)

8    Q.  AND NOBODY EVER CONSULTED WITH YOU ABOUT IT?

9    A.  NO.

10    Q.  WHAT I'M QUESTIONING IS, I'M LOOKING AT THE

11  PACA LICENSES, THERE'S FIVE PEOPLE LISTED AS PRINCIPALS,

12  MR. WILLIAMS, MR. PARSON, PRESTWICK PARTNERS, YOURSELF

13  AND MARK MCCORMICK.  DO YOU KNOW WHY THOSE PARTICULAR

14  PERSONS WERE SELECTED AS THE PRINCIPALS AS OPPOSED TO

15  OTHER PEOPLE THAT WERE ALSO INVOLVED?

16    A.  I HAVE NO IDEA.  MARK WAS THE CEO, PARSON I

17  KNOW WAS VERY INSTRUMENTAL IN THE VENDOR RELATIONSHIPS.

18  PRESTWICK IS ME AND THEN MYSELF AND MCCORMICK WAS CFO.

19  SO ALL THE TRADE RELATIONSHIPS WERE REALLY WILLIAMS,

20  PARSON AND MCCORMICK.  AND I WOULD IMAGINE JUST AS A

21  SHAREHOLDER I WAS INCLUDED.

22    Q.  OKAY.

23    A.  AND I THINK -- THE OTHER THING I COULD THINK OF

24  IS WHEN BAKER INCORPORATED THE BUSINESS, MY NAME MIGHT
            Page 123

Cinelli.ROUGHD~1.TXT

25   HAVE BEEN ON THE ORIGINAL INCORPORATION PAPERS.   THAT'S
Rough Draft - 150                NONCERTIFIED ROUGH DRAFT

1   THE ONLY THING I CAN THINK OF.

2      Q.   AS TO WHY YOU WERE SELECTED AS THE PRIMARY

3   PRINCIPAL?

4      A.   YEAH.

5      Q.   AND WHAT ABOUT STEVE -- IS IT STEVE PAVICH?

6      A.   TOM PAVICH.

7      Q.   TOM PAVICH, WHY WASN'T HE ON THE PACA LICENSE

8   IF HE WAS THE PERSON THAT WAS MARKETING AND SELLING THE

9   PRODUCE?

10      A.   I HAVE NO IDEA.

11      Q.   WHEN DID TOM PAVICH CEASE HIS INVOLVEMENT WITH

12   FRESH 'N HEALTHY.

13      A.   HE WAS STILL INVOLVED AFTER, EVEN AFTER

14   DECEMBER BY SELLING SOME OF THE EXCESS INVENTORY ON

15   BEHALF, YOU KNOW, AT THE DIRECTION OF THE BANK AND

16   BURBANK TO TRY TO GET AS MUCH MONEY AS HE COULD.

17      Q.   EXCESS INVENTORY OF PRODUCE?

18      A.   YES.

19      Q.   AND SO HE WAS WORKING WITH BURBANK AND THE BANK

20   TO SELL PRODUCE?

21      A.   WHATEVER WAS LEFT, YEAH.   FINISHED GOODS AND

22   STUFF THAT WAS IN THE GROUND.

23      Q.   AND CROPS IN GROUND THAT WERE SUBJECT TO

24   AGREEMENT?

25      A.   I DON'T KNOW IF THEY ARE SUBJECT TO AGREEMENT,
Rough Draft - 151                NONCERTIFIED ROUGH DRAFT

1   BUT THERE WAS, FROM WHAT I UNDERSTAND, THERE WERE CROPS

2   IN THE GROUND HE SOLD.

3      Q.   THAT HE WAS INVOLVED IN SELLING?

Page 124

Cinelli.ROUGHD~1.TXT

4       A.   UH-HUH.

5       Q.   WAS HE BEING PAID SOME KIND OF A COMMISSION TO

6    DO THAT?

7       A.   AS FAR AS I KNOW IT WAS COMMISSION BASED.

8       Q.   AND TOM PAVICH WAS THE ONE THAT WAS SELLING

9    PRODUCE FOR FRESH 'N HEALTHY?

10      A.   HE RAN SALES, YES.

11      Q.   FROM ITS INCEPTION --

12      A.   CORRECT.

13      Q.   -- UNTIL THE END?

14      A.   UH-HUH.

15      Q.   BUT YET HE WASN'T LISTED ON THE PACA LICENSE?

16      A.   IF THIS IS --

17      Q.   ACCORDING TO THE INTERNET PRINTOUT.

18      A.   HE'S NOT REPORTED THERE, SO.

19      Q.   OKAY.

20           MS. ANASTASSIOU:  LET'S MARK THIS AS SC-13.

21           (EXHIBIT SC-13 MARKED.)

22    BY MS. ANASTASSIOU:

23      Q.   OKAY.  I HAVE MARKED AS SC NO. 13 SOME

24    DOCUMENTS REGARDING FRESH 'N HEALTHY, INC, THAT HAVE

25    BEEN PRINTED FROM INTERNET RECORDS, THEY ARE MARKED SNO

Rough Draft - 152              NONCERTIFIED ROUGH DRAFT

1    80, 81, 82 AND 83.  STARTING WITH THE FIRST PAGE, FRESH

2    'N HEALTHY, INC., THAT WAS -- IT APPEARS THAT ACCORDING

3    TO THIS RECORD IT WAS FILED ON OCTOBER 10 OF '06.  IS

4    THAT YOUR UNDERSTANDING OF WHEN THE COMPANY WAS FORMED?

5       A.   PROBABLY.

6       Q.   OKAY.  AND THAT -- BUT THAT ESSENTIALLY IT

7    DIDN'T BECOME ACTIVE UNTIL AFTER THE GOURMET VEG-PAQ

8    ACQUISITION?

9       A.   UH-HUH.

                    Page 125

Cinelli.ROUGHD~1.TXT

10      Q.   AND THAT WAS ESSENTIALLY A DORMANT TPHAPBT

11  COMPANY UNTIL THEN?

12      A.   THAT'S CORRECT.

13      Q.   AND THEN YOU WERE LISTED AS THE AGENT FOR

14  SERVICE OF PROCESS HERE?

15      A.   I GUESS I WAS.

16      Q.   OKAY.

17      A.   AND THIS WAS -- I HAD BAKER & MCKENZIE ORGANIZE

18  THE COMPANY.  AND SO I GUESS THEY PUT ME AS THE AGENT.

19      Q.   AND THEN GOING DOWN TO THE NEXT PAGE, IF YOU

20  LOOK FOR CORPORATION ADDRESSES, UNDER SNO 81, IT HAS TWO

21  ADDRESSES, AN ADDRESS IN SAN DIEGO AND AND ADDRESS IN

22  HOLLISTER.  DO YOU SEE THAT?

23      A.   UH-HUH.  THAT IS ACTUALLY MARIAS ADDRESS THAT'S

24  A BAKER & MCKENZIE ADDRESS.

25      Q.   THAT'S A BAKER & MCKENZIE ADDRESS?

Rough Draft - 153                 NONCERTIFIED ROUGH DRAFT

1      A.   UH-HUH.

2      Q.   SO THEY INITIALLY INDICATED THEIR OWN ADDRESS

3  AS A CORPORATE MAJOR ADDRESS, IS THAT IT?

4      A.   I GUESS SO.

5      Q.   BECAUSE FRESH 'N HEALTHY NEVER HAD ANY

6  OPERATIONS IN SAN DIEGO, DID THEY?

7      A.   NO, NO.

8      Q.   AND THEN IT HAS YOU LISTED -- ON THIS NEXT

9  RECORD THAT WE ARE LOOKING AT HAS ON SPENCE ROAD IN

10  SALINAS.

11      A.   THAT'S THE ADDRESS OF PREMIUM FRESH FARMS.

12      Q.   DO YOU KNOW WHY THAT ADDRESS IS LISTED THERE?

13      A.   THE ONLY THING THAT I CAN THINK OF IS IN THE

14  EARLY STAGES OF FRESH 'N HEALTHY WHEN WE SET THE THING

Page 126

Cinelli.ROUGHD~1.TXT

15    UP, MARK WAS RUNNING THE DAY-TO-DAY OPERATION OVER AT

16    PREMIUM AND IT WAS THE ONLY OFFICE THAT WE THOUGHT THAT

17    WE COULD SEND, THIS WAS IN ANTICIPATION OF POSSIBLY

18    DOING SOMETHING COLLABORATIVELY WITH PREMIUM AND GOURMET

19    VEG-PAQ AS WE TALKED ABOUT BEFORE AND I ONLY ASSUME THAT

20    THAT WAS THE ONLY CORPORATE ADDRESS THAT WAS AVAILABLE

21    AT THE TIME.  WE DIDN'T HAVE SEPARATE OFFICES OF FRESH

22    'N HEALTHY.

23        Q.  AND THE 1851 AIRWAY DRIVE, HOLLISTER, THAT

24    SUBSEQUENTLY BECAME THE ADDRESS OF FRESH 'N HEALTHY?

25        A.  THAT BECAME MARK WILLIAMS, MARK MCCORMICK AND

Rough Draft - 154                NONCERTIFIED ROUGH DRAFT

1    TOM PAVICH, THAT CAME THEIR OFFICE.

2        Q.  OKAY.  AND THEN ON THIS, THE NEXT COUPLE OF

3    PAGES I GUESS THE CORPORATE PRINTOUT HAD FOR MARK

4    WILLIAMS SOME SUBSEQUENT ENTERPRISES HERE THAT THEY

5    LISTED.  ARE YOU FAMILIAR WITH MARK WILLIAMS BEING

6    INVOLVED IN ANY OF THESE ENTITIES LISTED?  OF COURSE,

7    THAT IS QUITE A COMMON NAME.

8        A.  I THINK THE MARK WILLIAMS LIMITED LIABILITY

9    COMPANY IS THE THING THAT MARK SET UP AS HIS ADVISORY

10    COMPANY.  BUT I KNOW THAT HE'S GOT A CORPORATION OR AN

11    LLC THAT HE RUNS HIS ACTIVITIES THROUGH.  I DON'T

12    RECOGNIZE ANY OF THE OTHER ONES.

13        Q.  SO YOU'RE NOT SURE IF THAT IS THE ONE THAT HE

14    DID BUT HE DID HAVE SOME KIND OF AN LLC THAT HE SET

15    UP --

16        A.  THAT'S CORRECT.

17        Q.  -- TO --

18        DO YOU KNOW WHAT OTHER BUSINESS OPERATIONS HE'S

19    BEEN INVOLVED WITH OTHER THAN IN RECENT, IN THE PAST TWO

20    YEARS OTHER THAN FRESH 'N HEALTHY AND PREMIUM FRESH?

Cinelli.ROUGHD~1.TXT

21      A.  PROBABLY ABOUT THE LAST TWO YEARS.  I WAS

22  WITH -- WHEN I WAS WITH OFFROAD CAPITAL, WE HAD MADE AN

23  INVESTMENT IN A SOFTWARE COMPANY DOWN IN ARIZONA, I

24  ASKED MARK AT THE TIME TO SIT ON THE BOARD.  IT WAS

25  AGAIN AN ENTERPRISE SOFTWARE BY THE NAME OF PATCHLINK.

Rough Draft - 155              NONCERTIFIED ROUGH DRAFT

1  THIS PROBABLY DATES TO THE EARLY 2000S.  I THINK HE

2  SEVERED HIS RELATIONSHIP WITH THEM PROBABLY THREE YEARS

3  AGO.  THREE, FOUR YEARS AGO.

4      Q.  I BELIEVE THAT THAT -- IF WE CAN TURN BACK TO

5  SC NO. 3 REALLY QUICK.  I THINK THERE IS A REFERENCE, IF

6  YOU LOOK AT SNO 74 --

7      A.  UH-HUH.  --

8      Q.  -- THERE IS THE LITTLE BIOS OF THE PERSONS

9  INVOLVED WITH FRESH 'N HEALTHY.  AND IT INDICATES HERE

10  THAT MARK WILLIAMS WAS PRESIDENT OF THE PATCHLINK

11  CORPORATION.

12      A.  HE STARTED AS DIRECTOR AND THEN BECAME

13  PRESIDENT.

14      Q.  BUT YOUR UNDERSTANDING HE IS NO LONGER INVOLVED

15  IN THAT COMPANY?

16      A.  THAT'S CORRECT.

17      Q.  WHAT ABOUT WESTERN GROWERS ASSOCIATION, WHAT'S

18  THAT ORGANIZATION?

19      A.  WESTERN GROWERS, AS I SAID, IS THE LARGEST

20  SUPERMARKET TRADE ASSOCIATION WEST OF THE ROCKIES DIS.

21  AND SO BASICALLY COMPROMISES ALL THE CEOS OF ALL THE

22  SUPERMARKET CHAINS WEST OF THE ROCKIES, BUT IT'S A TRADE

23  ASSOCIATION.

24      Q.  WITH THE CEOS OF THE --

25      A.  HE WAS EITHER THE PRESIDENT OR -- I KNOW HE WAS

Rough Draft - 156              NONCERTIFIED ROUGH DRAFT
                                    Page 128

Cinelli.ROUGHD~1.TXT

1   ON THE BOARD.

2       Q.   WHERE ARE THEY HEADQUARTERED?

3       A.   I DON'T KNOW.

4       Q.   AND SO THAT WAS JUST INFORMATION THAT HE GAVE

5   YOU?

6       A.   YES.

7       Q.   AND DO YOU KNOW WHETHER WILLIAMS MAINTAINS HIS

8   AFFILIATIONS WITH --

9       A.   I DON'T KNOW.

10      Q.   -- WESTERN GROWERS ASSOCIATION?

11           DO YOU KNOW WHETHER HE MAINTAINS HIS

12  AFFILIATION WITH CARR GOTTSTEIN FOODS?

13      A.   NO, HE DOESN'T.  THAT IS PART OF SAFEWAY NOW.

14      Q.   AND YOU SAID PREVIOUSLY THAT YOU DID NOT KNOW

15  WHAT MARK WILLIAMS' BUSINESS WAS IN COSTA RICA?

16      A.   I HAVE NO IDEA.

17      Q.   OKAY.  IT'S TWO NOW, SO --

18      A.   WE HAVE 15 MINUTES.  I SAID 2:15.  I SHOULD

19  HAVE SUFFICIENT TIME TO GET UP TO THE CITY.

20           (OFF THE RECORD.)

21           MS. ANASTASSIOU:  LET'S GO THROUGH THIS NEXT

22  REPORT THEN.  LET'S MARK THAT SC NO. 14.

23           (EXHIBIT SC-14 MARKED.)

24  BY MS. ANASTASSIOU:

25      Q.   SC-14 IS LABELED SNO 139 THROUGH 144.  AND

Rough Draft - 157                NONCERTIFIED ROUGH DRAFT

1   AGAIN IT'S A CORPORATE PRINTOUT WITH INFORMATION ABOUT

2   FRESH 'N HEALTHY, WHICH I'D JUST LIKE TO GO OVER WITH

3   YOU.

4           SO AGAIN THERE IS THIS SAN DIEGO ADDRESS LISTED

5   AND THAT SAN DIEGO ADDRESS YOU TESTIFIED THAT WAS YOUR

Cinelli.ROUGHD~1.TXT

6    ATTORNEY, CORRECT?

7        A.   CORRECT.

8        Q.   OKAY.  AND THEN ON PAGE 2, OH, PHONE NUMBERS

9    FOR BUSINESS ADDRESSES I SEE.  SO THEY ARE LISTING I

10   GUESS PHONE NUMBERS THAT ARE EAR BAKER & MCKENZIE.  SO

11   THAT'S WHAT THAT'S ALL ABOUT.  THEY ARE LISTING I GUESS

12   IN THE NEXT PAGES ALL THESE BUSINESSES THAT ARE MAYBE IN

13   THE SAME OFFICE AS BAKER & MCKENZIE?

14       A.   OH, CARNOUSTIE WAS THE ENTITY USED TO ACQUIRE

15   THE PROPERTY THAT IS BAKER'S OFFICE.

16       Q.   THAT IS WHY IT LISTED AT HIGH BLUFF?

17       A.   YES.  NONE OF THE OTHER COMPANIES REFERENCED

18   HAS ANYTHING TO DO WITH FRESH 'N HEALTHY.

19       Q.   AND YOU INDICATED CARNOUSTIE IS IN NEGOTIATIONS

20   WITH SANTOS TO SELL HIM BACK THE EL CENTRO PLANT?

21       A.   PRELIMINARY.  HE'S OFFERED TO BUY IT ON THE

22   CHEAP.  AND SO I'M WORKING WITH BOTH THE LENDER AND

23   EARLY STAGES OF SANTOS TO TRY TO MAKE SOMETHING HAPPEN

24   OR TRY TO SELL THAT THING.

25       Q.   AND IS COMERICA INVOLVED IN THAT TRANSACTION?

Rough Draft - 158                    NONCERTIFIED ROUGH DRAFT

1        A.   NOT AT ALL.

2        Q.   SO THAT'S JUST YOU PERSONALLY WITH SANTOS?

3        A.   THE TRANSACTION ORIGINALLY WAS -- THE

4    $3 MILLION LOAN CAME INTO FRESH 'N HEALTHY TO BEGIN WITH

5    TO ACQUIRE THE PROPERTY.  SUBSEQUENT TO THAT, IT WAS

6    ASSUMED IN ITS ENTIRETY BY CARNOUSTIE AS WELL AS THE

7    PROPERTY.  SO IT'S A PURE REAL ESTATE LOAN.  IT'S OFF

8    THE BALANCE SHEET OF FRESH 'N HEALTHY.

9        Q.   SO COMERICA BANK HASN'T BEEN LOOKING TO THAT

10   FACILITY AT ALL?

Page 130

Cinelli.ROUGHD~1.TXT

11        A.   NO.

12        Q.   AND THEN THE EQUIPMENT THAT WAS AT THAT

13   FACILITY, WAS THAT OWNED BY FRESH 'N HEALTHY?

14        A.   YES.

15        Q.   AND THAT EQUIPMENT IS ALL GONE?

16        A.   SOME OF THE EQUIPMENT IS GONE.  THE STUFF

17   THAT'S GONE IS THE STUFF THAT WAS TAKEN BY SANTOS AND

18   THE REST OF IT I BELIEVE IS PART OF THIS AUCTION.

19        Q.   SO SANTOS TOOK PART OF IT AND THEN PART OF IS

20   PART OF THIS AUCTION AND THEN SANTOS IS LOOKING TO BUY

21   BACK THE FACILITY WHERE ALL THE EQUIPMENT WILL GO AT

22   HALF THE PRICE?

23        A.   MUCH LESS.

24        MS. ANASTASSIOU: LET'S MARK THIS SC NO. 15.

25        (EXHIBIT SC-15 MARKED.)

Rough Draft - 159                  NONCERTIFIED ROUGH DRAFT

1        MS. ANASTASSIOU:  I HAVE HANDED YOU A DOCUMENT

2   THAT WE HAVE MARKED AS SC-15 IT'S RECORDS FROM THE

3   CALIFORNIA SECRETARY OF STATE REGARDING PRESTWICK

4   PARTNERS LLC.  AND IF YOU COULD TAKE -- IT'S BATES SNO

5   161.  IF YOU WOULD TAKE AN OPPORTUNITY TO LOOK AT THAT

6   DOCUMENT AND LET ME KNOW WHEN YOU ARE READY FOR

7   QUESTIONING.

8        A.   SURE.

9        Q.   SO PRESTWICK PARTNERS LLC YOU STATED IS NOT AN

10   OPERATING ENTITY?

11        A.   NO, THAT WAS SET UP AS AN INVESTMENT ENTITY TO

12   HOLD PRIVATE SECURITIES BUT WE NEVER -- WE SET UP THE

13   CORPORATION, THAT'S IT.  IT'S NEVER BEEN IN BUSINESS.

14   AND 188 EMBARCADERO IS AN OLD OFFICE ADDRESS OF MINE.

15        Q.   THAT WAS AN OLD OFFICE.  AND WHAT BUSINESS DID

16   YOU OPERATE THERE?

Page 131

Cinelli.ROUGHD~1.TXT

17      A.   JUST MY ADVISORY BUSINESS.

18      Q.   AND THAT WAS UNDER PRESTWICK PARTNERS INC.?

19      A.   YES.

20      Q.   BUT YOU HAVE KEPT THIS LLC ACTIVE?

21      A.   I DIDN'T KNOW IT WAS ACTIVE UNTIL YOU BROUGHT

22   IT UP.

23      Q.   IT SAYS THAT IT'S ACTIVE RIGHT THERE SO THAT

24   MEANS THAT YOU NEED TO BE PAYING CORPORATION -- I MEAN

25   OR LLC TAXES?

Rough Draft - 160              NONCERTIFIED ROUGH DRAFT

1       A.   I HAVEN'T BEEN NOTIFIED AT ALL.  I THOUGHT IT

2   WAS TERMINATED, SO SOMETHING I HAVE GOT TO FOLLOW UP ON.

3       Q.   SO TO YOUR KNOWLEDGE, YOU HAVEN'T BEEN FILING A

4   YEARLY --

5       A.   NO.

6       Q.   SO WHO WOULD BE DOING THAT, THEN?  YOUR

7   ACCOUNTANT?

8       A.   I THINK EVERYBODY IS UNAWARE OF IT.  I WOULD

9   ASSUME THAT -- I HAVEN'T BEEN IN THAT OFFICE FOR FIVE

10   YEARS.

11      Q.   WAS THAT AN OFFICE THAT YOU SHARED?

12      A.   YEAH.  IT WAS LEASED TO PRESTWICK AND I HAD A

13   HANDFUL OF OTHER PEOPLE PARTICIPATE IN THE OFFICE, A

14   TECHNOLOGIST, OTHER BANKERS.

15           MS. ANASTASSIOU:  LET'S MARK THIS AS NO. 16.

16           (EXHIBIT SC-16 MARKED.)

17           MS. ANASTASSIOU:  I HAVE HANDED THE WITNESS A

18   DOCUMENT THAT IS MARKED SC NO. 16, IT'S BATES-STAMPED

19   SNO 162, 163.  IT CONSISTS OF SOME INFORMATION ABOUT

20   STEVE CINELLI AND PRESTWICK PARTNERS FROM THE INTERNET.

21   IF YOU COULD TAKE A LOOK AT THAT AND LET ME KNOW WHEN

Page 132

Cinelli.ROUGHD~1.TXT
22    YOU ARE READY FOR QUESTIONS.

23        A.  SURE.

24        Q.  DID YOU PREPARE THIS DOCUMENT THAT'S ON THE

25    INTERNET?

Rough Draft - 161                    NONCERTIFIED ROUGH DRAFT


1         A.  I BELIEVE I DID, YES.

2         Q.  AND IS THAT -- WHAT IS THIS, IS THIS KIND OF

3     AAFTER MARKETING DOCUMENT OR WHAT'S --

4         A.  "LINKED IN" IS A SOCIAL NETWORK THAT IS REALLY

5     FOR BUSINESS CONNECTIONS AND STUFF LIKE THIS.  SO AS

6     PART OF IT, YOU PROVIDE A LITTLE BACKGROUND ON YOUR

7     BUSINESS ACTIVITIES AND EXPERTISE.  AND, AGAIN, IT'S A

8     NETWORK OF LARGELY BUSINESS CONNECTIONS.

9         Q.  THERE IS A PRESTWICK PARTNERS THAT IS IN THE

10    MIDWEST?

11        A.  MINNESOTA.

12        Q.  HAVE YOU EVER BEEN LINKED WITH THEM?

13        A.  NO.  IN FACT, THE ONLY CONVERSATION I HAD IS

14    THAT SOMEONE CONTACTED ME BECAUSE THEY PULLED UP I THINK

15    IT WAS PRESTWICK PARTNERS DOT-NET, MY DOMAIN THAT I

16    DON'T HAVE A WEBSITE FOR, BUT I OWN IS PRESTWICK

17    PARTNERS DOT-COM.  AND THE PRESTWICK PARTNERS DOT-NET IS

18    THIS MINNESOTA INVESTMENT BANKING FIRM.  BUT THERE IS NO

19    RELATIONSHIP.  I CHATTED DIRECTLY WITH THEM SAYING WHAT

20    THE HECK ARE YOU USING MY NAME FOR, THEY SAID THE SAME

21    THING.  BUT WE AGREED JUST MOST OF MY ACTIVITIES ARE OUT

22    HERE ON THE WEST COAST, THEY DO STUFF IN THE MID WEST.

23        Q.  WHERE IS PRESTWICK PARTNERS, INC., FORMED?

24        A.  WHERE?  IT'S A DELAWARE CORPORATION.

25        Q.  NOW, ARE YOU REGISTERED TO DO BUSINESS IN

Rough Draft - 162                    NONCERTIFIED ROUGH DRAFT


1     CALIFORNIA, DO YOU KNOW?
                    Page 133

Cinelli.ROUGHD~1.TXT

    2      A.  YES, YES.

    3      Q.  SO THAT IS AN ENTITY THAT HAS THE INVOLVEMENT

    4  WITH FRESH 'N HEALTHY AND NOT PRESTWICK PARTNER LLC; IS

    5  THAT CORRECT?

    6      A.  THAT'S CORRECT.

    7      Q.  OKAY.

    8          MS. ANASTASSIOU:  I MIGHT AS WELL JUST GO

    9  THROUGH THIS.  THIS IS ANOTHER DOCUMENT ABOUT FINANCES.

   10  LET'S MARK THIS NO. 17.

   11          (EXHIBIT SC-17 MARKED.)

   12  BY MS. ANASTASSIOU:

   13      Q.  SO THIS IS VFINANCE INVESTMENTS INC, WHICH YOU

   14  SAID THAT YOU HAD TERMINATED YOUR RELATIONSHIP WITH,

   15  RIGHT?

   16      A.  YES.

   17      Q.  AND YOU SAID THAT YOU JUST HAD A RELATIONSHIP

   18  WITH THEM AS, WHAT WAS IT, CONSULTANT?

   19      A.  INDEPENDENT CONTRACTOR WHEREBY THEY WOULD HOLD

   20  IN THEIR BROKER DEALER MY SECURITIES LICENSES.  AND WE

   21  WERE TO COLLABORATE ON VARIOUS INVESTMENT BANK

   22  OPPORTUNITIES AND SHARE FEES AND WHATNOT.

   23      Q.  AND THEN YOU SAID THAT THAT AD THAT THEY RAN

   24  FOR THE FRESH 'N HEALTHY DEAL, THE TOMBSTONE, THAT WAS

   25  KIND OF THEIR DEAL RATHER THAN YOURS, YOU WERE UNAWARE

Rough Draft - 163                  NONCERTIFIED ROUGH DRAFT

    1  THAT THEY EVEN PRINTED THAT?

    2      A.  THEY WERE AWARE OF THE TRANSACTION BECAUSE THEY

    3  GOT PARTIALLY COMPENSATED THROUGH ME ON THAT, BUT THE

    4  DESCRIPTION OF THE TRANSACTION WITHIN THE TOMBSTONE WAS

    5  INCORRECT.

    6      Q.  RIGHT.  AND THEY DIDN'T RUN THAT BY YOU, THEY

Cinelli.ROUGHD~1.TXT
7    JUST PRINTED THE TOMBSTONE?

8         A.   CORRECT.  AND I HAVE NO IDEA WHERE THEY PRINTED

9    IT.  I THINK THE ONLY PLACE THEY DID WAS ON THEIR

10   WEBSITE.

11        Q.   AND WHO WOULD HAVE BEEN THE PERSON RESPONSIBLE

12   FOR DOING THAT?

13        A.   I DON'T KNOW.  PROBABLY MARKETING DEPARTMENT

14   WHOEVER THAT IS.

15        Q.   I THINK -- LET'S GO THROUGH ONE LAST REPORT AND

16   THEN WE WILL CALL IT A DAY.  LET'S MARK THIS NO. 18.

17             (EXHIBIT SC-18 MARKED.)

18   BY MS. ANASTASSIOU:

19        Q.   I HAVE PRINTED OUT AN INTERNET REPORT ABOUT YOU

20   PERSONALLY AND I JUST WANTED TO GO OVER THIS WITH YOU.

21   IT'S MARKED SNO 461 THROUGH 471.  AND THERE IS AN

22   ADDRESS ON THE FRONT THAT'S LISTED FOR YOU IN SARATOGA

23   AND THEN THERE IS ALSO AN ADDRESS IN SAN MATEO.  DO YOU

24   SEE THAT?  IS THAT WHERE YOU USED TO HAVE A BUSINESS

25   OFFICE?

Rough Draft - 164                 NONCERTIFIED ROUGH DRAFT

1         A.   NO, THAT USED TO BE MY HOME WHEN I WAS MARRIED.

2         Q.   SO THAT'S A PRIOR RESIDENCE?

3         A.   THAT'S CORRECT.

4         Q.   AND DO YOU STILL OWN THAT RESIDENCE?

5         A.   NO.

6         Q.   AND THEN ALSO ON THE NEXT PAGE ON 462, THERE IS

7    ANOTHER ADDRESS IN SAN MATEO.  IS THAT --

8         A.   THAT WAS ANOTHER RESIDENCE THAT HAS BEEN SOLD.

9         Q.   AND THEN NEAR THE BOTTOM OF SNO 462 THERE IS AN

10   ADDRESS IN SAN FRANCISCO, 91 SIXTH AVENUE IN SAN

11   FRANCISCO.

12        A.   THAT'S A FORMER RESIDENCE.

Cinelli.ROUGHD~1.TXT

13      Q.   THAT IS A FORMER RESIDENCE.  IS THAT CURRENTLY

14  OWNED BY YOU OR --

15      A.   YEAH, I OWN IT IN A TRUST WITH THE KIDS.

16      Q.   IS IT A LEASED FACILITY?

17      A.   YES, IT'S A CONDOMINIUM THAT'S LEASED OUT.

18      Q.   AND THAT -- AND ON THAT 463 THAT ADDRESS AGAIN,

19  THAT'S THE LEASED CONDOMINIUM, THE 91 SIXTH AVENUE?

20      A.   UH-HUH.

21      Q.   AND THEN BELLEVUE, SAN MATEO, THOSE ARE FORMERS

22  ADDRESSES?

23      A.   YES.

24      Q.   AND REGAN B. CINELLI, IS THAT YOUR --

25      A.   MY FORMER WIFE.

Rough Draft - 165                NONCERTIFIED ROUGH DRAFT

1      Q.   OH, YOUR FORMER WIFE.

2      A.   AND THE 931 ALAMEDA DE LAS PULGAS IS WHERE MY

3  FORMER WIFE AND KIDS RESIDE.  AND SO IS MY DAUGHTER.  88

4  HOWARD STREET IS AN OLD -- THAT WAS AN APARTMENT THAT I

5  RENTED WHEN WE BECAME SEPARATED.

6      Q.   OKAY.  YOU ARE NO LONGER THERE?

7      A.   NO.  50 FREMONT WAS AN OFFICE THAT I SHARED.

8  106 EIGHTH AVENUE --

9      Q.   THAT WAS AN OFFICE YOU SHARED FOR WHAT

10  BUSINESS?

11      A.   PRESTWICK.

12      Q.   PRESTWICK?

13      A.   YEAH.  UH-HUH.

14      Q.   OKAY.

15      A.   106 EIGHT AVENUE WAS A CONDO WHEN WE FIRST GOT

16  MARRIED IN SAN FRANCISCO.

17      Q.   AND YOU NO LONGER OWN THAT?

Cinelli.ROUGHD~1.TXT

18      A.   NO.   555 NORTHGATE WAS WHEN I WAS AFFILIATED

19  WITH KNIGHTSBRIDGE PARTNERS.  WE OWNED SUPER CUTS AND

20  THAT WAS A CORPORATE HEADQUARTERS FOR SUPER CUTS.

21      Q.   OKAY.  IT WAS IN A FACILITY, WAS IT LIKE A

22  LEASED FACILITY?

23      A.   YES, IT WAS A CORPORATE BUILDING.

24      Q.   AND THE ONE MONTGOMERY STREET, SAN FRANCISCO?

25      A.   THAT WAS AN OLD OFFICE.

Rough Draft - 166                     NONCERTIFIED ROUGH DRAFT

1      Q.   FOR PRESTWICK?

2      A.   DID I -- YEAH, ACTUALLY, YEAH, IT WAS AN OLD

3  OFFICE, CORRECT.

4      Q.   OKAY.  AND THAT WAS ALSO FOR PRESTWICK?

5      A.   YES.

6      Q.   THIS 2190 WASHINGTON STREET?

7      A.   THAT WAS MY PARENTS'.  THEY ARE NOW BOTH

8  DECEASED.

9      Q.   AND THEN REGAN CINELLI --

10      A.   MY EX-WIFE.

11      Q.   YOUR EX-WIFE.  AND THOSE OTHER PEOPLE, REGAN

12  BETH BYERS, PROBABLY HER MAIDEN NAME?

13      A.   THAT'S HER MAIDEN NAME.

14      Q.   AND THEN ANGELA CINELLI, A DAUGHTER?

15      A.   I HAVE NO IDEA.  THERE IS NO RELATION.

16      Q.   THE NEXT PAGE THERE IS AN AG CINELLI?

17      A.   THAT IS MY FATHER.

18      Q.   WHO YOU SAID IS NOW DECEASED?

19      A.   YES.  L KAY IS MY MOM, SHE IS NOW DECEASED.

20      Q.   AND THEN ON THE NEXT PAGE MICHAEL CINELLI?

21      A.   MY BROTHER.

22      Q.   AND KAY CINELLI?

23      A.   MY MOM.

                    Page 137

Cinelli.ROUGHD~1.TXT

24      Q.   NOW, DECEASED.

25           THEN GOING TO 468, I THINK WE HAVE GONE OVER

Rough Draft - 167            NONCERTIFIED ROUGH DRAFT

1   MOST OF THESE ALREADY.  188 EMBARCADERO, WAS THAT --

2       A.   OLD OFFICE.

3       Q.   PRESTWICK PARTNERS OFFICE --

4       A.   UH-HUH.

5       Q.   FREMONT STREET, ALSO AN OLD PRESTWICK OFFICE?

6       A.   YES.  ACTUALLY, 50 FREMONT WAS THE OFFROAD

7   CAPITAL OFFICE.

8       Q.   SO ALL OF THESE IN SAN FRANCISCO ARE BASICALLY

9   FORMER OFFICES?

10      A.   YES.  WITH THE EXCEPTION OF 106 EIGHTH AVENUE

11  WHICH WAS THE FIRST RESIDENCE WHEN I GOT MARRIED.  91

12  SIXTH IS THE FLAT IN SAN FRANCISCO WHICH IS LEASED OUT.

13           MS. ANASTASSIOU:  OKAY.  I THINK THAT'S ABOUT

14  IT.

15           (OFF THE RECORD.)

16

17

18

19

20

21

22

23

24

25

Page 138

# Exhibit B
# (Declaration of
# Effie Anastassiou)

**Scott J Allen**

| | |
|---|---|
| **From:** | Stephen O'Neill [soneill@MURRAYLAW.com] |
| **Sent:** | Wednesday, March 12, 2008 1:11 PM |
| **To:** | Scott J Allen |
| **Subject:** | FW: Asa Farms vs. Fresh N Healthy |

Scott

The sale to Ashman took place yesterday.  The sale generated $525,000 in proceeds. FNH is planning to sell certain assets to Ray Nava today which will generate an additional  $60,000.  These funds are being held in trust pending further order of the Court.  After FNH sold the assets to Ashman,  Ashman conducted an auction. We do not know at this time what Ashman collected from the auction or who bought the assets. We heard that the auction went ok,  but not great. After the Nava sale is completed, FNH will still own certain assets.  We are compiling a list of those assets.  At this point, we expect to be filing a Chapter 7 bankruptcy case next week for FNH. We will inform Judge Fogel of our intention to file bankruptcy at the hearing on Friday .  FNH has no intention to distribute the sale proceeds prior to filing bankruptcy.

Pursuant to your request, I will be forwarding you a copy of the appraisal we gave Mr. Gorman. As previously communicated to you, the appraisal includes equipment not owned by FNH and is also outdated.

**From:** Scott J Allen [mailto:scottesq@salinasaglaw.com]
**Sent:** Wednesday, March 12, 2008 9:17 AM
**To:** Stephen O'Neill; Effie Anastassiou Esq.; Scott J Allen; ken@lomgil.com
**Cc:** Robert A. Franklin; Russ Burbank
**Subject:** RE: Asa Farms vs. Fresh N Healthy

Steve:

As you know, the Court ordered a hearing to argue Oceano's opposition to disposition of sale proceeds.  So that all parties can be on the same page, can you please advise me as to the following:

1.  Did the auction of the FNH equipment occur yesterday (3/11) as previously announced?
2.  If so, what equipment, trade names and/or labels were sold at auction and what was the aggregate amount of the sale (total auction sale price plus 10% buyer's premium);
3.  Were any equipment, trade names and/or labels not sold?
4.  Who purchased the assets?  and
5.  Does Ashman Company have a list of the assets sold, the price paid and the identity of the buyers?  If so, I'd ask that a copy of the list be provided.

Additionally, the Court's order added my client, Oceano, as a party to the ASA action.  Now that Oceano is officially a party, I ask, again, that Oceano be provided with a copy of the late-2006 appraisal regarding the equipment that FNH purchased from in March of 2007, as well as the bill(s) of sale for FNH's purchase of the equipment.  I was told by Ken Gorman yesterday that FNH had previously given a copy of the appraisal to the other plaintiffs in this case (ASA and Braga).  Receiving a copy of the appraisal would simply place Oceano on equal footing with the other plaintiffs in the case.

Your cooperation is appreciated.

Scott

**From:** Stephen O'Neill [mailto:soneill@MURRAYLAW.com]
**Sent:** Thursday, March 06, 2008 11:12 AM
**To:** Scott J Allen
**Cc:** Robert A. Franklin; Russ Burbank
**Subject:** RE: Asa Farms vs. Fresh N Healthy

Thanks for your email. We respectfully decline your request. The appraisal of which you speak is dated as of September 2006 and includes assets which were never owned by my client. As such it is out of date and irrelevant. In addition, many pieces of equipment that are included in the appraisal and which were purchased by my client have been returned to lessors and/or dismantled. Further, due to the change in the market and wear and tear, the equipments' value has deteriorated substantially. As set forth in our papers, the equipment has been extensively marketed and two experienced auction houses have opined on the value of this equipment. Comerica has consented to the sale of its collateral, securing its $4 million debt. No purpose is served by producing this document. The sale price is well in excess of the alleged PACA claims of both growers who have asserted such claims. Similarly, the bill of sale is irrelevant to the issue of the value of the equipment in its present state.

---

**From:** Scott J Allen [mailto:scottesq@salinasaglaw.com]
**Sent:** Thursday, March 06, 2008 10:26 AM
**To:** Scott J Allen; Stephen O'Neill
**Cc:** Effie Anastassiou Esq.
**Subject:** RE: Asa Farms vs. Fresh N Healthy

Steve:

I am following up on the below e-mail I sent you on Feb. 27, which confirmed our earlier telephone conversation in which you agreed to ask your client for permission to share the August 2007 appraisal of the FNH equipment. Please let me know as soon as possible whether your client will agree to share the appraisal with my clients.

In my e-mail, I also asked to get copies of the bills of sale for the equipment from March of 2007 and the purchase agreement for the sale that closed in March of 07. Please let me know as soon possible whether FNH will agree to provide that documentation.

Thank you for your cooperation.

Scott Allen

---

**From:** Scott J Allen
**Sent:** Wednesday, February 27, 2008 6:01 PM
**To:** Stephen O'Neill
**Cc:** Scott J Allen; Effie Anastassiou Esq.
**Subject:** RE: Asa Farms vs. Fresh N Healthy

Steve:

During our telephone conversation earlier today you indicated that there had been an appraisal of the equipment of FNH in about August of 2007. I asked that you provide me with a copy of the appraisal and you told me that you would ask your client if you were authorized to share the appraisal with me. By this e-mail, I once again ask that you provide me with a copy of the appraisal. Please let me know as soon as possible whether your client will allow you to release the appraisal to me.

In addition to the August 2007 appraisal, I would like to get a copy of

# Exhibit C
# (Declaration of
# Effie Anastassiou)

**GOURMET VEG-PAQ**
**Hollister, Gilroy & El Centro, California**

| Item # | Qty. | Effective Date: September 20-21, 2006 | Orderly Liquidation Value | | Fair Market Value | |
|---|---|---|---|---|---|---|
| 1 | 7 | IRRIGATION TRAILERS, 30' | $ | 3,500 | $ | 5,250 |
| 2 | 2 | IRRIGATION TRAILERS, 40' | $ | 1,200 | $ | 1,600 |
| 3 | 8 | HARVEST TRAILERS, 8' x 16', 2-AXLE | $ | 12,000 | $ | 16,000 |
| 4 | 6 | HARVEST TRAILERS | $ | 9,000 | $ | 12,000 |
| 5 | 1 | 1989 ZIEMEN FLATBED TRAILER, MODEL 2640, S/N 1ZCE29E36KZP14923, 25', 3-AXLE | $ | 4,000 | $ | 6,000 |
| 6 | 3 | WATER TANK TRAILERS, 1,000 GALLON | $ | 4,500 | $ | 6,000 |
| 7 | 2 | WATER TANK TRAILERS, 400 GALLON | $ | 2,500 | $ | 3,500 |
| 8 | 2* | FLATBED TRAILERS (HARVEST-MODIFIED) | $ | 3,000 | $ | 4,000 |
| 9 | 1* | FLATBED TRAILER (HARVESTER-HAUL) | $ | 1,500 | $ | 2,000 |
| 10 | 1 | CARSON DUMP TRAILER, 10', S/N 4HXDT10242C041247 (POSSIBLY 2001) | $ | 4,500 | $ | 6,500 |
| 11 | 1 | 2005 CARSON DUMP TRAILERS; 12', S/N 4HXDT10285C093114 | $ | 6,000 | $ | 8,000 |
| 12 | 2 | TOOL CARRIER TRAILERS, 20', 4 WHEEL | $ | 3,000 | $ | 4,000 |
| 13 | 1* | TOOL CARRIER TRAILER (TRI-POT), 2 WHEEL | $ | 1,000 | $ | 1,500 |
| 14 | 1 | TOOL CARRIER FLATBED TRAILER, DROP TYPE, 20' | $ | 1,500 | $ | 2,000 |
| 15 | 1 | TOOL CARRIER FLATBED TRAILER, DROP TYPE, 22' | $ | 1,500 | $ | 2,000 |
| 16 | 1 | 2005 CARSON CAR CARRIER (FLATBED) TRAILER, S/N 4HXHD16215C093302, 16', 2-AXLE | $ | 7,000 | $ | 9,000 |
| 17 | 5* | SPREADER TRAILERS, INCLUDING: 1-GYPSUM, 5 TON 1-GYPSUM, ONE BED, 80" 1-GYPSUM, 12' 1-COMPOST 1-FERTILIZER, 5 TON | $ | 6,500 | $ | 9,500 |
| 18 | 1 | 2005 HALLMARK ENCLOSED TRAILER, TRANSPORT, 14', 2-AXLE, LIC # 4GJ7537, MODEL TS7X14DT2, S/N 16HP1314225A017026 | $ | 4,000 | $ | 6,000 |
| 19 | 1 | 1996 JLG LIFT BOOM LIFT, MODEL 35ELECTRIC, S/N 022057-0300022799, | $ | 5,000 | $ | 7,000 |
| 20 | 1 | FRONT END LOADER CATERPILLER, MODEL 922, S/N 5993180, RUBBER TIRED | $ | 6,000 | $ | 8,000 |
| 21 | 1 | 1999 GMC WATER TRUCK, MODEL C6500, S/N 1GDJ7H1CXXJ515577, 2,000 GALLON STEEL WATER TANK | $ | 12,500 | $ | 15,000 |
| 22 | 1* | WILLIAM SCOTSMAN OFFICE TRAILER, 8' x 16' | $ | 3,000 | $ | 5,000 |
| 23 | 2* | 2003 HONDA QUADS | $ | 7,500 | $ | 8,500 |
| 24 | LOT | MISCELLANEOUS DISCS, C/O: (1) 10' STRATHMORE, MODEL 99, S/N L9428, (1) 13' JOHN DEERE, (1) 14' JOHN DEERE, (2) 80" HAHN, (3) 80" MINIMUM TILT DISCS, (1) 60" (TOMATO), (1) 18' JOHN DEERE, (1) TOWNER 520 (2 ROWS), (1) 3 BED MINIMUM TILT DISC, (1) 40" 4 BED DISC BEDER | $ | 14,000 | $ | 18,000 |
| 25 | LOT | MISCELLANEOUS MULCHERS, C/O: (2) 1 BED 80" BUTTON WILLOWS, (1) 3 BED 20 FT. BUTTON WILLOW, (1) 3 BED 20 FT. BUTTON WILLOW, (1) 4 BED 40" PER/BED | $ | 7,500 | $ | 10,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 26 | LOT | MISCELLANEOUS MOWING ATTACHMENTS, C/O: (2) SINGLE BED, 80", (1) BHC 3 BED, 20', (1) 3 BED 20 FT. | $ | 6,500 | $ | 9,000 |
| 27 | 2 | 2003 ORTOMEC LETTUCE HARVESTERS, MODEL SVC165B, TRACK TYPE | $ | 75,000 | $ | 100,000 |
| 28 | 2 | 2002 ORTOMEC LETTUCE HARVESTERS, MODEL SV165, WHEEL TYPE | $ | 40,000 | $ | 60,000 |
| 29 | 2 | 2000 ORTOMEC LETTUCE HARVESTERS, MODEL TR155B, PULL TYPE | $ | 22,500 | $ | 30,000 |
| 30 | LOT | MISCELLANEOUS FARM IMPLEMENTS, C/O: (1) GRAIN DRILL (SPREADER), (1) MARVIN TRI-PLANE, 16', (5) SEED PLANTERS, 80" BED, (1) PRECISION VACUUM PLANTER, (1) TRANSPLANTER 80" BED, (1) 16 FT. LAND PLANE MARVIN TRI-PLANE, (1) 10 FT. LAND PLANE, (1) 3-ROW BED SHAPER, (1) FRAME TO APPLY PLASTIC 80" BED, (2) 3 BED, LISTER, (2) RIPPERS, AC600, (2) HARROW, 3 BED, (1) PLOW (4 BOTTOM ROLL OVER), (1) CHISEL POINT, 80", (1) CHISEL PLOW (14 FT.) RED LITTLESTO, (1) RHINO BLADE; HYDRAULIC, (2) CULTIVATOR, 80" BED (FRISSEE & RADICCHIO), (1) CULTIVATOR 80" SIDE KNIVES, HAHN, (1) CULTIVATOR, 1 BED FURROW, (1) 1 BED UNDERCUTTING BAR, (1) 3 BED UNDERSUT BAR, (2) SPRAYERS, DEMCOS (LIQUID), (2) SPRAYERS, (ONE GEARMORE & ONE WHILIE), (2) BOX SCRAPER 10 FT., (1) LITTLESTON, 4 x 40" BEDS, (1) LITTLESTON 80" BED, (1) SULFUR DUSTER, (MODIFIED) 3 BED, (1) SPRAYER (40" BED) FOR TOMATOES, (1) ANGLE BLADES (MANUAL), (2) SMIZER 10 FT., (1) 2 BED CHESIL POINT (15 POINTS), (1) 80" FERTILIZER INJECTOR (FRISSEE), (1) SULFUR DUSTER (GEARMORE), (2) SEED CLEANING EQUIPMENT & TRAILER, (2) STORAGE PLASTIC | $ | 65,000 | $ | 90,000 |

| **FARM TRACTORS** | | | | | | |
|---|---|---|---|---|---|---|
| 31 | 1 | KUBOTA 7500 DT | $ | 3,000 | $ | 4,000 |
| 32 | 1 | JOHN DEERE 7200 | $ | 22,500 | $ | 27,500 |
| 33 | 1 | JOHN DEERE 6410, S/N LO6410X306927 | $ | 30,000 | $ | 35,000 |
| 34 | 2 | JOHN DEERE 5510, S/N LV55105351796, LV5510S351753 | $ | 35,000 | $ | 45,000 |
| 35 | 1 | JOHN DEERE 6400 | $ | 15,000 | $ | 20,000 |
| 36 | 7 | JOHN DEERE 2955, S/N LO2955W763190 (1992); LO2955V763166 (1992); LO2955W763746 (1992), (4) UNKNOWN | $ | 105,000   15.0 | $ | 140,000 |
| 37 | 1 | JOHN DEERE 4955 | $ | 35,000 | $ | 40,000 |
| 38 | 2 | JOHN DEERE 8440 | $ | 25,000 | $ | 30,000 |
| 39 | 1 | 1998 JOHN DEERE 8400, S/N RW8400P020463 | $ | 60,000 | $ | 80,000 |
| 40 | 1 | JOHN DEERE 8410T, RUBBER TRACK | $ | 100,000 | $ | 125,000 |
| 41 | 1* | JOHN DEERE 4050 | $ | 17,500 | $ | 22,500 |
| 42 | 1 | JOHN DEERE 4650 (BEING REBUILT, DISASSEMBLED) | $ | 5,000 | $ | 8,000 |
| 43 | 1 | 2002 JOHN DEERE 6220 | $ | 20,000 | $ | 25,000 |
| 44 | 4 | 2004 MASSEY FERGUSON 4253, S/N H27047, (3) UNKNOWN | $ | 24,000 | $ | 32,000 |
| 45 | 1* | MASSEY FERGUSON 390T | $ | 7,500 | $ | 10,000 |
| 46 | 1 | 1987 CATERPILLER BELTED TRACTOR, MODEL CHALLENGER 65, S/N 7YC0064M RUBBER TRACK BELT | $ | 25,000 | $ | 30,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 47 | 1 | KUBOTA, MODEL B7500, 4WD, S/N 30877 (EST. 1987) | $ | 2,000 | $ | 3,500 |
| 48 | 1 | WABCO MOTOR GRADER, MODEL 440 | $ | 5,000 | $ | 7,000 |
| | | **IRRIGATION BOOSTER PUMPS** | | | | |
| 49 | 1 | CATERPILLER, MODEL 3056E2310175, S/N 35600537 | $ | 12,000 | $ | 14,000 |
| 50 | 1 | CATERPILLER, MODEL 3056E2310175, S/N 35600534 | $ | 12,000 | $ | 14,000 |
| 51 | 1 | CATERPILLER, MODEL 3056E2310175, S/N 35601534 | $ | 12,000 | $ | 14,000 |
| 52 | 1 | CATERPILLER, MODEL 3116, S/N 5EN02421 | $ | 10,000 | $ | 12,000 |
| 53 | 1 | CATERPILLER, S/N 5EN02945 | $ | 10,000 | $ | 12,000 |
| 54 | 1 | CATERPILLER, MODEL 3056E23310175, S/N 35603331 | $ | 10,000 | $ | 12,000 |
| 55 | 1 | CATERPILLER, MODEL 3056E, S/N 35603332 | $ | 10,000 | $ | 12,000 |
| 56 | 1 | CATERPILLER, S/N 35601531 | $ | 10,000 | $ | 12,000 |
| 57 | 1 | CATERPILLER, S/N 5EN01240 | $ | 10,000 | $ | 12,000 |
| 58 | 1 | CATERPILLER, 7MS02092 | $ | 10,000 | $ | 12,000 |
| 59 | 3 | SAME DEUTZ, MODEL 10006AT | $ | 5,000 | $ | 7,500 |
| 60 | 1 | PERKINS, S/N U528554 | $ | 5,000 | $ | 7,500 |
| 61 | 1* | JOHN DEERE, MODEL 6068DF150, S/N T06068D705484 | $ | 5,000 | $ | 7,500 |
| 62 | 1 | DETROIT | $ | 5,000 | $ | 7,500 |
| 63 | 1 | CATERPILLER, MODEL 8N5751 | $ | 5,000 | $ | 7,500 |
| | | **FORK LIFTS** | | | | |
| 64 | 1* | CATERPILLER, MODEL 2EC15, S/N A2EC160800 | $ | 2,000 | $ | 3,000 |
| 65 | 1 | CATERPILLER, MODEL 2EC30, S/N A21C362560, ELECT. 3000# CAP. | $ | 3,000 | $ | 4,000 |
| 66 | 1 | CATERPILLER, MODEL GP25, S/N 5AM03030, 5,000 # CAP. | $ | 3,500 | $ | 5,000 |
| 67 | 1 | V-LIFT, MODEL SF-25L, 5000# CAPACITY, LPG | $ | 4,000 | $ | 6,000 |
| 68 | 1 | CATERPILLER, MODEL M50B, S/N 62B 910, ELECT. 5000# CAPACITY | $ | 4,000 | $ | 6,000 |
| 69 | 1* | CATERPILLER, MODEL M50B, S/N 91Y544 | $ | 4,000 | $ | 6,000 |
| 70 | 1* | CATERPILLER, MODEL 2EC15, S/N A2EC160811 | $ | 3,000 | $ | 4,000 |
| 71 | 1 | CATERPILLER, MODEL M50B, S/N 92B 911, ELECT. 5000# CAPACITY | $ | 3,000 | $ | 4,000 |
| 72 | 1* | CLARK | $ | 2,000 | $ | 3,000 |
| 73 | 1 | NISSAN FORKLIFT, MODEL CYB02L25V, ELECTRIC | $ | 2,000 | $ | 3,000 |
| 74 | 1 | TOYOTA, MODEL 3FGL25, S/N 3FGL25-21306 | $ | 1,500 | $ | 2,000 |
| 75 | 1 | CHAMP, MODEL FV405, S/N CC746426, 4000# CAPACITY, GAS | $ | 5,000 | $ | 7,000 |
| 76 | 1 | CATEPILLER, MODEL 2EC30, S/N A2EC320004, ELECT. 3000# CAPACITY | $ | 3,000 | $ | 4,000 |
| 77 | 1 | HYSTER, 5000# CAP. LPG | $ | 3,000 | $ | 4,000 |
| | | **BOBTAIL REEFER TRUCKS** | | | | |
| 78 | 1* | 1986 ISUZU BOBTAIL REEFER TRUCK | $ | 3,500 | $ | 4,500 |
| 79 | 1* | 1988 HINO BOBTAIL REEFER TRUCK | $ | 3,500 | $ | 4,500 |
| 80 | 1 | 1992 ISUZU BOBTAIL REEFER TRUCK, MODEL FTR W/ 1984 22' BOX, S/N JALM7A1U1N3200829 | $ | 5,000 | $ | 7,000 |
| 81 | 1 | 1994 INTERNATIONAL BOBTAIL REEFER TRUCK, MODEL 4900, W/ 22' BOX, S/N 1HTSDAAP4RH593183 | $ | 6,000 | $ | 8,000 |
| 82 | 1 | 1997 FREIGHTLINER BOBTAIL REEFER TRUCK, MODEL FL70, W/ 24' BOX, S/N 1FV6H6BA20VL540735 | $ | 10,000 | $ | 13,000 |
| 83 | 1* | 1997 GMC BOBTAIL REEFER TRUCK | $ | 10,000 | $ | 13,000 |
| 84 | 1* | 1998 GMC BOBTAIL REEFER TRUCK | $ | 10,000 | $ | 13,000 |
| 85 | 1 | 1999 GMC BOBTAIL REEFER TRUCK, MODEL 6500, W/ 26' BOX, S/N 1GDJ7H1C7XJ504035 | $ | 12,500 | $ | 15,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 86 | 1 | 1999 PETERBILT, S/N 1XP-5DU9X-3-XD495619, 2-AXLE CONV. CAB W/ SLEEPER | $ | 20,000 | $ | 25,000 |
| 87 | 1* | 2000 GMC BOBTAIL REEFER TRUCK | $ | 15,000 | $ | 18,000 |
| 88 | 1 | 2000 INTERNATIONAL BOBTAIL REEFER TRUCK, MODEL 4700, W/ 24' BOX, S/N 1HTSCAAM3YH243647 | $ | 15,000 | $ | 18,000 |
| 89 | 1 | 2003 GMC BOBTAIL REEFER TRUCK, MODEL C7500, S/N 1GM7J1363F50708, 30' BOX | $ | 25,000 | $ | 30,000 |
| 90 | 1 | 2003 GMC BOBTAIL REEFER TRUCK, MODEL C7500, S/N 1GDM7J1393F507214, 30' BOX | $ | 25,000 | $ | 30,000 |
| 91 | 1 | 2004 INTERNATIONAL BOBTAIL REEFER TRUCK, MODEL 4400, DT530, 30' BOX, S/N 1HTMKADN74H612746 | $ | 30,000 | $ | 35,000 |
| 92 | 1 | 1990 GMC BOBTAIL REEFER TRUCK, MODEL 7000, CAB FORWARD, 22' BOX, S/N J8DM7H1UIL3201623 | $ | 6,000 | $ | 8,000 |
| | | **REEFER TRAILERS** | | | | |
| 93 | 1 | 1998 GREAT DANE REFRIGERATED VAN TRAILER, S/N 1GRAA0627WW01360, 2-AXLE, 53' | $ | 14,000 | $ | 16,000 |
| 94 | 1 | 1982 GREAT DANE REFRIGERATED VAN TRAILER, S/N 1GRBBA9025CS082530, 45' | $ | 4,000 | $ | 6,000 |
| | | **PICKUP TRUCK & AUTOS** | | | | |
| 95 | 1* | 1991 FORD F150 PICK-UP | $ | 800 | $ | 1,200 |
| 96 | 1 | 1993 FORD F150 PICK-UP | $ | 1,200 | $ | 1,500 |
| 97 | 3 | 1998 DODGE PICK-UP TRUCKS, RAM 1500, S/N 1B7HC164OWS562782, (2) UNKNOWN | $ | 7,500 | $ | 9,000 |
| 98 | 1* | 1999 FORD F150 PICK-UP | $ | 4,500 | $ | 5,500 |
| 99 | 1* | 2000 FORD F350 PICK-UP | $ | 7,000 | $ | 8,500 |
| 100 | 2* | 2001 FORD F150 PICK-UP | $ | 6,000 | $ | 7,500 |
| 101 | 1* | 2001 FORD F350 PICK-UP | $ | 7,500 | $ | 9,000 |
| 102 | 1* | 2002 CHEVY | $ | 8,000 | $ | 11,000 |
| 103 | 2* | 2004 CHEVY | $ | 20,000 | $ | 26,000 |
| 104 | 1 | 1976 FORD FLATBED TRUCK, MODEL 700 S/N C70EVV70258 (INSTALLING REBUILT ENGINE) | $ | 2,000 | $ | 3,000 |
| 105 | 1* | 1997 TOYOTA CAMRY | $ | 3,000 | $ | 4,000 |
| 106 | 1* | 2000 HONDA ACCORD | $ | 5,000 | $ | 7,500 |
| 107 | 1 | 2005 FORD MECHANICS TRUCK, F-350 S/N 1FDWF35P85E07867, W/UTILITY BODY | $ | 22,000 | $ | 25,000 |
| 108 | LOT | (18,746) SECTIONS OF SPRINKLER PIPE, 30' x 3"; (450) SECTIONS OF SPRINKLER PIPE, 30' x 4"; (169) SECTIONS OF MAIN LINE, 40' x 6", (188) SECTIONS OF MAIN LINE, 40' x 8", (249) SECTIONS OF MAIN LINE, 40' x 10", (661) END PLUGS (3"), (24) END PLUGS (4"), (13) END PLUGS (6"), (4) END PLUGS (8"), (4) END PLUGS (10"), (23) "T"S (3"), (3) "T"S (8"), (16) ELBOWS (3"), (7) ELBOWS (6"), (11) ELBOWS (8"), (1) ELBOW (10"), (1) ELBOW (10") 45 ANGLE, (9) REDUCERS (10" TO 6"), (2) REDUCERS (10" TO 8"), (344) VALVES (3"), (3) VALVES (4"), (1) VALVE (6"), (1) VALVE (8"), (1) VALVE (10"), (9) "F" (3"), (6) "F" (4"), (59) RING LOCKS (6"), (132) RING LOCKS (8"), (26) RING LOCKS (10") | $ | 225,000 | $ | 650,000 |

| 109 | LOT | MISCELLANEOUS IRRIGATION PIPE, (EL CENTRO), C/O: (13500) SECTIONS OF SPRINKLER PIPE, 30' x 3", (245) SECTIONS OF MAIN PIPE, 40' x 10", (24) SECTIONS OF MAIN PIPE, 40' X 8", (52) SECTIONS OF MAIN PIPE, 40' x 6", (341) VALVES (4" x 3"), (4) LINE FILTERS (10"), (2) LINE FILTERS (8"), (4) PIE FOOT (10"), (2) PIE FOOT (8"), (%) TEE'S (10"), (1) TEE'S (8"), (350) END PLUGS (3"), (360) RING LOCKS (10"), (33) RING LOCKS (8"), (64) RING LOCKS (6") | $ | 150,000 | $ | 400,000 |
|---|---|---|---|---|---|---|
| 110 | LOT | MISCELLANEOUS STORAGE CONTAINERS, MOST REFRIGERATED, C/O: (1) GENSTAR, 20 FT., MODEL ACC-1003 MX, S/N GSTU704308, (1) ACE CONTAINER-PHILIPPINES, 20 FT., S/N GB/C946-LR/1989, (1)TEXU286691-3-4, S/N 2866917. (1) CONTAINERS (SHOP) 20 FT., MODEL F1059, S/N 30-46002, (1) CONTAINER (SHOP) 20 FT., MODEL 200133, S/N 810133, CONTAINER (SHOP) 20 FT., MODEL DKC92, S/N 812652, (1) CONTAINER (SHOP) 20 FT., (1) CONTAINER (FIELD), 20 FT., (5) WOOD SHEDS (8' x 8' x 8') | $ | 18,000 | $ | 22,000 |
| | | **TOTAL** | $ | **1,753,200** | $ | **2,829,050** |

**GOURMET VEG-PAQ**
**1600 Citation Way**
**Hollister, CA**

| Item # | Qty. | Effective Date: September 20, 2006 | Orderly Liquidation Value | | Fair Market Value | |
|---|---|---|---|---|---|---|
| | | **PROCESSING** | | | | |
| 1 | 1 | VEGETABLE PROCESSING LINE, STAINLESS STEEL, C/O: | $ | 500,000 | $ | 650,000 |
| | | 2-MIXING CONVEYORS, 24" x 16' | | | | |
| | | 1-INCLINE TRANSFER CONVEYOR, 28" x 24' | | | | |
| | | 1-HMI FINES ELIMINATOR SHAKER, 3 TIER, 36" x 13' | | | | |
| | | 1-PRODUCT SORTING CONVEYOR, 36" x 10' | | | | |
| | | 1-INCLINE TRANSFER CONVEYOR, 27" x 21' | | | | |
| | | 1-WATER FLUME, 32" x 15' | | | | |
| | | 1-DEWATERING BELT CONVEYOR, 32" x 7' | | | | |
| | | 1-WATER FLUME, 16" x 16' | | | | |
| | | 1-DEWATERING BELT CONVEYOR, 32" x 7' | | | | |
| | | 1-WATER FLUME, 24: x 22' | | | | |
| | | 1-DEWATERING SHAKER CONVEYOR, 32" x 7' | | | | |
| | | 1-DEWATERING SHAKER, 30" x 8' | | | | |
| | | 1-WATER TANK, 30" x 44" x 14' | | | | |
| | | 1-WATER TANK, 36" x 52" x 8' | | | | |
| | | 1-WATER TANK, 30" x 24" x 12' | | | | |
| | | 10-CUSTOM MADE SPIN DRYERS, 33 GALLON BASKETS | | | | |
| | | 1-PLASTIC STORAGE TANK, 1,000 GALLON | | | | |
| | | 2-INCLINE CONVEYORS, 24" x 30', W/HOPPERS | | | | |
| | | 2-ISHIDA SCALES, 1-MODEL M-214W-S/70-WP, S/N 84064 (2005) & MODEL CCW-M-214W-S/70WP, S/N 174452, 16 BUCKETS | | | | |
| | | 1-2000 PACMAN VACUUM FORM, FILL & SEAL MACHINE, MODEL 9500, S/N 95008243 | | | | |
| | | 1-GORING KERR METAL DETECTOR, 12" x 24" OPENING | | | | |
| | | 1-RAMSEY METAL DETECTOR, THERMOMETAL SCOUT IIe, 12" x 24" OPENING | | | | |
| | | MISC. TAKE-OFF CONVEYORS, SUPPORT STRUCTURE, ETC. | | | | |
| 2 | LOT | MISC. SUPPORT EQUIPMENT, C/O: SAND WATER FILTER, LADDERS, FLOOR MATS, CARTS, CONVEYORS, ETC. | $ | 12,000 | $ | 15,000 |
| 3 | 1 | CLAMSHELL MACHINE, PROTOTYPE, W/PREFERRED PACKAGING HEAT SEAL TUNNEL, MODEL PP180828-SS, S/N A141217 & CLAMSHELL LABELER | $ | 15,000 | $ | 20,000 |
| 4 | 1 | COMPRESSED AIR SYSTEM, C/O: 1-SULLIVAN PALATEK AIR COMPRESSOR, MODEL 200, 20 HP 1-AMERICAN AIR COMPRESSOR, MODEL 20BR, S/N 00K010, 20 HP | $ | 6,000 | $ | 8,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | 2-ARROW AIR DRYERS | | | |
| ✓ | 5 | 1 | CHILLED WATER SYSTEM, C/O:<br>1-BOHN WATER CHILLER, MODEL BOL-3500-460-3, S/N D94J04130<br>1-LARKIN WATER CHILLER | $ | 8,000 | $ | 12,000 |
| | 6 | 1 | SWECO SHAKER, 40" DIA., 2.5 HP, STAINLESS STEEL | $ | 4,000 | $ | 6,000 |
| | | | TOTAL | $ | 545,000 | $ | 711,000 |

**GOURMET VEG-PAQ**
**240 Commercial Ave.**
**El Centro, CA**

| Item # | Qty. | Effective Date: September 21, 2006 | Orderly Liquidation Value | | Fair Market Value | |
|--------|------|-------------------------------------|:--:|:--:|:--:|:--:|
| 1 | 1 | VEGETABLE PROCESSING LINE, STAINLESS STEEL, C/O: | $ | 30,000 | $ | 40,000 |
| | | 1-INCLINE CONVEYOR, 28" Xx 24' | | | | |
| | | 1-3 TIER FINES ELIMINATOR SHAKER, 36" x 13' | | | | |
| | | 1-PRODUCT SORTING CONVEYOR, 42" x 10' | | | | |
| | | 1-INCLINE PRODUCT TRANSFER CONVEYOR, 27" x 21' | | | | |
| | | 1-WATER FLUME, 32" x 16' | | | | |
| | | 1-DEWATERING SHAKER, 30" x 7' | | | | |
| | | 1-WATER FLUME, 32" x 31' | | | | |
| | | 1-WATER FLUME, 32" x 41' | | | | |
| | | 2-WATER TANK, 30" x 14' | | | | |
| | | 1-WATER TANK, 24" x 10' | | | | |
| 2 | 1 | PLATFORM FOR ISHIDA SCALE, STAINLESS STEEL, 9' x 14', | $ | 17,500 | $ | 22,500 |
| | | 2 LEVELS, INCLUDING: | | | | |
| | | 1-HOPPER & CONVEYOR BELT, 24" x 8' | | | | |
| | | 1-INCLINE CONVEYOR, 24" x 30', PLASTIC CLEATED BELT | | | | |
| | | ALL ABOVE W/STAIRS, RAILING ETC. | | | | |
| | | **TOTAL-EL CENTRO, CA** | **$** | **47,500** | **$** | **62,500** |

**GILROY MACHINING**
455 E. Luchissa Avenue
Gilroy, California

| Item # | Qty. | Effective Date: September 20, 2006 | Orderly Liquidation Value | | Fair Market Value | |
|---|---|---|---|---|---|---|
| 1 | 1 | LAGUN VERTICAL MILL, MODEL FVA-4LA, S/N 473568, 50 TAPER, 15" x 67" TABLE, POWER FEED TABLE & KNEE, 28-1400 RPM | $ | 10,000 | $ | 14,000 |
| 2 | 1 | 1967 SHIZUOKA CHORI VERTICAL MILL, 10" x 48" POWER FEED TABLE, MODEL VHR-G, S/N 1230, BELT DRIVE HEAD, KNEE FEED | $ | 2,000 | $ | 3,000 |
| 3 | 1 | 1978 CINCINNATI VERTICAL MACHINING CENTER, NC, MODEL 5V-1000, S/N 5525A01-78-3, CINTIMATIC, ACRAMATIC 8-D NC CONTROLS | $ | 1,000 | $ | 3,000 |
| 4 | 1 | 1952 TOS KURIM UNIVERSAL MILL, 15" x 76" TABLE, MODEL FA5U, S/N 058189 | $ | 1,000 | $ | 1,500 |
| 5 | 1 | HARDINGE AUTOMATIC CHUCKER, S/N AHC-608, W/ BAR FEEDER | $ | 750 | $ | 1,250 |
| 6 | 1 | SOUTH BEND VERTICAL MILL, EVS CHIPMASTER II, S/N SE39301 | $ | 6,000 | $ | 7,500 |
| 7 | 1 | 1995 TOS TRENCIN ENGINE LATHE, MODEL SN50C, S/N 085020950123, 20"/27" SWING x 72" CENTERS, REMOVABLE GAP | $ | 5,000 | $ | 7,000 |
| 8 | 1 | PONAR WROCLAW ENGINE LATHE, MODEL TUR-63, S/N 41114, 24" x 80" | $ | 4,000 | $ | 6,000 |
| 9 | 1 | BIG JOE ENGINE LATHE, 13" x 32", S/N 2519 | $ | 1,000 | $ | 1,500 |
| 10 | 1 | NORTON CYLINDRICAL GRINDER, MODEL LENNER A26, S/N 6X30CTUNAC 8215362 | $ | 1,500 | $ | 3,000 |
| 11 | 1 | FICEP IRON WORKER, S/N 37-08 | $ | 2,500 | $ | 4,000 |
| 12 | 1 | 1981 DOALL SURFACE GRINDER, 6" x 12", AUTOMATIC, MODEL 100 6x12, S/N 394-81-290 | $ | 1,250 | $ | 1,750 |
| 14 | 1 | LINCOLN WELDING POWER SUPPLY, MODEL POWER MIG 255C | $ | 1,500 | $ | 2,000 |
| 19 | 1 | SHAPECUTTER, SINGLE HEAD ULTRA-GRAPH HR SERIES, 44" X 54" TABLE | $ | 1,500 | $ | 2,000 |
| 20 | 1 | CLARK FORK LIFT | $ | 2,000 | $ | 3,000 |
| 21 | LOT | MISCELLANEOUS PLANT EQUIPMENT, INCLUDING: SPEEDAIRE AIR COMPRESSOR, 2-UNIBRAZE WELDING POWER SUPPLIES, L-TEC PLASMA CUTTER, HYPOTHERM PLASMA CUTTER, 150 TON "H" FRAME PRESS, HORIZONTAL BAND SAW, KEYWAY CUTTER, CRAFTSMAN VERTICAL BAND SAW, GRINDERS, VISES, BENCHES, SHELVING, OFFICE EQUIPMENT, BENCH DRILL PRESSES, SANDERS, ETC. | $ | 6,000 | $ | 8,000 |
| | | **TOTAL-GILROY MACHINING** | $ | 47,000 | $ | 68,500 |

**GOURMET VEG-PAQ (Epicure Select)**
**4395 Davidson Road**
**Gilroy, CA**

| Item # | Qty. | Effective Date: September 20, 2006 | Orderly Liquidation Value | | Fair Market Value | |
|---|---|---|---|---|---|---|
| 1 | 1 | ARTICHOKE PROCESSING LINE, STAINLESS STEEL, C/O:<br>1-ARTICHOKE SAW TABLE, 3' x 4.5' x 3'<br>1-PRE-PREP BELT CONVEYOR, 22" x 21', UPPER LEVEL<br>1-PRE-PREP BELT CONVEYOR, 16" x 12', LOWER LEVEL<br>1-PRODUCT WASH TANK & CONVEYOR, 4' x 16'<br>1-PRODUCT DRYING BELT, 3' x 9'<br>1-WATER TANK, 34" x 28" x 26"<br>1-CULLS CONVEYOR, 10' LONG | $ | 12,000 | $ | 15,000 |
| 2 | 1 | TURRATTI ARTICHOKE TRIM MACHINE, ROTARY, MODEL 1519, S/N 98/63-5, W/HYDRAULIC POWER PACK | $ | 5,000 | $ | 8,000 |
| 3 | 1 | 1995 MULTIVAC VACUUM SEALER, MODEL AG6, S/N 2070 | $ | 3,500 | $ | 5,000 |
| 4 | 1 | ARTICHOKE DEEP FRYING SYSTEM, C/O:<br>1-DOUGH MIXER<br>1-DEEP FRYER | $ | 6,000 | $ | 8,000 |
| 5 | 1 | WATER CHILLER, 15 TON | $ | 7,000 | $ | 10,000 |
| 6 | LOT | MISC. EQUIPMENT, C/O:<br>CARTON TAPER, IMPULSE FOOT OPERATED SEALER,<br>AIR COMPRESSOR, TABLES, CONVEYORS,<br>MAINTENANCE SHOP EQUIPMENT, ETC. | $ | 8,000 | $ | 11,000 |
| | | **TOTAL** | $ | 41,500 | $ | 57,000 |

# Exhibit D
# (Declaration of
# Effie Anastassiou)

**Scott J Allen**

| | |
|---|---|
| **From:** | Stephen O'Neill [soneill@MURRAYLAW.com] |
| **Sent:** | Thursday, March 06, 2008 11:12 AM |
| **To:** | Scott J Allen |
| **Cc:** | Robert A. Franklin; Russ Burbank |
| **Subject:** | RE: Asa Farms vs. Fresh N Healthy |

Thanks for your email. We respectfully decline your request. The appraisal of which you speak is dated as of September 2006 and includes assets which were never owned by my client. As such it is out of date and irrelevant. In addition, many pieces of equipment that are included in the appraisal and which were purchased by my client have been returned to lessors and/or dismantled. Further, due to the change in the market and wear and tear, the equipments' value has deteriorated substantially. As set forth in our papers, the equipment has been extensively marketed and two experienced auction houses have opined on the value of this equipment. Comerica has consented to the sale of its collateral, securing its $4 million debt. No purpose is served by producing this document. The sale price is well in excess of the alleged PACA claims of both growers who have asserted such claims. Similarly, the bill of sale is irrelevant to the issue of the value of the equipment in its present state.

---

**From:** Scott J Allen [mailto:scottesq@salinasaglaw.com]
**Sent:** Thursday, March 06, 2008 10:26 AM
**To:** Scott J Allen; Stephen O'Neill
**Cc:** Effie Anastassiou Esq.
**Subject:** RE: Asa Farms vs. Fresh N Healthy

Steve:

I am following up on the below e-mail I sent you on Feb. 27, which confirmed our earlier telephone conversation in which you agreed to ask your client for permission to share the August 2007 appraisal of the FNH equipment. Please let me know as soon as possible whether your client will agree to share the appraisal with my clients.

In my e-mail, I also asked to get copies of the bills of sale for the equipment from March of 2007 and the purchase agreement for the sale that closed in March of 07. Please let me know as soon possible whether FNH will agree to provide that documentation.

Thank you for your cooperation.

Scott Allen

---

**From:** Scott J Allen
**Sent:** Wednesday, February 27, 2008 6:01 PM
**To:** Stephen O'Neill
**Cc:** Scott J Allen; Effie Anastassiou Esq.
**Subject:** RE: Asa Farms vs. Fresh N Healthy

Steve:

During our telephone conversation earlier today you indicated that there had been an appraisal of the equipment of FNH in about August of 2007. I asked that you provide me with a copy of the appraisal and you told me that you would ask your client if you were authorized to share the appraisal with me. By this e-mail, I once again ask that you provide me with a copy of the appraisal. Please let me know as soon as possible whether your client will allow you to release the appraisal to me.

In addition to the August 2007 appraisal, I would like to get a copy of

1. the purchase agreement(s), through which FNH acquired title to the assets. It is my understanding (open to correction), that the purchase closed in about March of 2007; and

2. Bills of Sale for FNH's purchase of the equipment in March of 2007.

Please let me know if you will voluntarily provide me with this information.

---

**From:** Stephen O'Neill [mailto:soneill@MURRAYLAW.com]
**Sent:** Wednesday, February 27, 2008 2:34 PM
**To:** Scott J Allen
**Subject:** FW: Asa Farms vs. Fresh N Healthy

Scott
Follow up on our conversation, here is an email string we had regarding the "value" of the equipment, if you need further info, please call

---

**From:** Russ Burbank [mailto:rburbank@bpmllp.com]
**Sent:** Thursday, February 21, 2008 3:27 PM
**To:** Izmirian, Robert; drferree@comerica.com; Stephen O'Neill
**Subject:** RE: Asa Farms vs. Fresh N Healthy

Bob,

I believe Ken Gorman talked to Lloyd Ashman who confirmed that $60K is a "fair value" for the equipment and truck at Gilroy Machine. Ashman is one of the most active machine tool appraisers and auctioneers in the US.

We solicited two proposals to auction the FNH equipment – one from Ashman and one from Martella (both are attached). Martella's proposal was conditioned on the equipment being available for their Feb 15 auction in Tipton, which has now come and gone, and FNH would assume all auction risks. Martella was also quite concerned about meeting the Feb 15 date, because farm equipment begins to lose value as we get further into the growing season.

Ashman's quote is for a fixed price (i.e., Ashman assumes all the risks of the auction) and is for an on-site auction in Gilroy. I asked Martella to quote a fixed-price auction in Gilroy. They declined to meet a price range that I suggested would make them competitive with Ashman.

I should point out that these negotiations were taking place as Martinez and other lessors were self-helping themselves to equipment that we initially thought belonged to FNH. Ashman's final quotation, which is attached hereto, was finalized only after we were able to provide Ashman some assurance that the equipment he was buying actually belonged to FNH.

After much discussion, the company and Comerica agreed that Ashman was the best offer.

Russ


Russ Burbank
BPM Consulting Group
Direct: 415-677-4530
Cell:    415-381-9229

---

**From:** Izmirian, Robert [mailto:RIZMIRIAN@Buchalter.com]
**Sent:** Thursday, February 21, 2008 2:50 PM
**To:** Ken Gorman

**Cc:** Russ Burbank; David Ferree
**Subject:** RE: Asa Farms vs. Fresh N Healthy

Ken, I am told that Steve O'Neill is out of town. I've copied Russ Burbank, who is the consultant to FNH who has the most first hand knowledge of the deals to sell assets.

I'm not sure what we can show you to convince you that these liquidation values are the best we can reasonably get. The assets are being depleted as we speak. There is no security, rental charges are accruing, and pipe out in the fields is subject to "disappearing" because it isn't clearly identified and is easy to swipe. The Bank, as secured creditor, has zero interest in selling for less than the maximum value it can obtain. The company and the Bank strongly believe the sales should be consummated before more value is lost. If you stand in the way there is likely no way to sell in the near term and everyone loses.

---

**From:** Ken Gorman [mailto:Ken@lomgil.com]
**Sent:** Thursday, February 21, 2008 2:45 PM
**To:** Izmirian, Robert
**Subject:** RE: Asa Farms vs. Fresh N Healthy

I also care about getting FMV and the representations about the price because those were the inducements to the agreement. I appreciate that the prices are "holding" but that is no guarantee that FMV will be received. We do not approve of an open-ended deal that could result in a sale at far less than FMV, which these documents seem to allow. Am I misunderstanding this?

This is the first we have heard about the deal with Martinez. I will advise my client.

---

**From:** Izmirian, Robert [mailto:RIZMIRIAN@Buchalter.com]
**Sent:** Thursday, February 21, 2008 2:39 PM
**To:** Ken Gorman
**Cc:** David Ferree
**Subject:** RE: Asa Farms vs. Fresh N Healthy

The reason I didn't include the specific contract amounts is that things constantly change as we learn that an asset may not be owned by FNH, but, for instance, by a leasing co. All I think you should care about is that the proceeds are impounded. Right now the prices of $60k and $525k seem to be holding. The IP pertaining to labels, trademarks and tradenames is being "swapped" for $1 to Martinez to get him to cooperate to allow the sales--he controls the premises and a lot of the leased equipment.

---

**From:** Ken Gorman [mailto:Ken@lomgil.com]
**Sent:** Thursday, February 21, 2008 12:46 PM
**To:** Izmirian, Robert
**Subject:** RE: Asa Farms vs. Fresh N Healthy

Bob: My concern is that the documents do not reflect the contracts of prices that have been referenced in the previous documents which are the bases for our consent: $60,000 for the Gilroy Machinery and $525,000 as in the Ashman contract.

---

**From:** Izmirian, Robert [mailto:RIZMIRIAN@Buchalter.com]
**Sent:** Thursday, February 21, 2008 12:17 PM
**To:** Ken Gorman
**Cc:** Robert A. Franklin; Stephen O'Neill; David Ferree
**Subject:** RE: Asa Farms vs. Fresh N Healthy

Thanks Ken. Here is the Stip and proposed Order I drafted, which has been approved by FNH's counsel. If it's OK with you we'll get it circulated and executed.

3

**From:** Ken Gorman [mailto:Ken@lomgil.com]
**Sent:** Thursday, February 21, 2008 12:03 PM
**To:** Izmirian, Robert
**Subject:** Asa Farms vs. Fresh N Healthy

Dear Mr. Izmarian:

Thank you for the documentation via e-mail.
Based thereon, and on your assurances that the bank will hold all proceeds from the sale of the equipment until such time as the PACA claims have been resolved, we will stipulate to the sales specified.

Thank you,


Ken Gorman
Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php?option=com_content&task=view&id=151&Itemid=129.

**IRS Circular 230 Disclosure: In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.**

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php?option=com_content&task=view&id=151&Itemid=129.

**IRS Circular 230 Disclosure: In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.**

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/bt/index.php?option=com_content&task=view&id=151&Itemid=129.

**IRS Circular 230 Disclosure: In order to comply with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.**

4

**New Tax Laws**

There have been many recent tax law changes.  For more information about these new tax laws, please visit our website at www.bpmllp.com

IRS CIRCULAR 230 NOTICE: Please be advised that, based on current IRS rules and standards, the advice above was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer. If this message is provided in any manner to another taxpayer, he or she cannot use the advice and should seek advice based on his or her own particular circumstances from an independent tax advisor.

CONFIDENTIALITY NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# Exhibit E
# (Declaration of
# Effie Anastassiou)

**Appraisal Summary**

| Company | Location | Orderly Liquidation Value | Fair Market Value |
|---------|----------|---------------------------|-------------------|
| Gourmet Veg-Paq | Hollister, Gilroy & El Centro, CA | $ 1,753,200.00 | $ 2,829,050.00 |
| Gourmet Veg-Paq | 1600 Citation Way, Hollister, CA | $ 545,000.00 | $ 711,000.00 |
| Gourmet Veg-Paq | 240 Commercial Ave., El Centro, CA | $ 47,500.00 | $ 62,500.00 |
| Gilroy Machining | 455 E. Luchisa Ave., Gilroy, CA | $ 47,000.00 | $ 68,500.00 |
| Gourmet Veg-Paq (Epicure Select) | 43950 Davidson Rd., Gilroy, CA | $ 41,500.00 | $ 57,000.00 |
| | | $ 2,434,200.00 | $ 3,728,050.00 |